UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

OPTUM, INC. and
OPTUM SERVICES, INC.,

*Plaintiffs*,

v.

DAVID WILLIAM SMITH,

*Defendant*.

Civil Action No.: 19-cv-10101

## COMPLAINT

Plaintiffs Optum, Inc. and Optum Services, Inc. (together, "Optum"), by and through their undersigned counsel, hereby bring the following Complaint against Defendant David William Smith ("Smith") for breach of contract and misappropriation of trade secrets under state and federal law.

## NATURE OF THE CASE

1.      Smith was a senior executive at Optum who, during his employment, was repeatedly and extensively exposed to Optum's trade secrets and played an integral role developing Optum's critical strategies for its Corporate Strategy and Product business units.

2.      Smith now intends to work for Optum's competitor, TCORP62018 LLC ("ABC"), as Director of Product Strategy and Research, in violation of his restrictive covenants with Optum.

3.      Optum commences this action to enforce its contractual rights and to protect its confidential, competitive information.  Among other things, Smith will be unable to perform his anticipated role at ABC without using and/or disclosing Optum's information.

4.      In the days and weeks leading up to his resignation, during which time Smith was

in negotiations to join ABC, Smith engaged in the following conduct:

- On the same day that he talked with ABC, and just one minute before printing his résumé, Smith printed an Optum document marked "Confidential" that contains, among other things, Optum's highly confidential information including an in-depth market analysis of the healthcare industry, and Optum's potential opportunities in and solutions for the changing healthcare market;

- He approached several Optum employees seeking Optum's confidential information that was unrelated to his own job duties at Optum and for which he had no legitimate business need;

- On the same day as receiving a verbal offer from ABC, he attended an all-day, cross-team strategy meeting at which he gained access to Optum's highly-confidential competitive information; and

- After receiving a written offer from ABC, and just one day before he informed Optum that he planned to resign, he printed an Optum document marked "Confidential" that contains, among other things, Optum's highly confidential information concerning its product portfolio performance, new product development, and product job family and assessment plan.

5.     Moreover, to date, Smith and ABC have been unable or unwilling to provide any substantive insight as to what Smith will be doing in his new role for ABC.  In the absence of any such clarity, Optum can only conclude that Smith's role as "Director of Product Strategy and Research" at ABC will be broad and substantially similar to his former role at Optum and, importantly, implicate Optum's trade secrets.

PARTIES

6.     Optum, Inc. is a Delaware corporation with a principal place of business at 11000 Optum Circle, Eden Prairie, Minnesota.

7.     Optum Services, Inc., is a Delaware corporation with a principal place of business at 11000 Optum Circle, Eden Prairie, Minnesota.

8.     David William Smith is a natural person who, upon information and belief, is a citizen of Newton, Massachusetts.

## JURISDICTION AND VENUE

9.      Subject matter jurisdiction exists pursuant to 28 U.S.C. § 1331 because this civil action arises in part under the Federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. 1836, *et seq.*

10.      Subject matter jurisdiction also exists pursuant to 28 U.S.C § 1332 because there is complete diversity of citizenship between Plaintiffs, on the one hand, and Defendant, on the other hand, and the amount in controversy exceeds $75,000, exclusive of interest.

11.      Venue is proper pursuant to 28 U.S.C § 1391 because, upon information and belief, Smith is a resident of Massachusetts.

## FACTUAL BACKGROUND

### OPTUM AND THE HIGHLY COMPETITIVE
### BUSINESS OF HEALTH SERVICES

12.      Optum, a fast-growing subsidiary of UnitedHealth Group Incorporated ("UHG"), is a leading information and technology-enabled health services business dedicated to modernizing the healthcare system and improving the lives of people and their communities.

13.      With over 160,000 employees worldwide, Optum services virtually every dimension of the health system across the United States and globally.  Through its three primary business units – OptumRx, OptumInsight, and OptumHealth – Optum leverages its core competencies in data analytics, pharmacy care services, population health management, healthcare delivery, healthcare operations, and advisory services to work with a diverse set of clients that include payers, healthcare providers, employers, governments, life sciences companies, and consumers.

14.      To date, Optum has served over 124 million individuals, 200 health plans, 67,000 pharmacies, and 100,000 physicians, practices, and healthcare facilities, as well as companies, including JPMorgan Chase & Co. ("JPMorgan") and certain subsidiaries of Berkshire Hathaway.

15.     Optum has recently received recognition for its innovative solutions by two global research and consulting firms.

16.     Most recently, Frost & Sullivan awarded Optum its 2018 North America Company of the Year Award for Optum's strong focus on next-generation population health management ("PHM") solutions.  Specifically, Optum earned recognition in the PHM market with its integrated analytics and care coordination platforms, its expert advisory services, and clinical services that augment client capabilities.

17.     Optum was also named as a leader in three categories measured by Everest Group's 2017 PEAK Matrix™ Assessment:  Healthcare Provider Information Technology Services; Healthcare Payer Information Technology Services; and Healthcare Consulting.

