## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| OPTUM, INC. and<br>OPTUM SERVICES, INC.,<br><br>        *Plaintiffs*,<br><br>v.<br><br>DAVID WILLIAM SMITH,<br><br>        *Defendant*. | Civil Action No.: 19-cv-10101<br><br>**OPTUM, INC. AND OPTUM SERVICES, INC.'S  MEMORANDUM IN SUPPORT OF THEIR MOTION FOR A <u>TEMPORARY RESTRAINING ORDER</u>** |

Respectfully submitted,

OPTUM, INC. and
OPTUM SERVICES, INC.,

By their attorneys,

*/s/ Russell Beck*
Russell Beck, BBO No. 561031
Stephen D. Riden, BBO No. 644451
Hannah Joseph, BBO No. 688132
Beck Reed Riden LLP
155 Federal Street, Suite 1302
Boston, Massachusetts  02110
617.500.8660 Telephone
617.500.8665 Facsimile
*rbeck@beckreed.com*
*sriden@beckreed.com*
*hjoseph@beckreed.com*

Dated:  January 16, 2019

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document has been filed through the CM/ECF system on January 16, 2019, and will be served electronically to the registered participants as identified on the Notice of Electronic Filing through the Court's transmission facilities, and that non-registered participants have been served this day by mail.

*/s/ Russell Beck*

This is a textbook case for a temporary restraining order ("TRO").  David Smith is a former senior executive for Plaintiffs Optum, Inc. and Optum Services, Inc. (together, "Optum"). In exchange for his receipt of valuable stock, Smith promised not to compete with Optum for a year following his departure from the company.  Yet Optum recently learned that Smith intends imminently to begin working for Optum's competitor, TCORP62018 LLC ("ABC"), a partnership of Amazon, Berkshire Hathaway, and JPMorgan Chase & Co.  ABC is widely recognized as a disruptive force in the healthcare services market in which Optum competes.

Smith plainly intends to give ABC an unfair and substantial boost in its efforts to compete in that market.  At Optum, Smith was repeatedly and extensively exposed to Optum's most important trade secrets, and played an integral role in overseeing products and developing Optum's critical business strategies.  Smith has in-depth knowledge of some of Optum's most valuable and competitively-sensitive trade secrets, including its current product capabilities and profitability, its forward-looking plans, and its strategies for capital investments, potential acquisitions, market positioning, and new market opportunities.

There also can be no mistaking the fact that ABC hired Smith because of his knowledge of Optum's trade secrets.  Smith met with senior leadership at ABC over the course of two months before receiving his offer, and eventually received an offer to begin work on January 2, 2019 (which was extended to January 17, 2019 as the parties tried to resolve the matter out of court).  Yet, to this day, his position has no job description.  Put simply, ABC hired Smith because of what he knows about Optum's business, not to fill a role ABC had already created.

Smith's wrongful conduct on the eve of his departure from Optum confirms the need for a TRO.  Just days before tendering his resignation, Smith surreptitiously requested secret information that he had no legitimate business reason to request, acquire, or review, and he attended one of Optum's highest-level strategy meetings – a meeting he should never have

1

attended given his imminent plan to leave Optum.  In addition, a preliminary forensic analysis has revealed that in the weeks and days leading up to his receipt of an offer from ABC through his last days in Optum's office, Smith accessed multiple highly confidential, competitively-sensitive Optum documents, and printed highly-confidential, forward-looking documents marked "Confidential" containing information concerning Optum's product portfolio performance, new product development, and market analysis.  Again, there was no legitimate reason for Smith to access, print, or take any of these documents – particularly given his plan to leave Optum.  The information contained in these documents, as well as the information that Smith knows and reinforced or learned at the strategy meeting, would be extremely helpful for a company such as ABC and would cause Optum substantial irreparable harm if they were used for ABC's benefit.

Optum's need for a TRO is manifest.  Absent immediate injunctive relief, Optum will suffer substantial irreparable harm.  Its trade secrets and other confidential information will be compromised and made available to a competitor as the result of Smith's unfair competition and his inevitable use of Optum's trade secrets as he performs a job for ABC.  Accordingly, Optum moves for a temporary restraining order: (1) prohibiting Smith from working for, or soliciting on behalf of, ABC so Optum may conduct expedited discovery so this Court can then hear and rule on a preliminary injunction motion; (2) barring Smith from using or disclosing Optum's trade secrets or other confidential information; and (3) requiring Smith to return Optum's property and information, including devices where such information was stored.

## FACTUAL BACKGROUND[1]

### OPTUM

Optum is a leading information and technology-enabled health services business.  Optum

---

[1]     The facts are summarized from the contemporaneously-filed affidavits of Christopher Andrews and Steven Wolin.

delivers intelligent, integrated solutions that help to modernize the health system and improve overall population health. Optum's core capabilities include data and analytics, pharmacy care services, population health, healthcare delivery, and healthcare operations. Wolin Aff. ¶¶ 2, 3.

Optum's trade secrets and other confidential business information (some of which are described below) provide a significant competitive and economic advantage, which Optum has spent substantial time and resources developing and safeguarding in myriad, extensive ways (summarized below and in more detail in the accompanying affidavits). *Id.* ¶¶ 8-13.

