# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

OPTUM, INC. and
OPTUM SERVICES, INC.,

*Plaintiffs*,

v.

DAVID WILLIAM SMITH,

*Defendant*.

Civil Action No.: 19-cv-10101

## AFFIDAVIT OF DAVID SMITH

I, David Smith, hereby state under penalty of perjury as follows:

1.     I submit this Affidavit in opposition to Plaintiffs' Motion for a Temporary Restraining Order. The matters set forth herein are based on my personal knowledge.

### *Employment with Optum*

2.     I have worked in the health care space for my entire professional career. From 2004 to 2009, I worked as an analyst for a health care venture capital fund in New York, focused on medical technology and biotechnology. From 2009 to 2011, I attended business school and achieved a joint degree in health administration and policy. From 2011 to 2016 (including an internship during business school in 2010), I worked as a consultant at Bain & Company, focused on health care, working with health care insurers, health systems, pharmaceutical companies and other health care services companies.

3.     From July 2016 to December 2018, I worked for Optum, Inc. ("Optum"), a subsidiary of UnitedHealth Group ("UHG"), as a Vice President of Corporate Strategy and Product. I was a junior leader for Optum. In this job, I worked under the direct supervision of Nick Seddon, Head of Corporate Product, and Steve Wolin, Head of Corporate Strategy. As of

2018, these groups reported into Michael Weissel, Executive Vice President of Product and Strategy. Michael Weissel reported into Dirk McMahon, President of Optum, who in turn reported into Andrew Witty, CEO of Optum. Andrew Witty reported into David Wichmann, CEO of UHG. In my career at Optum, I never met either Andrew Witty or David Wichmann, and had met Dirk McMahon fewer than five times in my more than two years with the company.

4.      I was not a member of Optum's executive team or a part of senior leadership (i.e., I was not on the "Executive Leadership Team" consisting of the top ten to fifteen employees at Optum, nor was I on the "Senior Leadership Team" consisting of the approximately top two-hundred employees at Optum). I did not have independent authority to make decisions regarding Optum's corporate strategy or product portfolios and, as of 2018, I was one of seven individuals at a similar level on the Corporate Strategy/Product teams.

5.      Optum is in the business of delivering health care products and services to many customer types, including insurers, state and federal government entities, providers and employers. My role at Optum involved working on Optum's strategies and products in areas including workers' compensation, population health, and pharmacy benefits. In my job at Optum, I had no involvement in providing any Optum products or services to Amazon, Berkshire Hathaway and JPMorgan Chase (the "Founders"), and I had no confidential information about any Optum activity, product, or service related to the Founders.

6.      As part of my employment with Optum, I agreed to an Employment Arbitration Policy. A true and correct copy of my Employment Arbitration Policy is attached as Exhibit 1.

***Employment Offer From ABC***

7.      On December 11, 2018, I accepted an offer of employment from TCorp62018 LLC ("ABC"), a company that was created by the Founders with the goal of providing better health

2

care outcomes and increased patient satisfaction for the Founders' own employees and their families.

8.      By way of background, on June 24, 2018, I reached out to ABC's Chief Executive Officer, Atul Gawande, via email, expressed an interest in working with ABC, and submitted my resume. I did not receive a reply from Mr. Gawande. I was interested in working for ABC because I believed it would provide exciting, intellectually challenging, and very different opportunities to work directly toward better health care outcomes for a group of employees and their families. My interest was not financially motivated, and, in fact, my total compensation at ABC is less than I received at Optum.

9.      On October 7, 2018, an ABC recruiter, Paige Divoll, contacted me through LinkedIn, though I did not see or respond to this message until October 18, 2018. She arranged for me to interview with Jack Stoddard, ABC's Chief Operating Officer, on October 29, 2018, and arranged interviews with other ABC representatives on November 2, 2018. I never discussed or disclosed any Optum strategy, business plan, trade secret, or other confidential information to anyone at ABC, its recruiter, or any other third party (nor was I asked about these topics at any point), and I have not done so ever.

10.     On December 6, 2018, at approximately 3:00 p.m. central time, and after the conclusion of Optum's quarterly strategy meeting that I attended that day, I received a phone call from Ms. Divoll advising me that I would be getting an offer of employment from ABC. Prior to that date, I had no confirmation and did not have any certainty as to if, in fact, I would receive an offer of employment from ABC.

11.     On December 7, 2018, I received a written offer from ABC. I did not immediately decide to accept the offer. My wife and I co-parent two young children. I planned to discuss with

3

my wife what working at ABC would mean for our personal lives and the lives of our children. We considered the offer, discussed these issues over the weekend, and by Tuesday December 11, I decided to accept the offer. I signed and returned the ABC offer letter on December 11, 2018.

12.     On that same day, I notified Nick Seddon (Head of Corporate Product at Optum) that I had accepted the ABC offer. Believing that communications to more senior executives should be done in person, I advised Michael Weissel (Executive Vice President of Product and Strategy) and Steve Wolin (Head of Corporate Strategy) of my acceptance of ABC's offer on the morning of December 13, 2018, when they returned to the office from an out-of-town engagement. My communications with Mr. Weissel and Mr. Wolin were cordial and professional, and I advised them that I planned to work for Optum through the end of 2018 in order to enable a smooth transition.

13.     Contrary to the assertion made by Mr. Wolin in Paragraph 24 of his affidavit, at no time during my meeting with Mr. Wolin did he ever tell me that he "was uncomfortable with [my] plans to join ABC, a competitor of Optum that promises to be a disrupter in the health care industry, and that [I] would have an issue with [my] noncompete and equity grants under the Agreements." Nor did Mr. Wolin make any similar statements. When I ended my conversation with Mr. Wolin, I left with the clear understanding that I would work for Optum through the end of December.

14.     For the remainder of December 13, 2018, I focused on transitioning my duties to other Optum employees. At approximately mid-day, Mr. Weissel reached out to suggest that for the remainder of my transition, I should recuse myself from anything that may be sensitive. At this point, I canceled a number of future meetings and focused solely on transition activities. At approximately 3:00 p.m. that day, however, I was advised by Mr. Wolin that I was being placed on administrative leave at the recommendation of Legal and told to leave the building. I left all

4

Optum property behind. I did not walk out of the building with any of Optum's property, documents, or data in any media.

15.     On December 21, 2018, Optum sent me a letter threatening to bring legal action against me. As I have represented to Optum, through my counsel, the only UHG or Optum documents I have in my possession are an email chain with a slide deck attachment containing my headshot, some of my own personnel and onboarding documents, and some publicly filed UHG reports. I have also told Optum, through my counsel, that I will execute an affidavit attesting to these facts and return or destroy the documents at Optum's direction. Optum never responded to my offer.