18.     In January 2018, Amazon, JPMorgan, and Berkshire Hathaway announced that they "are partnering on ways to address healthcare for their U.S. employees, with the aim of improving employee satisfaction and reducing costs."  The press release ("ABC Press Release"), titled "Amazon, Berkshire Hathaway and JPMorgan to partner on U.S. employee healthcare," was released through Business Wire and is available at https://www.businesswire.com/news/home/20180130005676/en/Amazon-Berkshire-Hathaway-JPMorgan-Chase-partner-U.S.

19.     Their new venture – which is currently registered as "TCORP62018 LLC" and alternatively nicknamed "ABJ" and "ABC" after the three founding companies (it is referred to herein as "ABC") – is reportedly working on comprehensive healthcare solutions for each of its founding companies.

20.     According to one Bloomberg article, ABC will ultimately "make those innovations available freely to other companies, meaning that if it's successful, its effects could be felt more broadly among the more than 150 million people in the U.S. who get their health

insurance through work."  The Bloomberg article, titled "Amazon-Berkshire-JPMorgan Health Venture Takes Aim at Middlemen," is available at https://www.bloomberg.com/news/articles/2018-06-24/amazon-berkshire-jpmorgan-health-venture-takes-aim-at-middlemen.

21.     While the full scope of ABC's ultimate activities is still unknown, the expectation is that the venture aims to disrupt the healthcare industry as it exists today.

22.     Against this quickly evolving and highly competitive backdrop, Optum's continued success depends largely on preserving its intellectual property, including its trade secrets, maintaining the goodwill of its customers and business partnerships, and retaining and relying on its top-level talent.

Optum's Confidential Information

23.     Among other things, Optum's success is directly tied to its trade secrets and other proprietary, confidential information.  Optum's trade secrets are among Optum's most important assets.

24.     Optum has a broad portfolio of trade secrets across its multiple businesses and business units.  Optum's trade secrets include, without limitation, information concerning its:

- overall corporate roadmap;

- corporate strategies and business plans;

- merger and acquisition targets;

- overall product roadmap;

- product strategies and business plans;

- current product portfolio performance (including, for each product and product line, up-to-date sales momentum data, profit and loss information, return on invested capital, projected financial growth, market opportunity, and net promoter performance);

- analyses concerning product performance and opportunities (including where to prioritize investments of human capital and financial resources, as well as where to limit or avoid investments);

- data and advanced analytics (including its initiatives concerning artificial intelligence and broad data science capabilities);

- customer lists and information;

- supplier and vendor lists;

- business relationships with, *e.g.*, pharmaceutical manufacturers and the details concerning those relationships (including detailed information concerning the rebates Optum receives from certain pharmaceutical manufacturers for certain drugs);

- other strategic partnerships; and

- other competitively-sensitive information that is not generally available to the public.

25.     Optum's trade secrets are mission-critical, competitively sensitive, confidential information that Optum has developed and implemented through a significant investment of time, labor, and capital.  They provide Optum with a strong competitive advantage at almost every level of the market, including among payers, providers, and patients.  Optum therefore derives significant economic value and advantage from maintaining the secrecy of its trade secrets.

26.     If a competitor were to obtain Optum's trade secrets, it could, among other things: use Optum's corporate and product roadmaps, strategies, and business plans to position and inform its own competitive strategies; anticipate and divert or plan around Optum's acquisition targets; draw upon Optum's product performance analyses to determine what products and product lines to pursue, and which dead ends to avoid; more quickly develop its own competitive products and services, and offer them at lower costs; approach and divert Optum's customers and business partners; and negotiate competitive trade agreements with pharmaceutical

manufacturers by leveraging in negotiations the rebates Optum receives on certain drugs.  Any of these would harm Optum by undercutting its position in the market.

27.     Accordingly, to preserve its competitive edge, Optum takes proactive measures to maintain the strict confidentiality of its trade secrets.  Among other things, Optum password protects its computers and other systems using confidential, employee-specific identification numbers ("MSIDs") and passwords; requires its employees to change their MSID passwords every 90 days; uses firewalls and anti-malware on its computers and servers; provides access to its sensitive information only to those employees with a need to know the information; requires keycard access to its office buildings; requires its key employees to sign agreements containing nondisclosure obligations and other restrictive covenants; requires its employees to acknowledge its Code of Conduct and Employee Handbook, which contain policies regarding the maintenance of confidentiality of Optum's trade secrets and other confidential information, as well as the proper use of its confidential information and IT systems; requires third-party partners and potential partners to sign nondisclosure agreements; requires that employees undergo periodic training on information security; marks certain confidential information as "Confidential"; periodically reminds employees of their nondisclosure obligations with regard to specific confidential information; assigns code names to highly confidential projects; and retains outside data protection consultant companies.