SMITH'S EMPLOYMENT WITH OPTUM AND<br>KNOWLEDGE OF OPTUM'S HIGHLY CONFIDENTIAL INFORMATION

Smith began his employment with Optum in August 2016 as Vice President of Corporate Strategy, and was later named Vice President of Product Strategy. Wolin Aff. ¶ 14. In those roles, Smith repeatedly and extensively was exposed to Optum's trade secrets and other confidential information, and played an integral role in overseeing products and developing strategies for Optum. *Id.* ¶ 15. As Vice President of Product Strategy, Smith managed product strategy globally and had direct responsibility for steering product investment decisions and product development and strategy, and for execution of the decisions and strategy. *Id.* ¶ 17. As a consequence, Smith has extensive knowledge of Optum's product roadmap and proprietary business plans. *Id.* These plans are competitively-sensitive, confidential information that Optum has invested substantial time and resources developing and implementing. *Id.* ¶ 11.

Smith also was deeply involved with Optum's corporate strategy team, and recently participated in the corporate strategy team's development of a new multi-year plan. *Id.* ¶¶ 14, 16, 18. Through this work, Smith learned some of Optum's most important, highly-confidential information, and knows Optum's entire corporate strategy for the next three to five years. *Id.* ¶ 16. The details of Optum's highly-confidential corporate strategy would be of great interest and unfair competitive benefit to Optum's competitors, including ABC. *Id.* ¶¶ 11-12, 36. While

3

Smith was a senior executive of Optum, his work in both the corporate strategy and product strategy areas provided him with extensive, unique insight into the operations of Optum – even greater than that typical for an employee at his level. *Id*. ¶ 17.

Smith's cash compensation totaled over $200,000 annually. Wolin Aff. ¶ 20. In addition, as a senior executive of Optum, Smith was granted equity awards. *Id*. ¶¶ 19, 20. In exchange for these awards, Smith executed four agreements containing post-employment restrictions concerning noncompetition, nonsolicitation, and nondisclosure: Restricted Stock Unit Awards in 2017 and 2018 (the "RSU Awards") and Nonqualified Stock Option Awards in 2017 and 2018 (the "NQ Awards," and together with the RSU Awards, the "Agreements"). *Id*.

In the Agreements, Smith agreed not to disclose Optum's Confidential Information, or to use it for any other purpose than to perform his work for Optum. NQ Awards, ¶ 4(a); RSU Awards ¶ 8(a). Smith also agreed that for at least one year after the termination of his employment, he would not "[e]ngage in or participate in any activity that competes, directly or indirectly, with any [Optum[2]] activity, product or service that [Smith] engaged in, participated in, or had Confidential Information about during [Smith's] last 36 months of employment with [Optum]." NQ Awards, ¶ 4(c); RSU Awards ¶ 8(c). Smith also agreed not to solicit any Optum employees for two years. NQ Awards, ¶ 4(b); RSU Awards ¶ 8(b). These restrictions apply "anywhere in the United States." NQ Awards, ¶ 4(d); RSU Awards ¶ 8(d).

<u>Smith Accepts an Offer from ABC and Resigns from Optum</u>

ABC is "an independent [limited liability company]" that was announced in January 2018 by Amazon, JPMorgan Chase & Co. ("JPMorgan"), and Berkshire Hathaway. Compl., Exh. 10.

---

[2]      The Agreements award equity in shares of UnitedHealth Group, the publicly-traded ultimate parent company of Optum. As such, each of the Agreements contains language that covers the full UnitedHealth Group enterprise, including UnitedHealth Group's subsidiaries and affiliates; however, the scope of the noncompetition provision is limited to the employee's particular role and responsibilities. *See* NQ Awards, ¶ 4; RSU Awards, ¶ 8.

In a press release, the trio announced that they "are partnering on ways to address healthcare for their U.S. employees, with the aim of improving employee satisfaction and reducing costs." The new venture initially will focus on developing comprehensive healthcare solutions for the roughly 1.2 million U.S. employees of the three partner companies (many of whom are currently serviced by Optum). ABC reportedly will then "make those innovations available freely to other companies, meaning that if it's successful, its effects could be felt more broadly among the more than 150 million people in the U.S. who get their health insurance through work."[3]

ABC has stated its intention to compete in the health care services market. In its press release, ABC stated that it will focus on "technology solutions" to provide "high-quality and transparent health care at a reasonable cost." Compl., ¶ 87. Jamie Dimon (Chairman and CEO of JPMorgan) explained that "our goal is to create solutions that benefit our U.S. employees, their families and, potentially, all Americans." *Id.*

Smith applied for a position at ABC on September 28, 2018, and on December 6, 2018, ABC made a verbal offer of employment to Smith, followed by a formal written offer on December 7, 2018. Compl., Exh. 11. On December 11, 2018, Smith signed ABC's offer of employment and returned it to ABC. *Id.*, Exh. 11. On December 13, 2018, Smith informed his supervisor, Steve Wolin, that he was resigning to work for ABC. Wolin Aff. ¶ 22. In that conversation, Smith stated that he would be building and leading a "research team" for ABC. *Id.* ¶ 23. According to ABC, Smith's planned job title is Director, Strategy and Research, but he does not yet have a job description. Compl., Exh. 10.