16.     I understand that my employment with Optum was officially terminated on January 5, 2019. I began my employment with ABC on January 17, 2019. As a condition of my employment, ABC required me to sign an Employee Confidentiality, Assignment and Non-Solicitation Agreement. A true and correct copy of that Employee Confidentiality, Assignment and Non-Solicitation Agreement is attached as Exhibit 2. ABC also required me to sign an Acknowledgement on my first day of work that states, among other things, I will not use or disclose any confidential information belonging to a prior employer, and will immediately contact Erica Davila (ABC's Acting General Counsel) if I have any concerns about those issues. A true and correct copy of that Acknowledgment is attached as Exhibit 3.

17.     Optum's own Executive Vice President of Product and Strategy, Michael Weissel, has openly stated that ABC "is more likely a customer than a competitor."

18.     My role at ABC will be to conduct in-depth research focused on understanding the one million employees and family members who work for and receive health benefits from the Founders. This role is unrelated to the job I was performing at Optum, and it will not require me

5

to draw upon any Optum confidential information I was privy to while working for that company for at least three reasons. First, in my job at Optum, I had no involvement in providing any Optum products or services to the Founders, and I had no confidential information about any Optum activity, product, or service related to the Founders. Second, at ABC, I will not assist in any analysis of any Optum products or services (either separately or in comparison to any other company's products or services). Instead, I will be working for the Founders to help their employees better interact with the health care system—essentially acting as a benefits consultant and as an extension of the Founders' benefits teams, which are customers of companies like Optum, not competitors. Third, I will be solving a problem fundamentally different from the issues I worked on for Optum. My old role at Optum was focused on profitably selling Optum products into multiple markets, whereas my new role at ABC has nothing to do with commercializing products or making a profit; it is only focused on helping to improve the health and wellbeing of the employees and families of the Founders and helping make health benefits more affordable for the Founders' companies.

### *I Did Not Engage In Any Wrongful Conduct*

19.     Optum makes several allegations about me in its Complaint. These allegations are false. I have not misappropriated any Optum confidential information and have not shared (and will not share) any of Optum's information with anyone associated with ABC. At all times during my employment with Optum up until I was placed on administrative leave, my focus was on performing my job for Optum.

20.     Optum alleges that on October 29, 2018, I printed a document titled "20180912 Project Orange Factbook v.FINAL.pdf" (the "Factbook"). Optum alleges that the Factbook contains highly confidential, competitive information that I would have "no reason to print" for

6

my work responsibilities at Optum. *See* ECF No. 4, p. 7; ECF No. 7, Wolin Aff. ¶ 36. The Factbook was created as part of the first phase of a planned four-phase initiative to refresh Optum's corporate strategy and determine how the company can better sell its products and services in the health care market. The first phase involved fact-based market research, and the Factbook summarized that research. The second phase involved the development of a high-level approach and overall corporate strategy structure. Two more phases were planned for completion in the February-April 2019 time period to develop an actual strategy for the business units to sell specific products, which I was not privy to since I was placed on administrative leave before these phases commenced.

21.    Though I did not draft the Factbook itself, I assisted with the market research summarized in the Factbook and used the document in performing my job (as did the entire Corporate Strategy team) in order to help businesses understand how the Corporate Strategy group was looking at overall health care trends. I printed the document as part of my work for Optum and either discarded or left the document at Optum. While working for Optum, I routinely printed and read/worked from hard copy documents while in the office. It was my preference and regular practice to read and work from hard copy documents for in-person meetings rather than electronic documents. I have not retained, used, or disclosed the Factbook or the contents of the Factbook to anyone outside of Optum.

22.    Optum alleges that on December 4, 2018, I "asked junior members on the Corporate Strategy team for secret information that had nothing to do with [my] job." *See* ECF No. 4, p. 7. I do not know what Optum is referring to specifically, as it provides no details regarding who I allegedly asked, what "secret" information I allegedly asked about, or why that "secret" information was unrelated to my job.

7

23.     In performing their jobs, the Optum Corporate Strategy team members—particularly those who sit at a single space in Boston, which included me—continually brainstorm and talk among themselves and with other colleagues about a wide range of business ideas and concepts, beyond the specific tasks to which they are assigned at the time.  Both I and other team members used each other as sounding boards, to get different perspectives on issues they are talking through, and to collaborate.  I attest that I did not, on December 4, 2018, or at any other time, engage with any colleague in an effort to obtain confidential information that had nothing to do with my job.  Any work-related conversations I had with junior members of the Corporate Strategy team were solely intended to advance Optum's business goals.

24.     Optum alleges that on December 6, 2018, I attended a confidential, cross-team product and strategy meeting with senior leadership, including Optum's Chief Executive Officer. Optum claims that I should not have attended the meeting because I was informed by ABC's recruiter that same day that I would receive a formal written offer the next day.  *See* ECF No. 4, p. 7.  However, I had not yet received a job offer from ABC at the time I attended this meeting.  At that point, I had no confirmation and did not have any certainty as to if, in fact, I would receive an offer of employment from ABC.  Therefore, my resignation was not imminent and my attendance and participation at the meeting was appropriate and, indeed, required as part of my job duties for Optum.  Optum held off-site strategy meetings approximately every three months.  These quarterly meetings were attended by Michael Weissel and either Steve Wolin and the Corporate Strategy team or Nick Seddon and the Product team.  As a member of both teams, I was expected to attend and participate in the meetings, and often led discussions and prepared meeting materials.  For the December 6, 2018 meeting, I helped to prepare and present a discussion about changing product organization.  I gave my presentation around mid-day.  At roughly 3:00 p.m. central time, after the

8

meeting had concluded, I received a call from Ms. Divoll notifying me that I would be receiving

an offer from ABC.  Prior to receiving that call, I did not know that I would be receiving an offer

from ABC.  I continued to work diligently for Optum until I was placed on administrative leave

on December 13, 2018.