### DEFENDANT SMITH'S EMPLOYMENT WITH OPTUM

28.     Defendant David William Smith joined Optum in July 2016 as Vice President, Corporate Strategy.  Although his official title later changed to Vice President, Product, he spent most of his employment performing work for both the Corporate Strategy and Product units.

29.     With respect to his work for the Corporate Strategy unit, Smith reported directly to Head of Corporate Strategy and Business Acceleration, Steven Wolin ("Wolin").  With

respect to his work for the Product unit, Smith reported to Senior Vice President, Head of Corporate Product, Nick Seddon ("Seddon").

30.     In his roles at Optum, Smith was repeatedly and extensively exposed to Optum's trade secrets and other confidential information, described above, and played an integral role in developing strategies for Optum to compete in the marketplace.

31.     On the Corporate Strategy side, Smith worked extensively on Optum's strategy initiatives.  Just before his resignation, Smith reviewed the output of a four-month project to redefine Optum's overall corporate strategy for the next three to five years.  Through the entirety of his work for the Corporate Strategy business unit, and given his access to the results of Optum's recent strategy project, Smith became keenly aware of Optum's corporate roadmap, corporate strategies, business plans, and acquisition targets.

32.     On the Product side, Smith was instrumental in helping to determine which specific products and product lines Optum should prioritize and, conversely, which did not merit a commensurate investment of talent or capital.

33.     In the 18 months leading up to his resignation, Smith played a key role in performing a comprehensive review of Optum's product portfolio, helping to amass and synthesize information concerning the performance (and projected performance) of each of Optum's products and product lines, analyze market opportunities, and direct Optum's strategies for developing a stronger product portfolio in the coming years.  As a result, Smith developed a deep understanding of Optum's product roadmap and proprietary business plans.  Indeed, at the time of his resignation, Smith was one of fewer than 50 people at the company who had access to Optum's consolidated set of profit and loss statements at a product-line level for the entire company.

34.     Throughout his employment, Smith frequently attended meetings at which Optum's highly confidential information was discussed.

35.     On December 6, 2018 – on the same day that Smith received a verbal offer from ABC and just one week before he resigned from Optum – Smith attended a highly confidential, all-day, cross-team strategy meeting (the "Offsite Meeting"), the content of which he helped to develop.  Among other things, the meeting included several deep-dive discussions concerning Optum's product portfolios, product development plans, capital planning initiatives, enterprise strategies, and a number of other specific initiatives.  By helping to plan and, later, attending the meeting, Smith was privy to some of Optum's most confidential business information.

<u>SMITH'S RESTRICTIVE COVENANTS WITH OPTUM</u>

36.     In recognition of Smith's position and his access to Optum's trade secrets and other confidential information, and in exchange for equity in shares of UHG, Smith agreed to several nondisclosure, noncompete, and nonsolicitation restrictive covenants.  These are reflected in several agreements ("the Agreements"), specifically, a 2017 Nonqualified Stock Option Award (the "2017 NQ Award Agreement"), a 2017 Restricted Stock Unit Award (the "2017 RSU Award Agreement"), a 2018 Nonqualified Stock Option Award (the "2018 NQ Award Agreement" and, together with the 2017 NQ Award Agreement, the "NQ Awards"), and a 2018 Restricted Stock Unit Award (the "2018 RSU Award Agreement" and, together with the 2017 RSU Award Agreement, the "RSU Awards").  The Agreements are attached, respectively, as <u>Exhibits 1-4</u>.

37.     For the purposes of the restrictive covenants contained in the Agreements, the Agreements define "Company" as UHG and all of its subsidiaries and/or affiliates, including Optum.  *See* NQ Awards, ¶ 4; RSU Awards, ¶ 8.

38.     In the Agreements, Smith agreed to not disclose Optum's Confidential Information, or to use it for any purpose other than to perform his work for Optum.  *See* NQ Awards, ¶ 4(a); RSU Awards, ¶ 8(a).

39.     Smith also agreed that, during his employment and for at least one year following the termination of his employment, he would not:

> (i)     Engage in or participate in any activity that competes, directly or indirectly, with any [Optum] activity, product or service that [Smith] engaged in, participated in, or had Confidential Information about during [Smith's] last 36 months of employment with [Optum]; or
>
> (ii)    Assist anyone in any of the activities listed above.

*See* NQ Awards, ¶ 4(c); RSU Awards, ¶ 8(c).

40.     Smith also agreed that, during his employment and for at least two years following the termination of his employment, he would not "[r]aid, hire, employ, recruit or solicit" any Optum employee possessing its confidential information, or "[i]nduce or influence" any such employee "to terminate his, her or its employment or other relationship with the Company," or assist anyone to do the same.  NQ Awards, ¶ 4(b); RSU Awards, ¶ 8(b).

41.     These restrictive covenants apply "on a nationwide basis anywhere in the United States" because Optum's "business competes on a nationwide basis."  *See* NQ Awards, ¶ 4(d); RSU Awards, ¶ 8(d).