At this meeting, Smith was reminded that ABC is Optum's competitor and working there would conflict with his noncompete and other obligations to Optum. Wolin Aff. ¶ 24. Indeed,

---

[3]     https://www.bloomberg.com/news/articles/2018-06-24/amazon-berkshire-jpmorgan-health-venture-takes-aim-at-middlemen

Smith will be engaged in activities to develop and provide competitive products and services for ABC for two of Optum's customers: JPMorgan and Berkshire Hathaway.  *Id.* ¶ 4.

<u>OPTUM DISCOVERS SMITH'S WRONGFUL ACTIVITY</u>

Smith also misappropriated Optum's trade secrets and confidential information for use in his work for a competitor on the heels of his departure from Optum.  For example, on December 4, 2018 – presumably aware that senior colleagues would reject his request – Smith asked junior members on the Corporate Strategy team for secret information that had nothing to do with his job in Product Strategy.  Wolin Aff. ¶¶ 31-35.

Similarly, on December 6, 2018 – the same day that ABC's recruiter informed him that he would be receiving the formal written offer the next day – Smith attended a confidential, cross-team product and strategy meeting with senior leadership, including Optum's CEO.  The meeting included, among other things, discussions concerning Optum's product portfolios, product development, capital planning initiatives, enterprise strategies, and a number of other specific initiatives.  *Id.* ¶¶ 29-30.  By helping to plan and, later, attending the meeting, Mr. Smith was privy to some of Optum's most confidential business information.  *Id.* ¶ 30.  Given his seniority at ABC and his level of sophistication, he never should have attended that meeting.  *Id.*

Further, a preliminary forensic analysis and computer logs reveal that, in the days and weeks leading up to his receipt of an offer from ABC, and through his last days at Optum, Smith:

- ◦ accessed multiple highly confidential, competitively-sensitive Optum documents;

- ◦ printed a highly-confidential, 65-page market analysis performed by Optum that, among other things, identified potential opportunities and solutions for the changing healthcare market – just one minute before printing his résumé and on the same day as he met or communicated with ABC; and

- ◦ printed a highly-confidential, forward-looking slide deck containing information concerning Optum's product portfolio performance, new product development, and product job family and assessment plan.

Like the information he requested from the Corporate Strategy team members, there was no

legitimate reason for Smith to access, print, or take any of these documents – particularly given his imminent plan to leave Optum.  Wolin Aff. ¶ 36.

On or about January 4, 2019, ABC hired another Optum employee, Caitlin Fleming.  *Id.* ¶ 44.  She served as Director, Product, reporting to Smith.  *Id.*  Like Smith, Fleming had routine access to Optum's trade secrets.  *Id.*  Optum has reason to believe that Smith solicited Fleming in violation of his employee nonsolicitation restriction.  *Id.*

<u>OPTUM WILL SUFFER IRREPARABLE HARM</u>

Optum will be irreparably harmed if Smith is permitted to work for ABC.  Wolin Aff. ¶¶ 36, 46.[4]  Optum is a leader in healthcare services, with a significant head start in the development of the next generation of system-changing products and services.  *Id.* ¶¶ 2-5.  Smith had extensive exposure to Optum's trade secrets and confidential information.  *Id.* ¶ 15.  Those trade secrets are now at risk of inevitable use and disclosure through Smith's anticipated role at ABC. *Id.* ¶ 46.[5]  Thus, there is no credibility to any assurances that he might provide concerning his intention to keep Optum's information confidential if he were permitted to work for ABC during the noncompete period – particularly given his pre-departure misconduct.  *Id.* ¶¶ 29-36. Accordingly, entry of the requested TRO is necessary and warranted.

**PROCEDURAL STATUS**

Optum attempted to avoid filing this action.  Specifically, on December 21, Optum sent letters to Smith and ABC seeking assurances and explaining again that Smith's work for ABC

---

[4]     Smith has acknowledged as much insofar as he agreed that a breach of his restrictive covenants would cause immediate and irreparable harm to Optum and therefore, in the event of any such breach, in addition to other remedies which may be available, Optum "will be entitled to injunctive relief."  NQ Awards, ¶¶ 3(b), 12; RSU Awards ¶¶ 7(b); 11(f).

[5]     In addition, ABC's hiring of Smith is likely part of a larger plan to lift Optum's model or, at the very least, to duplicate or develop similar products and services.  Wolin Aff. ¶ 47.  Indeed, in September 2018, ABC named Jack Stoddard as its Chief Operating Officer.  *Id.*  Stoddard is a former, high-level UnitedHealth Group employee.  *Id.*  With Stoddard's help and direction, ABC hired Smith just a few months later, and Fleming shortly after that.  *Id.*

would violate his Agreements.  Compl., Exhs. 8 & 9.  On December 28, ABC's counsel replied,

admitting that Smith was going to start working for ABC, but generally denying that his

employment would constitute a violation of his Agreements.  *Id.*, Exh. 10.  Yet ABC's counsel

acknowledged that Smith's role was not yet defined and that they had not even developed a job

description.

On January 11, 2019, ABC, Smith, and Optum participated in mediation.  They were

unable to reach a satisfactory resolution, and as a result Smith may begin working at ABC as

early as January 17, 2019.  Optum thus was compelled to file this action.