25.     Optum alleges that on December 10, 2018, I printed out a document titled "OES

Socialization Deck for OET _v20181126FINAL.pptx" (the "OES Deck").  Optum alleges that the

OES Deck contains highly confidential information that I would have "no reason to print" for my

work responsibilities at Optum.  *See* ECF No. 4, p. 7; ECF No. 7, Wolin Aff. ¶ 36.  The OES Deck

was created as part of the second phase of the four-phase initiative referenced above, and the

document memorialized Optum's corporate strategy at a high level.  I relied heavily on this

document when preparing for the December 6, 2018 quarterly strategy meeting and in ongoing

work, both for the Product team and for the Corporate Strategy team as it was intended to be

socialized (i.e., shared) within Optum (per the title of the document).  I again printed it on

December 10 as part of two pieces of work specifically assigned to me.  The first project was an

effort to help the Pharmacy Benefit Management business (OptumRx) grow business with health

care insurers.  OptumRx leadership had been solely focused on Optum Rx products, and I was

trying to help them think more broadly about how to go to market.  The OES Deck focused on this

approach at a very high level, and bringing it to update meetings allowed me to convince leadership

to take a longer, broader view, understanding that the OES Deck reflected just an outline.  The

second project was an effort to help the Product team think about how to allocate capital, and

understanding which products might align with the strategy outlined in the OES Deck allowed us

to make proposals to the businesses about which products they should spend more time on.  Given

the large number of products at Optum, I needed to print out documents to be able to compare

9

to work for Optum until the end of 2018, so I intended to continue progressing and transitioning these projects for the rest of December. I either discarded or left the OES Deck at Optum. I have not retained, used, or disclosed the OES Deck or the contents of the OES Deck to anyone outside of Optum.

26. As I stated above, other than the email and attachment containing my headshot, some personnel and onboarding documents, and some public reports, I have no hard or electronic copies of any Optum documents in my possession. I did not print-out and remove any Optum documents to my home. I have not shared any Optum documents with ABC, or any other third party, except as authorized by Optum during the course of my employment. When placed on administrative leave on December 13, 2018, I left my work laptop and all other Optum property with Optum and did not remove any Optum property from the office. Any Optum documents I printed at work were either discarded once I was finished with them or left at Optum when I was placed on administrative leave.

### *I Did Not Solicit Caitlin Fleming, Or Any Other Optum Employees, To Work For ABC*

27. Optum also alleges that I solicited another former Optum employee, Caitlin Fleming, to leave Optum and work for ABC, in violation of my non-solicit with Optum. Again, this is a false allegation.

28. Ms. Fleming previously worked with me in the Corporate Strategy group, but rotated out of that group in the beginning of 2018. After that, I no longer worked with Ms. Fleming directly, though I maintained a good professional relationship with her. I was unaware that Ms. Fleming was interviewing with ABC until Ms. Divoll informed me on December 6, 2018. Upon being informed of this, I canceled a meeting I had scheduled with Ms. Fleming for the following

10

week, and intentionally kept my distance from her because of my non-solicit. I had no involvement whatsoever in recruiting Ms. Fleming to ABC, and I never encouraged or solicited Ms. Fleming to leave Optum or join ABC. I have made no efforts to recruit any other Optum employees to work for ABC, nor do I intend to do so.

### *Granting Optum's Request For A Temporary Restraining Order And Injunction Would Cause Great Hardship To Me And My Family*

29.     In this action, Optum seeks to prohibit me from working for ABC or any other company that, in Optum's view, competes with it "directly or indirectly."  Given that Optum describes itself as servicing "every dimension of the health system across the United States and globally," (ECF No. 3, ¶ 13), Optum effectively seeks an order that would bar me from working in the health care industry entirely.

30.     If the relief Optum seeks is granted, it would cause extreme hardship to me and my family.  I would be prohibited from working in the health care industry, my field of expertise and the space in which I have worked for my whole professional career, for an entire year.  I am married with two young children, ages one and three.  I am the primary wage earner for my family and my income is needed to, among other things, pay the mortgage and maintenance on our home, pay down graduate school debt, and provide for childcare and other basic necessities for my family. Having an injunction granted against me based on Optum's false allegations also may cause irreparable and indefinite damage to my professional reputation and career trajectory and make it difficult for me to obtain employment in the health care industry ever again.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on _January 21_ , 2019

David Smith

11

# EXHIBIT 1

**UnitedHealth Group Employment Arbitration Policy Acknowledgement Form**

DAVID SMITH

**Review and Acknowledge at the bottom of this page**

UnitedHealth Group Employment
Arbitration Policy

**Employment Arbitration Policy**

### A.   STATEMENT OF INTENT

UnitedHealth Group Incorporated and its subsidiaries and affiliates (referred to as "UnitedHealth Group") acknowledge that disagreements may arise between an individual employee[1] and UnitedHealth Group or between employees in a context that involves UnitedHealth Group. It is the intent of UnitedHealth Group that legal disputes be resolved as efficiently and amicably as possible, and that issues not resolved voluntarily through informal resolution or through the  internal dispute resolution ("IDR") process be resolved through binding arbitration.  Unless excluded below, legal disputes that cannot be resolved through voluntary informal resolution or the IDR process are covered under this Employment Arbitration Policy ("Policy").

This Policy is a binding contract between UnitedHealth Group and its employee.  **Acceptance of employment or continuation of employment with UnitedHealth Group is deemed to be acceptance of this Policy.** However, this Policy is not a promise that employment will continue for any specified period of time or end only under certain conditions. Employment at UnitedHealth Group is a voluntary (at will) relationship existing for no definite period of time and this Policy does not change that relationship.

The Federal Arbitration Act (9 U.S.C. § 1 et seq.) shall govern this Policy.  All disputes covered by the Policy shall be decided by an arbitrator through arbitration and not by way of court or jury trial.

### B.   SCOPE OF POLICY

This Policy creates a contract between UnitedHealth Group and employee requiring both parties to resolve employment-related disputes (except the excluded disputes listed below) that are based on a legal claim through final and binding arbitration. Arbitration is the exclusive forum for the resolution of such disputes, and the parties mutually waive their right to a trial before a judge or jury in federal or state court in favor of arbitration under the Policy.

UnitedHealth Group and employee mutually consent to the resolution by arbitration of all claims and controversies, past, present, or future, that employee may have against UnitedHealth Group or UnitedHealth Group may have against employee, which arise out of or relate to employee's employment, application for employment, and/or termination of employment.

Employees are encouraged to exhaust the IDR process before initiating arbitration. If an employment-related dispute is not resolved through the IDR process and the dispute is based on a legal claim not expressly excluded from this Policy, any party to the dispute may initiate the arbitration process. UnitedHealth Group is not required to follow the steps of either the IDR process or the Policy before initiating or implementing any disciplinary action.