42.     Smith agreed that the restrictive covenants in his Agreements are reasonable and necessary to protect Optum's legitimate business interests.  *See* NQ Awards, ¶ 4; RSU Awards, ¶ 8.

43.     In the Agreements, Smith further agreed that, if he violated any of the restrictive covenants in his Agreements, he would be required to (1) "repay or otherwise reimburse the Company . . . an amount having a value equal to the aggregate Fair Market Value of the shares of

Common Stock underlying such Restricted Stock Unit Awards on the date the Restricted Stock Units became vested"; and (2) "repay or otherwise reimburse the Company, upon demand, an amount in cash or Common Stock having a value equal to . . . the aggregate proceeds received from such sale of the net Option Shares acquired after payment of the Exercise Price and any applicable taxes." *See* NQ Awards, ¶ 3(a); RSU Awards, ¶ 7(a).

44.     In addition to the 1,580 option shares and 289 restricted stock units that Optum gave Smith in exchange for his nondisclosure, noncompete, and nonsolicitation restrictions, Optum employed Smith and provided him with substantial benefits.  Specifically, Optum provided Smith a substantial base salary (starting at $200,000 annualized), a $25,000 sign-on bonus, and other benefits.  Relying on the strength of its covenants, Optum also provided Smith with access to its trade secrets during his employment.

45.     In addition to the Agreement, Smith acknowledged his obligations under Optum's Code of Conduct and Employee Handbook, including his obligation not to use or disclose Optum's sensitive, confidential, proprietary, or trade secret information.  *See* The Code of Conduct and Employee Handbook Acknowledgment Form, attached as <u>Exhibit 5</u>, pp. 2-3.

SMITH'S DECISION TO JOIN ABC AND RESIGNATION FROM OPTUM

46.     Smith applied for a position at ABC on September 28, 2018.

47.     Smith spoke or interviewed with ABC officials starting on October 18, 2018 and continuing through mid-December 2018.

48.     ABC made a verbal offer of employment to Smith on December 6, 2018.

49.     ABC made a formal written offer to Smith on December 7, 2018.

50.     Smith signed the written offer on December 11, 2018.

51.     On or about December 11, 2018, Smith told Seddon that he was planning to resign from Optum.

52.     On the morning of December 13, 2018, Smith told Wolin that he would be resigning from Optum to join ABC.

53.     In his conversation with Wolin, Smith described his anticipated role as building and leading a "research team" for ABC.  Smith did not provide any further detail about what he would be doing there.

54.     At the time, Wolin told Smith that he was uncomfortable with Smith's plans to join ABC – a competitor of Optum that is expected to be a disrupter in the healthcare industry – and that Smith would have an issue with his noncompete and equity grants under the Agreements.  Smith responded that he had spoken with a lawyer and did not think that his noncompete would be an issue.

55.     Although Smith offered to stay at Optum until his start date at ABC, the risks that he posed in light of his employment plans were too great to permit him to continue to maintain access to Optum's information.

56.     On the afternoon of December 13, 2018, Optum placed Smith on administrative leave and terminated his access to Optum's systems.

### SMITH'S PRE-DEPARTURE MISCONDUCT

57.     Since Smith's resignation, Optum has attempted to assess the risk posed by Smith in his planned work for ABC.  In addition to the grave concerns that Optum has based simply on the depth of Smith's knowledge of Optum's business, products, and strategic plans, Optum's concerns regarding Smith's employment plans are exacerbated by his pre-resignation conduct.

58.     As described below, during the time that Smith was engaging in discussions with ABC about his employment there, Smith continued to acquire – and even affirmatively seek out – Optum's most confidential, competitively-sensitive, strategic information.

*With Undisclosed Plans to Leave for ABC, Smith*
*Attended a Confidential, High-Level Company Meeting*

59.     On December 6, 2018 – on the same day that he received his verbal offer from ABC – Smith attended the Offsite Meeting.  Based on the timeline of his employment discussions with ABC, it is apparent that Smith was planning to work at ABC by the time he chose to attend the Offsite Meeting.

60.     Given Smith's apparent plans to join ABC, Smith should, under no circumstances, have attended the Offsite Meeting where he knew he would receive some of Optum's most sensitive competitive information.  Not only would this information provide a tremendous unfair competitive advantage to ABC, it is information of a type and nature that he could not perform his proposed duties (*i.e.*, the typical duties of someone in the position of Director of Product Strategy and Research) for ABC without drawing upon it.

*With Undisclosed Plans to Leave for ABC, Smith*
*Asked Junior Colleagues for Top Secret, Competitive Information*

61.     In addition, during the timeframe when Smith was apparently planning to join ABC, Smith actively sought to obtain Optum's trade secrets – for which he had no business need even if he had planned to stay at Optum – from his colleagues.

62.     On or around December 4, 2018, one of Smith's colleagues informed Wolin that Smith had requested certain confidential company information from several junior members on Wolin's team.

63.     The confidential information Smith requested had nothing to do with Smith's role or responsibilities at Optum.  Smith therefore did not have any legitimate business reason for requesting the information.