## ARGUMENT

I.    LEGAL STANDARD

A TRO is warranted if the moving party establishes that (1) it has a likelihood of success

on the merits of its claims, (2) it will suffer irreparable harm if the injunction is denied, (3) a

balancing of the relevant equities favors the issuance of an injunction, and (4) the public interest

favors the issuance of an injunction.  *Oxford Global Res., Inc. v. Guerriero*, No. 03-12078-DPW,

2003 WL 23112398, *4 (D. Mass. Dec. 30, 2003).  "The sine qua non of this four-part inquiry is

likelihood of success on the merits[.]"  *New Comm. Wireless Servs., Inc. v. SprintCom, Inc.*, 287

F.3d 1, 9 (1st Cir. 2002).[6]  The court need not conclusively determine the merits of the

underlying  claims with absolute assurance.  *Ross-Simons of Warwick, Inc. v. Baccarat, Inc*., 102

F.3d 12, 16 (1st Cir. 1996).

As demonstrated below, Optum has amply satisfied this standard.  Indeed, courts in

Massachusetts routinely grant injunctions barring employees from violating their noncompete

agreements and from using former employers' trade secrets and confidential information.  *See,*

---

[6]      The same four factors apply to both a motion for a temporary restraining order and a motion for
preliminary injunction.  *See, e.g., Commerce Bank & Trust Company v. Property Administrators, Inc., et
al*., 252 F.Supp.3d 14, 16 (2017).

*e.g., Perficient, Inc. v. Priore*, 2016 WL 1716720, at *8 (D. Mass. Apr. 26, 2016) (enjoining

employee from working at competitor in violation of restrictive covenants); *SimpliVity Corp. v.*

*Moran,* 2016 WL 5122671, at *4, *13 (Mass. Super. Aug. 14, 2016) (ordering former employee

to cease working for competitor for one year due in part to knowledge of "confidential and

commercially sensitive information").  Further, Optum is entitled to injunctive relief pursuant to

the Massachusetts Uniform Trade Secrets Act ("MUTSA") and the Federal Defend Trade Secrets

Act ("DTSA") because Smith's work for ABC – especially given his pre-departure misconduct –

threatens the use or disclosure of Optum's trade secrets.

II.   <u>O</u><u>PTUM</u> <u>H</u><u>AS</u> <u>A</u> <u>S</u><u>TRONG</u> <u>L</u><u>IKELIHOOD</u> <u>O</u><u>F</u> <u>S</u><u>UCCESS</u> <u>O</u><u>N</u> <u>T</u><u>HE</u> <u>M</u><u>ERITS</u> <u>O</u><u>F</u> <u>I</u><u>TS</u> <u>C</u><u>LAIMS</u>[7]

     A.   Optum Has A Strong Likelihood of Success on Its Claim for Smith's
         <u>Breach of His Agreements</u>

Under Delaware law,[8] to succeed on its breach of contract claim, Optum must establish

"(1) . . . a valid, enforceable contract; (2) [a] breach [of defendant's] obligations under the terms

of that contract; and (3) Plaintiff suffered damages."  *UtiliSave, LLC v. Miele*,  2015  WL

5458960,  at *5 (Del. Ch. Sept. 17, 2015).[9]  Optum satisfies these elements.

     *1.  <u>The Noncompete and Nondisclosure Provisions are Valid and Binding</u>*

Delaware courts enforce restrictive covenants when they "(i) adhere to general principles

of contract, (ii) are reasonable in scope and duration, (iii) advance the legitimate economic

interests of the party enforcing the covenant, and (iv) survive a balance of the equities."  *Sensus*

*USA, Inc. v. Franklin*, 2016 WL 1466488, at *7 (D. Del. Apr. 14, 2016) (internal quotations

---

[7]    Because of the nature of the relief sought at this early stage in the case, Optum relies for this motion on only its claims for breach of the Agreements (including the noncompete and nondisclosure obligations) and misappropriation of trade secrets (under state and federal law).

[8]    All four Agreements state that Delaware law governs.  NQ Awards, ¶ 15; RSU Awards, ¶ 11(h).

[9]    Massachusetts law is similar on this point.  *See Aspect Software, Inc. v. Barnett*, 787 F. Supp. 2d 118, 127–28 (D. Mass. 2011) (breach of contract requires "1) existence of a valid and binding contract, 2) that the defendant breached the terms of the contract, and 3) the plaintiff has suffered damages").

omitted).[10]

As a threshold matter, the Agreements adhere to general contract principles of mutual assent and consideration, as Smith received valuable restricted stock units and options to purchase shares of UnitedHealth Group Incorporated Common Stock for signing the Agreements.  *See Newell Rubbermaid Inc. v. Storm*, 2014 WL 1266827, at *6 (Del. Ch. Mar. 27, 2014) (employer and employee entered into enforceable contract when employee "accepted a benefit from her employer, additional [restricted stock units], which she supported with new consideration, such as the post-employment restrictive covenants.").