Subject to the specific exclusions below, the claims covered by the Policy include, but are not limited to: claims for unfair competition and violation of trade secrets; claims incidental to the employment relationship but arising after that relationship ends (for example, claims arising out of or related to post-termination defamation or job references and claims arising out of or related to post-employment retaliation); claims for wages or other

000044

compensation due (including but not limited to, minimum wage, overtime, meal and rest breaks, waiting time penalties, vacation pay and pay on separation); claims for breach of any contract or covenant (express or implied); tort claims; common law claims; equitable claims; claims for discrimination and harassment; retaliation claims; and claims for violation of any federal, state or other governmental law, statute, regulation, or ordinance, except claims excluded below.

Covered claims include any disputes regarding the Policy or any portion of the Policy or its interpretation, enforceability, applicability, unconscionability, arbitrability or formation, or whether the Policy or any portion of the Policy is void or voidable, with the exception noted in the Class and Representative Actions Waivers section below.

Claims excluded from mandatory arbitration under the Policy are (i) Workers' Compensation benefit claims (but workers' compensation discrimination and/or retaliation claims are covered); (ii) state unemployment or disability insurance compensation claims; (iii) claims for severance benefits under the UnitedHealth Group Severance Pay Plan; (iv) claims for benefits under UnitedHealth Group's other ERISA benefit plans; (v) claims for benefits under UnitedHealth Group's Short-Term Disability Plan; (vi) claims that may not be the subject of a mandatory arbitration agreement as provided by Section 8116 of the Department of Defense ("DoD") Appropriations Act for Fiscal Year 2010 (Pub. L. 111-118), Section 8102 of the Department of Defense ("DoD") Appropriations Act for Fiscal Year 2011 (Pub. L. 112-10, Division A), and their implementing regulations, or any successor DoD appropriations act addressing the arbitrability of claims; and (vii) claims that the Dodd-Frank Wall Street Reform and Consumer Protection Act or other controlling federal law bars from the coverage of mandatory pre-dispute arbitration agreements..

This Policy does not preclude an employee from filing a claim or charge with a governmental administrative agency, such as the National Labor Relations Board, the Department of Labor, or the Equal Employment Opportunity Commission, or from filing a workers' compensation or unemployment compensation claim in a statutorily-specified forum. In addition, this Policy does not preclude either an employee or UnitedHealth Group from seeking emergency or temporary injunctive relief in a court of law in accordance with applicable law. However, after the court has issued a ruling concerning the emergency or temporary injunctive relief, the employee and UnitedHealth Group are required to submit the dispute to arbitration pursuant to this Policy.

 An issue is subject to arbitration only if it states a claim under applicable federal, state, or local law. An arbitrator or a court of law with jurisdiction shall dismiss, without a hearing on the merits, any matter which does not state a claim under applicable federal, state, or local law.

**C.    CLASS AND REPRESENTATIVE ACTION WAIVERS**

There will be no right or authority for any dispute to be brought, heard, or arbitrated as a class or collective action, or in a representative capacity on behalf of any other person. Nor shall the Arbitrator have any authority to hear or arbitrate any such dispute. Accordingly,

1. There will be no right or authority for any dispute to be brought, heard or arbitrated as a class or collective action ("Class Action Waiver"). The Class Action Waiver shall not be severable from this Policy in any case in which (1) the dispute is filed as a class or collective action and (2) a civil court of competent jurisdiction finds the Class Action Waiver is invalid, unenforceable, unconscionable, void or voidable. In such instances, the class action must be litigated in a civil court of competent jurisdiction; and

2. There will be no right or authority for any dispute to be brought, heard or arbitrated as a private attorney general act representative action ("Private Attorney General Waiver"). The Private Attorney General Waiver does not apply to any claim employee brings in arbitration as a private attorney general solely on employee's own behalf and not on behalf of or regarding others. The Private Attorney General Waiver shall be severable from this Policy in any case in which a civil court of competent jurisdiction finds the Private Attorney General Waiver is invalid, unenforceable, unconscionable, void or voidable. In such instances and where the claim is brought as a private attorney general, such private attorney general claim must be litigated in a civil court of competent jurisdiction.

000045

Regardless of anything else in this Policy and/or any rules or procedures that might otherwise be applicable by virtue of this Policy or by virtue of any arbitration organization rules or procedures that now apply or any amendments and/or modifications to those rules, the interpretation, enforceability, applicability, unconscionability or formation of the Class Action Waiver and Private Attorney General Waiver may be determined only by a court and not by an arbitrator.

### D.   ARBITRATION RULES AND PROCEDURES

The arbitration will be administered by the American Arbitration Association ("AAA") and, except as provided in this Policy, shall be in accordance with the then-current Employment Arbitration Rules of the AAA ("AAA Rules").  The AAA Rules are available via the Internet at www.adr.org/employment or by using a search engine such as www.google.com to search for "AAA Employment Arbitration Rules."  To the extent any of the terms, conditions, or requirements of this Policy conflict with AAA Rules, the terms, conditions, or requirements of this Policy shall govern,  All arbitrations shall be conducted in accordance with the Policy in effect on the date the Corporate Legal Department receives the Demand for Arbitration, except that any amendments to the Policy made after a claim arises will not be applied to proceedings related to that claim.

#### 1.   Initiation of Arbitration Proceeding

**a. Arbitration Initiated by Employee** - UnitedHealth Group shall pay 100 percent in excess of the first twenty-five dollars ($25) of the required AAA administrative fee. An employee may initiate arbitration by submitting, within the applicable statute of limitations period, a written demand for arbitration which states a claim under applicable federal, state, or local law to Corporate Legal Department, UnitedHealth Group, 9900 Bren Road East, MN008-T502, Minnetonka, MN 55343, with a check for $25 payable to "UnitedHealth Group." The demand shall set forth the dispute, including the alleged act or omission at issue, the name, address and telephone number of the employee, and the names of all persons allegedly involved in the act or omission. Within 30 business days of receiving such demand UnitedHealth Group shall file the demand with the appropriate office of the AAA, together with the applicable administrative fee as provided in the AAA's fee schedule.

**b. Arbitration Initiated by UnitedHealth Group** - UnitedHealth Group may initiate arbitration by submitting, within the applicable statute of limitations period, a written demand for arbitration which states a claim under applicable federal, state, or local law to the employee's last home address of record via certified mail or overnight mail. The demand shall set forth the dispute, including the alleged act or omission at issue, the name, address and telephone number of the employee, and the names of all persons allegedly involved in the act or omission. Within 30 business days of submitting the demand to the employee, UnitedHealth Group shall file the demand with the appropriate office of the AAA, together with the applicable administrative fee as provided in the AAA's fee schedule. When arbitration is initiated by UnitedHealth Group, the company is responsible for 100% of all AAA administrative fees.