64.     Smith requested the information from the team's most junior employees.  Optum believes that Smith approached the team's most junior employees for the information because

they might feel more compelled (as a matter of deference to seniority) to provide the requested information to him.

65.     Both of Smith's supervisors, Wolin and Seddon, therefore felt that Smith's conduct in this regard was inappropriate.  They discussed and planned to raise the issue with Smith.  Wolin and Seddon never had the chance to raise the issue, however, because Smith announced his resignation just a few days later.

*Smith Accessed Optum Trade Secrets Prior to Resigning*

66.     Optum has recently uncovered forensic evidence that Smith accessed its trade secrets and other confidential information in the days and weeks leading up to his resignation (during which time it appears that he was already planning to join ABC).

67.     For example, on October 29, 2018, at approximately 9:51 a.m. (Central Time), Smith printed a document with the file name "20180912 Project Orange Factbook vFINAL.pdf" (hereinafter, the "Factbook").  The Factbook, which is a 65-page PDF, is titled "Market Segment Trends Factbook" and dated September 12, 2018.

68.     The Factbook, which is marked "Confidential," contains Optum's highly-confidential, competitive information, including Optum's in-depth analysis of healthcare trends among consumers, employers, payers, government entities, providers, and Pharmacy Benefit Managers ("PBMs") and other life sciences entities.  The Factbook also identifies Optum's potential opportunities in, and solutions for, the changing healthcare market.  A redacted copy of the Factbook is attached as <u>Exhibit 6</u>.  (All pages that have been redacted in their entirety are omitted from Exhibit 6.)

69.     Smith had no reason to print this document for his work responsibilities at Optum.

70.     Just one minute after printing the Factbook, Smith printed his résumé.  Smith interviewed or communicated with ABC on the same day.

71.     On information and belief, Smith printed the Factbook for the purpose of obtaining Optum's confidential information for use in his interview with ABC as part of his efforts to secure a position there.

72.     On December 10, 2018 – one day before he informed Optum that he planned to resign – Smith printed out a document with the file name "OES Socialization Deck for OET_v20181126FINAL.pptx" (hereinafter, the "OES Deck").

73.     The OES Deck, which is marked "Confidential," bears the title "Optum Enterprise Strategy" and is dated Fall 2018.  It contains highly confidential and up-to-date information concerning Optum's product portfolio performance, new product development, and product job family and assessment plan.  The document is forward-looking and would cause Optum irreparable harm if it fell into the hands of a competitor.  Redacted copies of the OES Deck, in presentation and notes view, are attached as Exhibit 7 (separated by tabs).

74.     At the time that he printed the OES Deck, Smith had no reason to print this document for his work responsibilities at Optum.

UHG SENDS LETTERS TO SMITH AND ABC RAISING ITS CONCERNS;
ABC AND SMITH POSIT THAT ABC DOES NOT COMPETE WITH OPTUM

75.     In order to enforce Optum's contractual rights and protect Optum's confidential information, on December 21, 2018, UHG sent letters to Smith and ABC outlining its concerns regarding Smith's employment plans and his pre-departure conduct.  Copies of the letters are attached as Exhibits 8 and 9.

76.     The Chief Legal Officer of UHG spoke with ABC's General Counsel on December 27, 2018.  During the conversation, ABC stated that it would push out Smith's January 2 start date while UHG and ABC continued discussions.

77.     During the call, ABC also informed UHG that Smith's title at ABC will be "Director of Strategy & Research," a title that suggests that Smith's role is far broader than the description he provided when he resigned from Optum and disclosed his plans to work at ABC.

78.     Also during the call, ABC and UHG agreed to speak again on January 2 to accommodate holiday schedules.  In the interim, ABC agreed not to start Smith and UHG agreed not to file a lawsuit.

79.     The next day, on December 28, 2018, ABC's General Counsel sent UHG a letter, a copy of which is attached as Exhibit 10.  In the letter, among other things, ABC took the position that "there is no product or service competition between UnitedHealth and [ABC], nor does [ABC] anticipate that there will be any such initiatives or activities that would violate Mr. Smith's non-compete covenant."

80.     Also on December 28, 2018, counsel for Smith sent a response letter to UHG. The letter is attached as Exhibit 11.  Similar to ABC, Smith took the position that ABC and Optum are not competitors because ABC "has no products" and "does not compete for business with Optum."

81.     In his letter, Smith also represented that he had not been given a job description, but "expects that his initial tasks will be in-depth research focused on the delivery and costs of health care for the over one million individuals covered by the health plans of Amazon, Berkshire Hathaway and JPMorgan Chase."

82.     On January 2, 2019, UHG's Chief Legal Officer again spoke with ABC's General Counsel.  During the conversation, ABC represented that it did not have a job description for Smith and, moreover, did not even know what the full scope of his responsibilities at ABC would be.