The post-employment noncompete restriction in the Agreements also is reasonable in scope and duration:[11]  First, the restriction is limited to the United States and, given the worldwide reach of Optum's business, the geographic limitation contained in the Agreements is reasonable.  *See O'Leary v. Telecom Res. Serv., LLC*, 2011 WL 379300, at *5 (Del. Super. Ct. Jan. 14, 2011) (enforcing a nationwide noncompete, reasoning that "[a] national scope can be particularly necessary in today's world where so many businesses operate on a national or even global scale.").  Second, the post-employment noncompete restriction is limited to a period of one year, and restrictive periods of this length and longer have been found reasonable under Delaware law.  *See Am. Homepatient, Inc. v. Collier*, 2006 WL 1134170, at *2 n.5 (Del. Ch. Apr. 19, 2006) (collecting cases and noting that "Non-compete agreements covering limited areas for two or fewer years generally have been held to be reasonable.").[12]

---

[10]     Similarly, Massachusetts courts enforce restrictive covenants when they are (1) necessary to protect a legitimate business interest; (2) reasonably limited in duration and geographic reach; and (3) otherwise consonant with public policy.  *SimpliVity Corp. v. Bondranko*, 204 F. Supp. 3d 340, 347 (D. Mass. 2016), appeal dismissed, 2016 WL 9665544 (1st Cir. Oct. 6, 2016).

[11]     When reviewing confidentiality agreements, courts generally do not consider geographic scope or duration of the covenant.  *See EDIX Media Grp. Inc. v. Mahani*, 2006 WL 3742595, at *5, *7–8 (Del. Ch. Dec. 12, 2006) (applying scope and duration test to noncompete but not to nondisclosure covenant).

[12]     Smith acknowledged in the Agreements that the restrictive covenants are reasonable and necessary to protect the Company's legitimate interests.  *See* NQ Awards, ¶ 4; RSU Awards, ¶ 8.

The restrictive covenants also advance Optum's legitimate economic interests.  Delaware courts considering noncompete agreements recognize that an employer's "legitimate interests include preserving employer goodwill and protecting an employer's confidential information, including customer lists, pricing, trade secrets and proprietary information." *Sensus USA, Inc. v. Franklin*, 2016 WL 1466488, at *7 (D. Del. Apr. 14, 2016).  Further, restrictive covenants on "key employees" with access to proprietary information serve legitimate business interests, even where such information has little independent value.  *See Delaware Exp. Shuttle, Inc. v. Older*, 2002 WL 31458243, at *15 (Del. Ch. Oct. 23, 2002) (noncompete enforced against employee who had "critical insights into" former employer's "plans for future business expansion" because employer had "a significant and legitimate interest in seeking to limit [defendant's] competition with it.").  Similarly, the nondisclosure provisions of the Agreements are self-evidently necessary to protect Optum's trade secrets and other confidential information.

The purpose of the restrictive covenants here is to protect, *inter alia*, Optum's trade secrets and confidential information, including its competitively sensitive plans and strategies. The highly confidential information Smith learned while working on Optum's behalf is exactly the type of information that courts deem entitled to protection.  *See Sensus USA, Inc.*, 2016 WL 1466488, at *7; *Delaware Exp. Shuttle, Inc.*, 2002 WL 31458243, at *15.

Smith was a key employee who was given extensive access to Optum's most critical trade secrets and other confidential information in the course and scope of his employment with the company.  In *Sensus USA, Inc.*, the court ruled that the former employer's noncompete provision served legitimate business interests because, *inter alia*, the defendant was a "key employee," he "had in-depth information regarding the [company's] proprietary technology" and knowledge of company's prices, business strategy, and he worked on some of the company's largest accounts.  2016 WL 1466488, at *7.  Similarly, the information to which Smith was

exposed by virtue of his employment at Optum, was precisely the type of "in-depth information" that Optum has a legitimate interest in protecting from disclosure to ABC.  *See id*.

One of the ways that Smith learned about Optum's confidential and highly sensitive competitive information was through his participation in high-level meetings.  Wolin Aff. ¶ 18. Through such meetings – including the meeting he attended just one day before he received the final written offer from ABC – Smith was exposed to the inner workings of Optum's business, products and strategy, marketing plans, and overall goals and plans, which are not generally known in the industry or to the public.  *Id*. ¶¶ 29-30.  It is well established that all such confidential and competitively sensitive matters that Smith learned about during his tenure at Optum are entitled to protection under Delaware law.  *See Sensus USA, Inc.*, 2016 WL 1466488, at *7; *Delaware Exp. Shuttle, Inc.*, 2002 WL 31458243, at *15.  Accordingly, Smith's restrictive covenants are necessary to protect Optum's legitimate business interests in preventing him from using its information to its detriment and for the benefit of ABC.  *See id*.