#### 2.   Appointment of Neutral Arbitrator

The arbitrator shall be selected in the following manner:

**a.** As soon as practicable, the AAA shall submit to each party an identical list of nine (9) proposed arbitrators.

**b.** Each party shall have ten (10) business days from the mailing date of the list to cross off names of arbitrators to which the party objects, number the remaining names in order of preference and return the list to the AAA. Each party may strike up to three names without cause.

**c.** If the party does not return the list within the time specified, all persons on the list shall be deemed acceptable.

**d.** If only one common name remains on the lists of all parties, that individual shall be designated as the arbitrator. If more than one common name remains on the lists of all parties, the AAA shall appoint an arbitrator remaining on the list in the order of preference, to the extent the order of preference of the parties can be reconciled by the AAA.

In the event the parties fail to agree on any of the persons named, or if an acceptable arbitrator is unwilling to act, the AAA shall issue an additional list of arbitrator names to the parties.

**3.    Qualifications of Neutral Arbitrator**

Unless the parties jointly agree otherwise, the arbitrator shall be an attorney experienced in employment law and licensed to practice law in the state in which the arbitration is convened, or a retired judge from any jurisdiction.

**4.    Vacancies**

If a vacancy occurs, if an appointed arbitrator is unable to serve promptly, or if an arbitrator is disqualified under subparagraph 3 above, the vacancy shall be filled in accordance with subparagraph 2.

**5.    Summary Disposition**

The arbitrator shall have the authority to issue an award or partial award without conducting an arbitration hearing on the grounds that there is no claim stated on which relief can be granted or that there is no genuine issue as to any material fact and that a party is entitled to a judgment as a matter of law, consistent with Rule 12 or Rule 56 of the Federal Rules of Civil Procedure. Upon the request of either party, the arbitrator will establish a briefing schedule and, if necessary, schedule an opportunity for oral argument prior to considering such motions for dispositive motions.

**6.    Date, Time, and Place of Hearing**

The arbitrator shall set the date and time of the hearing. Unless the parties jointly agree otherwise, the arbitration shall take place in or near the city in which employee is or was last employed by UnitedHealth Group.

**7.    Representation**

Any party may be represented by an attorney or by him or herself. A party must inform the other party and the AAA of the name, address and telephone number of an authorized representative at least three (3) business days prior to the date set for the hearing.

**8.    Confidentiality**

All proceedings under this Policy are private and confidential, unless applicable law provides to the contrary. The arbitrator shall maintain the privacy and confidentiality of the arbitration hearing unless applicable law provides to the contrary. The arbitrator shall have the authority to make appropriate rulings to safeguard that confidentiality.

**9.    Stenographic Record**

000047

Either party may request a stenographic record of the hearing. The party that requests the record shall bear the cost of such a record. If both parties request a stenographic record, the cost shall be borne equally by the parties.

**10.   Discovery**

**a. Interrogatory** - Each party shall be entitled to propound and serve upon the other party one interrogatory in a form consistent with Rule 33 of the Federal Rules of Civil Procedure and which shall be limited to the identification of potential witnesses. "Identification" means that a party must identify each witness's name, current address and telephone number, and a brief description of the subject of testimony.

**b. Requests for Production of Documents** - Each party shall be entitled to propound and serve upon the other party one set of Requests for the Production of Documents in a form consistent with Rule 34 of the Federal Rules of Civil Procedure and which shall be limited in number to twenty-five (25) requests (including subparts, which shall be counted separately). Parties reserve the right to make objections to any document request on the grounds that the request is irrelevant, overly broad, vague, or burdensome, or any other good faith objection available under the Federal Rules of Civil Procedure.

**c. Depositions** - Each party shall be entitled to conduct a maximum of two (2) eight-hour days of depositions of witnesses or of the parties in accordance with the procedures set forth in Rule 30 of the Federal Rules of Civil Procedure. In addition, each party shall be entitled to conduct a maximum of one (1) eight-hour day of depositions of expert witnesses designated by the other party.

**d. Physical and Mental Examinations** - Each party shall be entitled to obtain discovery consistent with Rule 35 of the Federal Rules of Civil Procedure.

**e. Arbitrator Authority** - The arbitrator shall have the authority to resolve all issues concerning discovery that may arise between the parties. Each party can request that the arbitrator allow additional discovery, and additional discovery may be conducted under the parties' mutual stipulation or as ordered by the arbitrator.  In addition, the arbitrator shall have the authority to issue subpoenas for the appearance of witnesses or the production of documents pursuant to applicable law.

**f. Prehearing Submissions** - At least thirty (30) days prior to the hearing, the parties are required to exchange lists of witnesses, including any expert witnesses, who the parties anticipate will be called to testify at the hearing. In addition, the parties are required to exchange copies of all exhibits the parties intend to introduce as evidence at the hearing.

**12.   Evidence**

The arbitrator shall apply the Federal Rules of Evidence.

**13.   Award**

**a. Form -** The award shall be in writing and shall set forth findings of fact and conclusions of law upon which the arbitrator based the award.  All awards shall be executed in the manner required by law.

000048

**b. Scope of Relief –** Except as to disputes involving an employment agreement or equity award containing a Minnesota choice of law provision, the arbitrator shall follow the rules of law of the state which is the employee's principal place of work, any applicable Federal law, and the rules as stated in this Policy. In cases involving an employment agreement and/or equity award with a Minnesota choice of law provision, the arbitrator shall follow Minnesota law, any applicable Federal law, and the rules as stated in this Policy. The arbitrator shall have the authority to grant any remedy or relief (including attorneys' fees where authorized by statute) that the arbitrator deems just and equitable and which is authorized by and consistent with applicable law, including applicable statutory limitations on damages.

**c. Final Judgment -** The award shall be final and binding upon all parties to the arbitration.

### 14.   Delivery of Award to Parties

The award shall be deemed delivered to a party upon placement of the award, or a true and correct copy thereof, addressed to the party or its representative at the last known address in the U.S. mail, certified, return receipt requested; personal service of the award, or a true and correct copy thereof; or the filing of the award in any manner that is permitted by law.

### 15.   Severability

Except as provided in the clause entitled "Class and Representative Action Waivers," above, if any portion or provision of this Policy is held to be void or unenforceable, the remainder of this Policy will be enforceable and any part may be severed from the remainder, as appropriate.

### 16.   Judicial Proceedings and Enforcement of Awards

Either party may bring an action in a court of competent jurisdiction to compel arbitration under this Policy, to enforce an arbitration award, or to vacate an arbitration award.