83.     On January 3, 2019, UHG sent ABC a letter reiterating its continuing concerns about Smith's anticipated employment with ABC.  In the letter, UHG requested, among other things, a commitment by ABC to provide sufficient information necessary for UHG to fully assess the risks posed to Optum's trade secrets.  The letter is attached as Exhibit 12.

84.     In lieu of responding to UHG's January 3 letter, on or around January 4, 2019, ABC hired another Optum employee, Caitlin Fleming ("Fleming"), who served as Director, Product at Optum.  During her Optum employment, Fleming reported to Smith.  Like Smith, Fleming had routine access to some of Optum's most confidential information including its trade secrets.  Based on this recent event, Optum believes that Smith helped to solicit Fleming on behalf of ABC, in violation of his employee nonsolicitation restriction.  Indeed, on December 7, the same day that Smith received his formal written offer from ABC, he scheduled a meeting with Fleming in a location "TBD."

85.     To date, despite UHG's multiple requests, ABC and Smith have refused to shed any further light on Smith's anticipated role or responsibilities or, for that matter, ABC's current or planned business activities for the next year.

ABC IS A COMPETITOR OF OPTUM;
SMITH'S EMPLOYMENT WITH ABC THREATENS OPTUM'S TRADE SECRETS

86.     Contrary to ABC's and Smith's representations, ABC's public statements demonstrate that ABC provides or intends to provide health care services, which compete with Optum's services, to the same client base.

87.     Although vague, Amazon, JPMorgan, and Berkshire Hathaway, have made the following statements regarding their plans for ABC:

- "The initial focus of the new company will be on technology solutions that will provide U.S. employees and their families with simplified, high-quality and transparent healthcare at a reasonable cost." *See* ABC Press Release.

17

- "[ABC's] goal is to create solutions that benefit [its three partners'] U.S. employees, their families and, potentially, all Americans." *See id.*

- "[T]he venture will seek to target three kinds of waste in the health-care system:  administrative costs, high prices and improper health-care usage." Bloomberg, "Amazon-Berkshire-JPMorgan Health Venture Takes Aim at Middlemen," available at https://www.bloomberg.com/news/articles/2018-06-24/amazon-berkshire-jpmorgan-health-venture-takes-aim-at-middlemen (quoting Dr. Atul Gawande, ABC's recently-appointed leader).

88.     These statements indicate that ABC will first focus on the employees of its three partner companies and later seek to offer its products and services to the general public.  Two of ABC's three partner companies (JPMorgan and Berkshire Hathaway) are currently Optum customers.  Accordingly – at least with respect to JPMorgan and Berkshire Hathaway – ABC will very soon be a direct competitor, if it is not already.

89.     The public has similarly recognized ABC as a competitor and a disruptive force in the healthcare market.  As one Forrester senior analyst recognized, "Working out the business with their own employees first would be a smart way to test out the product before opening it up to the general market . . . and that could be a game changer." *See* NBC News, "Amazon, Chase, and Berkshire Hathaway partner up to disrupt health care," available at https://www.nbcnews.com/business/business-news/bezos-buffett-dimon-join-create-independent-health-care-company-n842546.

90.     With respect to Smith, he is, or will be in the near future, helping to "improv[e] health outcomes, patient satisfaction and cost" for the employees of Amazon, JPMorgan, and Berkshire Hathaway as ABC's Director, Strategy and Research.  Exh. 10.

91.     As Smith's December 28, 2018 letter represents, some of Smith's initial research will focus on the delivery and costs of health care for over one million individuals.

92.     Given the broad-reaching and high-level nature of Smith's role, Smith is, or will be in the near future, engaging in activities that compete, directly or indirectly, with Optum, or assisting ABC in such activities – all in violation of his noncompete restrictions.

93.     Given the similarity in his anticipated role at ABC, as Director, Strategy and Research, to his previous roles at Optum as Vice President, Product and Vice President, Corporate Strategy, Smith will be unable to perform his role with ABC without using and/or disclosing Optum's trade secrets.

94.     ABC's and Smith's refusal to provide more information about what Smith will be doing at ABC suggests that ABC hired Smith because of what he knows about Optum's business, not to fill a role ABC had already created.

95.     Smith's position with ABC now poses a direct threat to Optum's trade secrets and other confidential information, which could have a detrimental impact on Optum's value and competitive advantage.

96.     If Smith is permitted to work for ABC, he will inevitably use Optum's trade secrets to expedite ABC's development of competitive capabilities and products.  Even if those products take more than a year to commercialize, Smith's assistance in the process of beginning to develop them now is a direct competitive harm to Optum.

97.     On information and belief, ABC's hiring of Smith is part of ABC's larger plan to lift Optum's model or, at the very least, to duplicate or develop similar products and services.  In September 2018, ABC named Jack Stoddard ("Stoddard") as its Chief Operating Officer. Stoddard is a former, high-level UnitedHealth Group employee who has reportedly represented

himself as Optum's co-creator (a fact that Optum disputes).  With Stoddard's help and direction, ABC hired Smith just a few months later, in December 2018, and Fleming shortly after that.