The balance of equities favors enforcement of the restrictive covenants because Optum, on the one hand, is seeking to protect itself from an unfair competitive threat and threat of imminent use and disclosure of some of its most valuable confidential information, while Smith, on the other hand, is being asked to comply with agreements that he voluntarily executed and for which he was compensated.  *See TP Group–CI, Inc. v. Vetecnik,* 2016 WL 5864030, at *2 (D. Del. Oct. 6, 2016) ("Defendant's extensive knowledge of Plaintiff's confidential information would make 'his competition with plaintiff's business . . . particularly effective and unfair,' tipping the balance of equities in favor of enforcement."), quoting *McCann Surveyors, Inc. v. Evans*, 611 A.2d 1, 4 (Del. Ch. 1987); *Singh v. Batta Envtl. Assocs., Inc.*, 2003 WL 21309115, at *9 (Del. Ch. May 21, 2003) (ruling that noncompete is not oppressive because its enforcement did not leave well-educated defendant without financial support, and it was not unreasonable to

require defendant to "choose between (i) reducing the scope of his . . . business to comply with the noncompetition provision, or (ii) working in a different field in which he is adequately trained . . . , or (iii) simply waiting until the noncompetition period expires.").

### 2. *Smith Has Breached His Agreements, Causing Damage to Optum*

Smith breached his obligations under the Agreements when he accepted employment with ABC, Optum's competitor, in a position comparable to his prior position at Optum that places Optum's trade secrets and other confidential information directly at risk.[13]  This is a clear violation of Smith's post-employment noncompete restriction.

Based on ABC's and Smith's response to Optum's December 21, 2018, demand letter, Optum expects that Smith will argue that there has been no breach of the noncompete portion of the Agreements because ABC is not *currently* competing with Optum and, consequently, that Optum is not entitled to injunctive relief.  This is a fig leaf.  As a threshold matter, ABC's own public statements demonstrate that ABC intends to provide health care services to its three partner companies (covering more than 1 million employees) that are competitive with the Optum's services; significantly, two of those three partner companies (JPMorgan and Berkshire Hathaway) are currently Optum customers.  Thus, it is clear that – at least with respect to JPMorgan and Berkshire Hathaway – ABC will very soon be a direct competitor, if it is not providing competitive services to Optum's clients already.

Further, the noncompete provisions in the Agreements are not so limited to apply only to companies that are Optum's established competitors, because the Agreements bar participation "in any *activity* that competes, directly or *indirectly*" with Optum (emphasis added), and the development of integrated healthcare programs, like the programs that Smith would be

---

[13]     Like much else about ABC's operations, it is not clear precisely what Smith will be working on at ABC.  Accordingly, this is an area of inquiry that Optum seeks to explore through its companion Motion for Expedited Discovery.

developing for ABC, is one such competitive activity.  Accordingly, Smith's work for ABC is barred by the Agreements.

In any event, the threat of future competition by a new employer can serve as the basis for entering an injunction order in these circumstances.  *See EDIX Media Grp., Inc. v. Mahani*, 2006 WL 3742595, at *9 (Del. Ch. Dec. 12, 2006).  In that case, the court reasoned that the departing employee's work for a new employer justified an award of injunctive relief because, although the new employer did not "engage primarily in activities directly in competition with EDIX's business," it "might eventually compete with EDIX" in two specific areas (the provision of paid-for banner advertisements and modeling services).  *Id.*  As a consequence, the court entered an injunction barring the defendant from, *inter alia*, directly or indirectly providing (a) advertisements for EDIX's advertisers and (b) modeling services.

Here, based on ABC's January 30, 2018 press release,[14] it is clear that ABC is actively working on products competitive with Optum's (and other similarly-situated companies') because it is reportedly focusing on developing comprehensive healthcare solutions for Amazon, JPMorgan, and Berkshire Hathaway's U.S. employees (totaling more than one million people) and reportedly plans to "make those innovations available freely to other companies, meaning that if it's successful, its effects could be felt more broadly among the more than 150 million people in the U.S. who get their health insurance through work."[15]  If Smith works for ABC, he will inevitably use Optum's trade secrets to expedite its development of competitive capabilities and products.  Even if those products take more than a year to commercialize, Smith's assistance in the process of beginning to develop them *now* is a direct competitive harm to Optum.

In addition, forensic analysis of Smith's Optum computer shows that Smith engaged in

---

[14]     https://www.businesswire.com/news/home/20180620005747/en/Amazon-Berkshire-Hathaway-JPMorgan-Chase-appoint-Dr.
[15]     https://www.bloomberg.com/news/articles/2018-06-24/amazon-berkshire-jpmorgan-health-venture-takes-aim-at-middlemen

the wrongful conduct described above and in the accompanying affidavits (including – after he received ABC's offer – printing and accessing several of Optum's trade secrets). Optum expects to learn more about Smith's conduct through discovery, but the information it has already gathered shows a significant threat of misappropriation of Optum's information, which would constitute additional breaches of the Agreements' nondisclosure provisions.

Whether Smith's work for ABC is considered separately or is coupled with the other contract breaches and immediate threat of disclosure of Optum's trade secrets and confidential information, Smith is unfairly competing with Optum in breach of the noncompete restriction in his Agreements. As discussed in Section III below, if Smith is allowed to continue to violate the restrictive covenants in his Agreements, Optum will suffer irreparable harm. For these reasons, Optum has shown a strong likelihood of success on the merits of its breach of contract claim.