### 17.   Expenses

The expenses of witnesses for either side shall be paid by the party requiring the presence of such witnesses. Each side shall pay its own legal fees and expenses, except where such legal fees and expenses may be awarded under applicable law.

### 18.   Time Period for Arbitration

The written Demand for Arbitration must be received within the time period allowed pursuant to the statute, regulation, or other law applicable to the alleged act or omission giving rise to the dispute. Nothing in this Policy relieves any party of the duty to exhaust administrative remedies by filing a charge or complaint with an administrative agency and obtaining a right to sue notice, where required by law.

### 19.   Interpretation and Application of Procedure

The arbitrator shall interpret and apply these procedures insofar as they relate to the arbitrator's powers and duties. All other procedures shall be interpreted and applied by the AAA.

### E.   CONSIDERATION

The mutual obligations by UnitedHealth Group and by employee to arbitrate differences provide consideration for each other. UnitedHealth Group's payment of the filing fee in excess of $25 for employee also constitutes

000049

consideration for this Policy.   Employee's employment by UnitedHealth Group constitutes additional consideration.

Employee and UnitedHealth Group understand and agree that through this agreement, UnitedHealth Group and employee give up their respective rights to a court or jury trial and that, pursuant to the terms of this Policy, UnitedHealth Group and employee are agreeing to arbitrate claims covered by this Policy.

This Policy supersedes any and all prior versions and has been revised effective January 1, 2016.

_____

[1]  Throughout this Policy, the term "employee" includes both current and former employees of UnitedHealth Group.

**DAVID SMITH**

Date Received:   08/02/2016

**Thank You. Your acknowledgement has been captured. No further action is needed.**

000050

# EXHIBIT 2

DocuSign Envelope ID: 8FD46900-B244-4A24-B693-882EE33220F6

**TCorp62018 LLC**

**Employee Confidentiality, Assignment and Non-Solicitation Agreement**

In consideration and as a condition of the commencement of my employment by **TCorp62018 LLC** (including its subsidiaries and other affiliates and its and their successors and assigns, the "Company"), I agree as follows:

1.     **Proprietary Information.** I agree that all proprietary and confidential information, whether or not in writing, concerning the Company's business, technology, business relationships or financial affairs which the Company has not released to the general public (collectively, "Proprietary Information") and all tangible embodiments thereof are and will be the exclusive property of the Company. By way of illustration, Proprietary Information may include information or material which has not been made generally available to the public, such as: (a) *corporate information*, including plans, strategies, methods, policies, resolutions, negotiations or litigation; (b) *marketing information*, including strategies, methods, customer or business partner identities or other information about customers, business partners, prospect identities or other information about prospects, or market analyses or projections; (c) *financial information*, including cost and performance data, debt arrangements, equity structure, investors and holdings, purchasing and sales data and price lists; (d) *operational and scientific information*, including plans, specifications, manuals, forms, templates, software, pre-clinical and clinical testing data and strategies, research and development strategies, designs, methods, procedures, formulas, data, reports, discoveries, inventions, improvements, concepts, ideas, know-how and trade secrets; and (e) *personnel information*, including personnel lists, reporting or organizational structure, resumes, personnel data, compensation structure, performance evaluations and termination arrangements or documents. Proprietary Information also includes information received in confidence by the Company from its customers or suppliers, business partners or other third parties.

2.     **Recognition of Company's Rights.** I will not, at any time, without the Company's prior written permission, either during or after my employment, disclose any Proprietary Information to anyone outside of the Company, or use or permit to be used any Proprietary Information for any purpose other than the performance of my duties as an employee of the Company. I will cooperate with the Company and use my best efforts to prevent the unauthorized disclosure of all Proprietary Information. I will deliver to the Company all copies and other tangible embodiments of Proprietary Information in my possession or control upon the earlier of a request by the Company or termination of my employment.

3.     **Rights of Others.** I understand that the Company is now and may hereafter be subject to non-disclosure or confidentiality agreements with third persons ("Third Party Agreements") which require the Company to protect or refrain from use or disclosure of proprietary information. I agree to be bound by the terms of such Third Party Agreements in the event I have access to such proprietary information and have actual knowledge or reasonable grounds to believe that the proprietary information is subject to a Third Party Agreement. I understand that the Company strictly prohibits me from using or disclosing confidential or proprietary information belonging to any other person or entity (including any employer or former employer), in connection with my employment. In addition, I understand that the Company prohibits me from bringing any confidential information belonging to any other person or entity onto Company premises or into Company workspaces. I expressly acknowledge and agree that I will indemnify and hold the Company harmless against loss, damage, liability or expense arising from any claim based upon circumstances alleged to be inconsistent with the representations in this paragraph 3.

4.     **Commitment to Company; Avoidance of Conflict of Interest.** While an employee of the Company, I will devote my full-time efforts to the Company's business and I will not engage in any other business activity, except as expressly authorized in writing and in advance by the Company. I will advise an authorized officer of the Company or his or her nominee at such time as any activity of either the Company or another business presents me with a conflict of interest or the appearance of a conflict of interest as an employee of the Company. I will take whatever action is reasonably requested of me by the Company to resolve any conflict or appearance of conflict which it finds to exist.

5.     **Developments.** I acknowledge that all work performed by me is on a "work for hire" basis, and I hereby do assign and transfer and, to the extent any such assignment cannot be made at present, will assign and transfer, to the Company and its successors and assigns all my right, title and interest in and to all inventions, discoveries, designs, developments, methods, modifications, improvements, processes, algorithms, data, databases, computer programs, research, formulae, techniques, trade secrets, graphics or images, and audio or visual works and other works of authorship, including works in progress (collectively, "Developments"), whether or not patentable or copyrightable, that are created, made, conceived or reduced to practice by me (alone or jointly with others) or under my direction during the period of my employment, that (a) relate to the business of the Company or any customer of, supplier to or business partner of the Company or any of the products or services being researched, developed, manufactured or sold by the Company or which may be used with such products or services; or (b) result from tasks assigned to me by the Company; or (c) result from the use of premises or personal property (whether tangible or intangible) owned, leased or contracted for by the Company ("Company-Related Developments"), and all related patents, patent applications, trademarks and trademark applications, copyrights and copyright applications, and other intellectual property rights in all countries and territories worldwide and under any international conventions ("Intellectual Property Rights"). To the extent necessary to identify, create or protect

DocuSign Envelope ID: 8FD46900-B244-4A24-B693-882EE33220F6

the Company's interest or ownership in its rights to any Company-Related Developments as reasonably determined by the Company at any time, I agree to make full disclosure and reporting to the Company regarding such Company-Related Developments or Intellectual Property Rights.