## COUNT I

### BREACH OF CONTRACT

98.     Optum repeats and incorporates herein by reference the allegations set forth in each of the foregoing paragraphs.

99.     On March 1, 2017, Smith accepted the 2017 NQ Award Agreement.

100.     On March 1, 2017, Smith accepted the 2017 RSU Award Agreement.

101.     On February 22, 2018, Smith accepted the 2018 NQ Award Agreement.

102.     On February 22, 2018, Smith accepted the 2018 RSU Award Agreement.

103.     The Agreements were each supported by valid and sufficient consideration.

104.     The restrictive covenants contained in the Agreements are between UHG and Optum, on the one hand, and Smith, on the other hand.  *See* NQ Awards, ¶ 4 (defining "Company" for purposes of restrictive covenants); RSU Awards, ¶ 8 (same).

105.     In the Agreements, Smith agreed to not disclose Optum's confidential information, or to use it for any other purpose than to perform his work for Optum.  *See* NQ Awards, ¶ 4(a); RSU Awards, ¶ 8(a).

106.     Smith also agreed that, for at least one year following the termination of his employment, he would not "[e]ngage in or participate in any activity that competes, directly or indirectly, with any [Optum] activity, product or service that [Smith] engaged in, participated in, or had Confidential Information about during [Smith's] last 36 months of employment with [Optum] . . . or . . . [a]ssist anyone in any of the activities listed above."  *See* NQ Awards, ¶ 4(c); RSU Awards, ¶ 8(c).

107.    Smith also agreed that, during his employment and for at least two years following the termination of his employment, he would not "[r]aid, hire, employ, recruit or solicit" any Optum employee possessing its confidential information, or "[i]nduce or influence" any such employee "to terminate his, her or its employment or other relationship with the Company," or assist anyone to do the same.  NQ Awards, ¶ 4(b); RSU Awards, ¶ 8(b).

108.    Smith's restrictive covenants apply "on a nationwide basis anywhere in the United States" because Optum's "business competes on a nationwide basis."  *See* NQ Awards, ¶ 4(d); 2017 RSU Awards, ¶ 8(d).

109.    The protection of Optum's confidential information, including trade secrets, is a legitimate business interest that may be protected by way of a restrictive covenant agreement.

110.    The restrictions contained in the Agreements are reasonably necessary to protect Optum's legitimate business interests.

111.    By accepting employment with ABC, a competitor of Optum, during his noncompete period, in the United States, Smith has breached the express terms of the Agreements.

112.    By engaging or participating in activities that compete with Optum, and/or assisting ABC to engage in competing activities, during his noncompete period, in the United States, Smith has breached the express terms of the Agreements.

113.    By soliciting Fleming, a then-Optum employee possessing its confidential information, during his nonsolicitation period, in the United States, Smith has breached the express terms of the Agreements.

114.    Smith's competitive employment with ABC jeopardizes Optum's trade secrets and confidential information.

115.    Optum has reason to believe that Smith will inevitably and imminently use or disclose Optum's trade secrets and confidential information in violation of his Agreements.

116.    After being reminded of his obligations by Optum, Smith has chosen to violate his obligations under the Agreements.

117.    Smith is, therefore, in breach of the Agreements.

118.    As a result of Smith's breaches of contract, Optum has suffered and will continue to suffer both irreparable harm and monetary damages in an amount to be determined at trial, which include without limitation the fair market value of the equity that was provided to Smith in exchange for the covenants, plus interest.

COUNT II

MISAPPROPRIATION OF TRADE SECRETS UNDER MUTSA

119.    Optum repeats and incorporates herein by reference the allegations set forth in each of the foregoing paragraphs.

120.    Optum's confidential information described above constitutes trade secrets within the meaning of the Massachusetts Uniform Trade Secrets Act (M.G.L. c. 93 §§ 42-42G).

121.    Optum expended significant amounts of time and expense developing its proprietary, confidential information, including its trade secrets, all of which are highly valuable to Optum and integral to its competitive edge in the market.

122.    In his position with Optum, Smith had access to Optum's trade secrets and other nonpublic confidential information that is of extraordinary value to Optum.

123.    Optum took reasonable efforts to preserve the confidentiality of this information by, among many other things, requiring Smith to enter into the Agreements, which expressly impose confidentiality obligations.

124.    Optum derives an economic and competitive value and advantage over its competitors as a result of its confidential information, including trade secrets.

125.    Smith has misappropriated and/or threatened to misappropriate Optum's confidential information, including trade secrets, by improper means by, among other things:  (1) accepting employment with a competitor (ABC), in violation of his Agreements, in a role in which Smith will inevitably draw upon Optum's trade secrets as he performs a job for a direct competitor; (2) during the time he knew he would be leaving Optum to join a competitor, attending a highly-confidential Optum meeting concerning its forward-looking strategies; and (3) during the time he knew he would be leaving Optum to join a competitor, accessing Optum's highly confidential documents concerning, among other things, its market analysis, product portfolio, and competitive strategies.