B.     Optum Has A Strong Likelihood of Success on Its Misappropriation Claims

To succeed on its DTSA claim, Optum must establish that: (1) the plaintiff owned a trade secret; (2) the defendant acquired, disclosed, or used that trade secret through improper means; and (3) the defendant's actions harmed the plaintiff. *Phyllis Schlafly Revocable Tr. v. Cori*, No. 4:16CV01631 JAR, 2016 WL 6611133, at *2 (E.D. Mo. Nov. 9, 2016).[16] Here, Smith's possession of and inevitable disclosure to ABC of Optum's highly confidential and trade secret information satisfies these elements. Accordingly, Optum is likely to succeed on its claims for misappropriation of trade secrets under the DTSA and MUTSA.[17]

---

[16]     There are currently no DTSA decisions in the District of Massachusetts directly on point.

[17]     The MUTSA became effective on October 1, 2018 (accordingly, there is scant case law currently available). However, given the significant similarities between the MUTSA and DTSA, the DTSA analysis applied here is applicable to the MUTSA claim and, as such, the MUTSA claim is not discussed separately. Analyzing these claims together is consistent with the approach taken in other states that have adopted the UTSA when analyzing claims under the state UTSA and DTSA. *See Kuryakyn Holdings, LLC v. Ciro, LLC*, 242 F. Supp. 3d 789, 797 (W.D. Wis. 2017); *PDC Machines Inc. v. Nel Hydrogen A/S*, No. CV 17-5399, 2018 WL 3008531, at *2 (E.D. Pa. June 15, 2018); *Great Am. Opportunities, Inc. v. Cherry Bros., LLC*, No. 3:17-CV-1022, 2018 WL 418567, at *3 (M.D. Tenn. Jan. 16, 2018).

As a threshold matter, Optum possesses trade secrets (as defined by 18 U.S.C.A. § 1839(3) and G.L. c. 93, § 42(4)) that are well known to Smith:  As discussed above, Smith had extensive knowledge of Optum's competitively-sensitive, confidential information, all aspects of Optum's product strategy plans, and detailed specifics of Optum's corporate strategy.  It cannot be credibly disputed that Smith has extensive knowledge of Optum's trade secrets (indeed, he was directly involved in the development and operation of many of Optum's trade secrets) or that – as stated in his Agreements – he acquired knowledge of such trade secrets "under circumstances giving rise to a duty to maintain the secrecy" of it (18 U.S.C.A. § 1839(5)) and to "limit its acquisition, disclosure or use" (G.L. c. 93, § 42(2)(B)(II)).

Moreover, Optum closely guarded this information from improper disclosure through a variety of means, including the use of restrictive covenants (as with Smith) and various security measures, policies, and trainings.  As described in the accompanying affidavits, Optum's trade secret information is kept confidential and has been developed over a long period of time at great expense to Optum.  Accordingly, this information constitutes protectable trade secrets.

Smith used improper means because, under the DTSA and MUTSA, improper means includes "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means."  18 U.S.C.A. § 1839(6); G.L. c. 93, § 42(2) (substantially the same).  Under the Agreements, Smith owes a duty to Optum to maintain the secrecy of its trade secret and confidential information.  Smith's inevitable use and disclosure of trade secrets is a direct result of the breach of that duty of secrecy, which constitutes wrongful means under the DTSA and MUTSA.  *Id*.  Given this improper conduct, Optum is likely to succeed on the merits of its DTSA and MUTSA claims.

This Court may enjoin actual or threatened misappropriation of trade secrets.  18 U.S.C. §

1836(b)(3)(A)(i).[18]  Similarly, The MUTSA provides that "threatened misappropriation may be enjoined upon principles of e*quity, including, but not limited to, consideration of prior conduct and the circumstances of potential use. . . .*" (Emphasis added).  M.G.L.A. c. 93, § 42A.  Thus, Optum need not wait until the actual use or disclosure of a trade secret to seek injunctive relief.

Based on preliminary forensic evidence of misappropriation, Optum has grave concerns about Smith's access to, and use of, its confidential information.  Further, Smith's attendance at an all-day, cross-team strategy meeting, *the very day he was told that he would be receiving his formal written offer from ABC*, is alarming, and it is egregious that he did not excuse himself from the confidential discussions during that meeting.  Smith's pre-departure conduct ensured that he had an up-to-the-minute roadmap of Optum's products and business strategy.  ABC's knowledge of Optum's strategy would allow it to unfairly compete with Optum.

If Smith is permitted to work for ABC, the secrecy of Optum's information will be in immediate and constant jeopardy, thereby placing Optum at a significant, unfair competitive disadvantage.  Given Smith's extensive access to Optum's trade secret information, his likely retention and mishandling of that information as revealed through forensic analysis, and his work for ABC in a position comparable to his position with Optum and in which it will therefore be impossible for him to not draw upon Optum's confidential and trade secret information, Optum has demonstrated a likelihood of success on its claims for trade secrets misappropriation.  Accordingly, regardless of Smith's breach of the Agreements, Optum is separately entitled to an order barring Smith from using or disclosing Optum's trade secrets and from working for ABC.

---

[18]     The DTSA defines "misappropriation" as:  "disclosure or use of a trade secret of another without express or implied consent by a person who . . . at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret []derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret."  18 U.S.C.A. § 1839(5).