To preclude any possible uncertainty, if there are any Developments that I have, alone or jointly with others, conceived, developed or reduced to practice prior to the commencement of my employment with the Company that I consider to be my property or the property of third parties and that I wish to have excluded from the scope of this Agreement ("Prior Inventions"), I have set forth on Exhibit A attached hereto a complete list of those Prior Inventions. If disclosure of any such Prior Invention would cause me to violate any prior confidentiality agreement, I understand that I am not to list such Prior Inventions in Exhibit A but am only to disclose a cursory name for each such invention, a listing of the party(ies) to whom it belongs and the fact that full disclosure as to such inventions has not been made for that reason. If there are any patents or patent applications in which I am named as an inventor, other than those which have been assigned to the Company ("Other Patent Rights"), I have also listed those Other Patent Rights on Exhibit A. If no such disclosure is attached, I represent that there are no Prior Inventions or Other Patent Rights. If, in the course of my employment with the Company, I incorporate a Prior Invention into a Company product, process or machine, research or development program, or other work done for the Company, I hereby grant to the Company a nonexclusive, royalty-free, fully paid-up, irrevocable, worldwide license (with the full right to sublicense through multiple tiers) to make, have made, modify, use, sell, offer for sale and import such Prior Invention. Notwithstanding the foregoing, I will not incorporate, or permit to be incorporated, Prior Inventions in any Company-Related Development without the Company's prior written consent.

This Agreement does not obligate me to assign to the Company any Development which, in the sole judgment of the Company, reasonably exercised, is developed entirely on my own time and does not substantially relate to the business efforts of the Company, or to the research and development efforts in which, during the period of my employment, the Company actually is engaged or reasonably would be engaged, and does not result from the use of premises or equipment owned or leased by the Company ("Individual Developments"). However, I will also promptly disclose to the Company any such Individual Developments for the purpose of determining whether they qualify for such exclusion. I understand that to the extent this Agreement is required to be construed in accordance with the laws of any state which precludes a requirement in an employee agreement to assign certain classes of inventions made by an employee, this paragraph 5 will be interpreted not to apply to any invention which a court rules and/or the Company agrees falls within such classes. I also hereby waive all claims to any moral rights or other special rights which I may have or accrue in any Company-Related Developments.

**6.**   **Documents and Other Materials.** I will keep and maintain records of all Proprietary Information and Company-Related Developments developed by me during my employment, as reasonably requested by the Company, and

such documents will be available to and remain the sole property of the Company at all times.

All files, letters, notes, memoranda, reports, records, data, sketches, drawings, notebooks, layouts, charts, quotations and proposals, specification sheets, or other written, photographic or other tangible material containing Proprietary Information, whether created by me or others, which come into my custody or possession, are the exclusive property of the Company to be used by me only in the performance of my duties for the Company. Any property situated on the Company's premises and owned by the Company, including without limitation computers, disks and other storage media, filing cabinets or other work areas, is subject to inspection by the Company at any time with or without notice. In the event of the termination of my employment for any reason, I will deliver to the Company all Company property and equipment in my possession, custody or control, including all files, letters, notes, memoranda, reports, records, data, sketches, drawings, notebooks, layouts, charts, quotations and proposals, specification sheets, and other written, photographic or other tangible material containing Proprietary Information, and other materials of any nature pertaining to the Proprietary Information of the Company and to my work, and will not take or keep in my possession any of the foregoing or any copies.

**7.**   **Enforcement of Intellectual Property Rights.** I will cooperate fully with the Company, both during and after my employment with the Company, with respect to the procurement, maintenance and enforcement of Intellectual Property Rights in Company-Related Developments. I will sign, both during and after the term of this Agreement, all papers, including without limitation copyright applications, patent applications, declarations, oaths, assignments of priority rights, and powers of attorney, which the Company reasonably may deem necessary or desirable in order to protect its rights and interests in any Company-Related Development or Intellectual Property Rights therein. If the Company is unable, after reasonable effort, to secure my signature on any such papers, I hereby irrevocably designate and appoint each officer of the Company as my agent and attorney-in-fact to execute any such papers on my behalf, and to take any and all actions as the Company may deem necessary or desirable in order to protect its rights and interests in any Company-Related Development, including any Intellectual Property Rights therein.

**8.**   **Non-Solicitation.** In order to protect the Company's Proprietary Information and good will, during my employment and for a period of one (1) year following the date of the cessation of my employment with the Company, I will not, directly or indirectly, in any manner, solicit, entice or attempt to persuade any employee or consultant of the Company to leave the Company for any reason or otherwise participate in or facilitate the hire, directly or through another entity, of any person who is then employed or engaged by the Company.

**9.**   **Government Contracts.** I acknowledge that the Company may have from time to time agreements with other persons or with the United States Government or its agencies which impose obligations or restrictions on the Company regarding inventions made during the course of work under such agreements or regarding the confidential nature of such

DocuSign Envelope ID: 8FD46900-B244-4A24-B693-882EE33220F6

work. I agree to comply with any such obligations or restrictions upon the direction of the Company. In addition to the rights assigned under paragraph 5, I also hereby assign to the Company (or any of its nominees) all rights which I have or acquired in any Developments, full title to which is required to be in the United States under any contract between the Company and the United States or any of its agencies.

**10.    Prior Agreements.** I hereby represent that, except as I have fully disclosed previously in writing to the Company, I am not bound by the terms of any agreement with any previous or current employer or other party to refrain from using or disclosing any trade secret or confidential or proprietary information in the course of my employment with the Company or to refrain from competing, directly or indirectly, with the business of such employer or any other party. I further represent that my performance of all the terms of this Agreement as an employee of the Company does not and will not breach any agreement to keep in confidence proprietary information, knowledge or data acquired by me in confidence or in trust prior to my employment with the Company. I will not disclose to the Company or induce the Company to use any confidential or proprietary information or material belonging to any previous employer or others.

**11.    Remedies Upon Breach.** I understand that the restrictions contained in this Agreement are necessary for the protection of the business and goodwill of the Company and I consider them to be reasonable for such purpose. Any breach of this Agreement is likely to cause the Company substantial and irrevocable damage and therefore, in the event of such breach, the Company, in addition to such other remedies which may be available, will be entitled to specific performance and other injunctive relief without the posting of a bond. If a court of law makes a final determination that I have violated this Agreement, in addition to all other remedies available to the Company at law, in equity, and under contract, I agree that I am obligated to pay all the Company's reasonable costs of enforcement of this Agreement, including attorneys' fees and expenses.