126.    Smith's acts of misappropriation occurred on or after October 1, 2018.

127.    Optum is entitled to actual damages pursuant to M.G.L. c. 93, § 42B (effective October 1, 2018).

128.    Smith's conduct was willful and/or malicious, entitling Optum to exemplary damages under M.G.L. c. 93, § 42B(b) (effective October 1, 2018).

129.    As a result of Smith's misappropriation, Optum has suffered, and will continue to suffer, both irreparable harm and monetary damages in an amount to be proven at trial.

COUNT III

MISAPPROPRIATION OF TRADE SECRETS UNDER DTSA

130.    Optum repeats and incorporates herein by reference the allegations set forth in each of the foregoing paragraphs.

131.    Optum's confidential information described above constitutes trade secrets within the meaning of the Defend Trade Secrets Act (18 U.S.C. 1839(3)).

132.    Optum's trade secrets relate to products and/or services used in, or intended for use in, interstate or foreign commerce.

133.    Optum expended significant amounts of time and expense developing its proprietary, confidential information, including its trade secrets, all of which are highly valuable to Optum and integral to its competitive edge in the market.

134.    In his position with Optum, Smith had access to Optum's trade secrets and other nonpublic confidential information that is of extraordinary value to Optum.

135.    Optum took reasonable efforts to preserve the confidentiality of this information by, among many other things, requiring Smith to enter into the Agreements, which expressly impose confidentiality obligations.

136.    Optum derives an economic and competitive value and advantage over its competitors as a result of its confidential information, including trade secrets.

137.    Smith has misappropriated and/or threatened to misappropriate Optum's confidential information, including trade secrets, by improper means by, among other things:  (1) accepting employment with a competitor (ABC), in violation of his Agreements, in a role in which Smith will inevitably draw upon Optum's trade secrets as he performs a job for a direct competitor; (2) during the time he knew he would be leaving Optum to join a competitor, attending a highly-confidential Optum meeting concerning its forward-looking strategies; and (3) during the time he knew he would be leaving Optum to join a competitor, accessing Optum's highly confidential documents concerning, among other things, its market analysis, product portfolio, and competitive strategies.

138.    Smith's acts of misappropriation occurred after May 11, 2016.

139.    Smith's conduct was willful and/or malicious, entitling Optum to exemplary damages under 18 U.S.C. 1836(b)(3)(C).

140.     As a result of Smith's misappropriation, Optum has suffered, and will continue to suffer, both irreparable harm and monetary damages in an amount to be proven at trial.

<u>PRAYER FOR RELIEF</u>

**WHEREFORE,** for the reasons set forth above, Optum respectfully requests that this Court:

A.     Grant temporary, preliminary, and permanent injunctive relief enjoining David William Smith from working for TCORP62018 LLC ("ABC") or otherwise violating his Agreements.

B.     Grant temporary, preliminary, and permanent injunctive relief enjoining David William Smith from using or disclosing Optum's trade secrets and other confidential information including, without limitation, its information concerning Optum's:  corporate roadmap(s); corporate strategies and business plans; merger and acquisition targets; product roadmap(s); product strategies and business plans; current product portfolio performance (including, for each product and product line, up-to-date sales momentum data, profit and loss information, return on invested capital, projected financial growth, market opportunity, and net promoter performance); analyses concerning product performance and opportunities (including where to prioritize investments of human capital and financial resources, as well as where to limit or avoid investments); data and advanced analytics (including its initiatives concerning artificial intelligence and broad data science capabilities); customer lists and information; supplier and vendor lists; business relationships with, *e.g.*, pharmaceutical manufacturers and the details concerning those relationships (including detailed information concerning the rebates Optum receives from certain pharmaceutical manufacturers for certain drugs); other strategic partnerships; and other competitively sensitive information that is not generally available to the public.

C.      Enter judgment for Optum on all Counts in this Complaint, and award damages to

Optum in an amount to be determined at trial, together with interest and costs; and

D.      Award all other relief this Court determines is appropriate.

Respectfully submitted,

OPTUM, INC. and
OPTUM SERVICES, INC.

By their attorneys,

*/s/ Russell Beck*
Russell Beck, BBO No. 561031
Stephen D. Riden, BBO No. 644451
Hannah Joseph, BBO No. 688132
Beck Reed Riden LLP
155 Federal Street, Suite 1302
Boston, Massachusetts  02110
617.500.8660 Telephone
617.500.8665 Facsimile
*rbeck@beckreed.com*
*sriden@beckreed.com*
*hjoseph@beckreed.com*

Dated:  January 16, 2019

## CERTIFICATE OF SERVICE

I hereby certify that this document has been filed through the CM/ECF system on January 16, 2019, and will be served electronically to the registered participants as identified on the Notice of Electronic Filing through the Court's transmission facilities, and that non-registered participants have been served this day by mail.

*/s/  Russell Beck*

26