III.     <u>OPTUM WILL SUFFER IRREPARABLE HARM IF SMITH IS NOT ENJOINED IMMEDIATELY</u>

Optum will suffer irreparable harm if a Temporary Restraining Order does not issue due to the wrongful conduct of Smith in (a) violating his restrictive covenants and (b) currently or imminently exploiting Optum's trade secrets and other confidential information in competition with Optum.  Not only did he agree as much in the Agreements, but Smith's ABC employment places Optum's confidential and trade secret information in grave, immediate risk of disclosure.

As a threshold matter, "When a plaintiff demonstrates likelihood of success on a misappropriation of trade secrets claim, it need not prove irreparable injury because such harm is presumed."  *EchoMail, Inc. v. Am. Express Co.*, 378 F.Supp.2d 1, 4 (D. Mass. 2005); *Optos, Inc. v. Topcon Med. Sys.*, Inc., 777 F.Supp.2d 217, 241 (D. Mass. 2011).  Regardless, Courts in the District of Massachusetts have recognized that an employer suffers irreparable harm when a former employee will inevitably disclose the employer's trade secrets or confidential information.  *See Lombard Med. Techs. Inc. v. Johannessen*, 729 F. Supp. 2d 432, 435 (D. Mass. 2010) (enforcing a noncompetition agreement because, even in the absence of misappropriation of any confidential information, the former employees would "not begin at [the new employer] with 'a tabula rasa with respect to'" their former employer's confidential information); *see also Aspect Software, Inc. v. Barnett*, 787 F. Supp. 2d 118, 130-31 (D. Mass. 2011) ("even sincere, scrupulous efforts by an employee and his or her new employer to protect a prior employer's trade secrets are insufficient to remove the threat of irreparable harm via disclosure of trade secrets"); *Corp. Techs., Inc. v. Harnett*, 943 F. Supp. 2d 233, 243 (D. Mass.), aff'd, 731 F.3d 6 (1st Cir. 2013) (finding irreparable harm because the defendant "cannot wipe his mind of the confidential . . . information he learned while employed at [plaintiff] and will inevitably call upon that information" when working for his new employer).  The DTSA also provides for protection in the event of "actual *or threatened* misappropriation."  18 U.S.C. § 1836

(b)(3)(A)(ii) (emphasis added); s*ee also Oneida Grp. Inc. v. Steelite Int'l U.S.A. Inc.*, 2017 WL

6459464, at *8 (E.D.N.Y. Dec. 15, 2017) (denying motion to dismiss misappropriation claims

under the DTSA where the allegation of a threat of misappropriation was sufficient).

Smith cannot possibly separate the information that he learned at Optum from the work

he intends to perform for ABC, given the apparent overlap in his roles for the two companies.

Indeed, it is inevitable that Smith will rely upon and disclose Optum's trade secret and

confidential information in the course of his employment with ABC.  Such disclosure will cause

Optum irreparable harm by undermining the substantial time, effort, and expense that Optum has

invested in creating and safeguarding its products and its business strategies.  *See Marcam Corp.*

*v. Orchard*, 885 F. Supp. 294, 297 (D. Mass. 1995) ("There is no way to assess the amount of

loss . . . sustain[ed] due to the dissemination of highly confidential material."); *TouchPoint*

*Solutions, Inc. v. Eastman Kodak Co.*, 345 F. Supp. 2d 23, 28 (D. Mass. 2004) (recognizing the

irreparable harm that "once a trade secret is lost, it is gone forever").

IV.    THE BALANCE OF THE EQUITIES SUPPORTS THE ISSUANCE OF A TEMPORARY
       RESTRAINING ORDER

The Court must balance any "potential harm caused to [Plaintiff] by a

denial of its motion . . . against any reciprocal harm caused to [Defendant] by the imposition

of an injunction."  *TouchPoint Solutions, Inc. v. Eastman Kodak Co*., 345 F. Supp. 2d 23, 32

(D. Mass. 2004).  Optum's likelihood of success on the merits and irreparable harm tips the

balance of equities in its favor.  If the Temporary Restraining Order is granted, Smith would

simply be required to honor the agreements he willingly entered into and for which he was

substantially compensated.  Therefore, there are no concerns of equity that weigh in favor of

Smith being allowed to work for ABC for the full duration of his noncompete.

Smith also agreed that a breach of his restrictive covenants would cause the Company

immediate and irreparable harm and, therefore, the Company would be entitled to injunctive

relief in addition to any legal remedies that the Company might seek. *See* NQ Awards, ¶ 12; RSU Awards, ¶ 11(f).

V.     THE PUBLIC INTEREST WILL NOT BE ADVERSELY AFFECTED BY ENFORCEMENT OF THE AGREEMENTS

As set forth above, while this Court is required to consider the impact on the public interest, there is no detrimental impact – and indeed there are positive public implications – for holding Smith to the agreements to which he agreed and prohibiting him from using misappropriated confidential information. Both because of the public interest in upholding contracts and the public interest in preventing individuals from misappropriating trade secrets to gain an unfair advantage, enforcement of the Agreements is consistent with the public interest.

## CONCLUSION

In light of the foregoing, including Smith's repeated and extensive exposure to Optum's trade secrets, Optum respectfully requests that this Court issue a TRO that, *inter alia*, bars him from working for Optum's competitor ABC in violation of his ongoing contractual and statutory obligations to Optum, in the form of the Proposed Order filed herewith.