**12.    Use of Voice, Image and Likeness.** I hereby give the Company permission to use any and all of my voice, image and likeness, with or without using my name, in connection with the products and/or services of the Company, for the purposes of advertising and promoting such products and/or services and/or the Company, and/or for other purposes deemed appropriate by the Company in its reasonable discretion, except to the extent expressly prohibited by law.

**13.    Publications and Public Statements.** I will obtain the Company's written approval before publishing or submitting for publication any material that relates to my work at the Company and/or incorporates any Proprietary Information. To ensure that the Company delivers a consistent message about its products, services and operations to the public, and further in recognition that even positive statements may have a detrimental effect on the Company in certain securities transactions and other contexts, any statement about the Company which I create, publish or post during my period of employment and for six (6) months thereafter, on any media accessible by the public, including but not limited to social media and networking services and sites, electronic bulletin boards and Internet-based chat rooms, must first be reviewed and approved by an officer of the Company before it is released in the public domain.

**14.    No Employment Obligation.** I understand that this Agreement does not create an obligation on the Company or any other person to continue my employment. I acknowledge that, unless otherwise agreed in a formal written employment agreement signed on behalf of the Company by an authorized officer, my employment with the Company is at will and therefore may be terminated by the Company or me at any time and for any reason, with or without cause.

**15.    Survival and Assignment by the Company.** I understand that my obligations under this Agreement will continue in accordance with its express terms regardless of any changes in my title, position, duties, salary, compensation or benefits or other terms and conditions of employment. I further understand that my obligations under this Agreement will continue following the termination of my employment regardless of the manner of such termination and will be binding upon my heirs, executors and administrators. The Company will have the right to assign this Agreement to its affiliates, successors and assigns. I expressly consent to be bound by the provisions of this Agreement for the benefit of the Company or any parent, subsidiary or affiliate to whose employ I may be transferred without the necessity that this Agreement be resigned at the time of such transfer.

**16.    Notice of Resignation.** If I elect to resign from my employment with the Company, I agree to provide the Company with written notification of my resignation at least two (2) weeks prior to my intended resignation date. Such notice shall include the name and address of any subsequent employer and/or person or entity which whom or which I intend to engage in business activities, and my job title/position. The Company may elect to waive all or part of the two (2) week notice period in its sole discretion.

**17.    Severability.** In case any provisions (or portions thereof) contained in this Agreement shall, for any reason, be held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect the other provisions of this Agreement, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein. If, moreover, any one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to duration, geographical scope, activity or subject, it shall be construed by limiting and reducing it, so as to be enforceable to the extent compatible with the applicable law as it shall then appear.

**18.    Defend Trade Secrets Act of 2016; Other Notices.** I understand that pursuant to the federal Defend Trade Secrets Act of 2016, I shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that (a) is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made in a complaint or other document filed in a lawsuit or other

DocuSign Envelope ID: 8FD46900-B244-4A24-B693-882EE33220F6

proceeding, if such filing is made under seal. I further understand that nothing contained in this Agreement limits my ability to (A) communicate with any federal, state or local governmental agency or commission, including to provide documents or other information, without notice to the Company, or (B) share compensation information concerning myself or others, except that this does not permit me to disclose compensation information concerning others that I obtain because my job responsibilities require or allow access to such information.

**19.** <u>**Choice of Law and Jurisdiction.**</u> This Agreement will be deemed to be made and entered into in the Commonwealth of Massachusetts, and will in all respects be interpreted, enforced and governed under the laws of the Commonwealth of Massachusetts. I hereby agree to consent to personal jurisdiction of the state and federal courts situated within Massachusetts for purposes of enforcing this Agreement,

and waive any objection that I might have to personal jurisdiction or venue in those courts.

**20.** <u>**Other Agreements and Obligations**</u>. This Agreement constitutes the entire agreement between me and the Company regarding the subject matter hereof, and supersedes any previous agreements or understandings that I had or may have had between me and the Company regarding the subject matter, except any obligations specifically preserved in this Agreement.

**21.** <u>**Independence of Obligations**</u>. My obligations under this Agreement are independent of any obligation, contractual or otherwise, the Company has to me. The Company's breach of any such obligation shall not be a defense against the enforcement of this Agreement or otherwise limit my obligations under this Agreement.

I UNDERSTAND THAT THIS AGREEMENT AFFECTS IMPORTANT RIGHTS. BY SIGNING BELOW, I CERTIFY THAT I HAVE BEEN ADVISED BY THE COMPANY THAT I HAVE THE RIGHT TO CONSULT WITH COUNSEL PRIOR TO SIGNING THIS AGREEMENT.

IN WITNESS WHEREOF, the undersigned has executed this agreement as a sealed instrument.

EMPLOYEE

Signed: _____
(Employee's full name)

Type or print name: David Smith _____

Date: 12/11/2018 _____

DocuSign Envelope ID: 8FD46900-B244-4A24-B693-882EE33220F6

**EXHIBIT A**

To:    **TCorp62018 LLC**

From:   David Smith
          _____

Date:   12/11/2018
         _____

SUBJECT:     **Prior Inventions**

      The following is a complete list of all inventions or improvements relevant to the subject matter of my employment by the Company that have been made or conceived or first reduced to practice by me alone or jointly with others prior to my engagement by the Company:

    ☒     No inventions or improvements

    ☐     See below:

       _____

       _____

       _____

    ☐     Additional sheets have been emailed to TCorp62018 contact

The following is a list of all patents and patent applications in which I have been named as an inventor:

    ☒     None

    ☐     See below:

       _____

       _____

       _____

# EXHIBIT 3

### Acknowledgment

By signing below, I represent and warrant that (a) I am not bound by any agreement (such as a non-competition or non-solicitation agreement) that restricts me from becoming an employee of Tcorp62018 LLC (the "Company") or limits the performance of my job duties and responsibilities; and (b) I have not retained, and will not retain, in my possession, custody or control, any: (i) documents (hard copy, electronic, or otherwise) or other tangible embodiments of any confidential or non-public information of any former employer (for the avoidance of doubt, this includes emails and electronic documents stored in the "cloud"); or (ii) any other property, of any type belonging, to any prior employer.  I also agree that: (a) I will not disclose to the Company, or any of its employees, contractors or agents, any confidential information belonging to any current or former employer (or any other person or entity to whom I owe a duty to keep such information confidential); and (b) in the course of performing my duties on behalf of the Company, I will not make any use of any such information.  If I have concerns at any time about the matters in this Acknowledgment, I will immediately notify Erica Davila.

Signature: _____  Date: _1/ 17 / 19_
               Dave Smith