## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

OPTUM, INC. and
OPTUM SERVICES, INC.,

   *Plaintiffs*,

  v.

DAVID WILLIAM SMITH,

   *Defendant*.

Civil Action No. 19-cv-10101

## DEFENDANT DAVID WILLIAM SMITH'S REPLY IN SUPPORT OF HIS MOTION TO STAY PROCEEDINGS

## I. INTRODUCTION

This Court's questions boil down to three issues.

**First**, is a stay warranted pending appeal of the Court's failure to compel arbitration—either automatically under the Federal Arbitration Act or on a discretionary basis under the factors set out in *Hilton v. Braunskill*, 481 U.S. 770 (1987)?

**Second**, if a stay is granted, may this Court nonetheless proceed to adjudicate the temporary restraining order (*i.e.*, to rule on the subject of what Smith seeks to have considered by the arbitrator) either directly or indirectly by framing that restraining order as a "condition" of the stay?

**Finally**, if that is permissible, is there a record here which warrants any such restraining order (and, if so, what restraints make sense)?

## II. ANALYSIS

### A. Is A Stay Warranted? Yes

1

Smith has appealed this Court's failure to grant his motion to compel arbitration. Based on that automatic interlocutory appeal under the FAA, there are two separate and independent reasons why this Court should stay all further proceedings pending appeal.

### 1.    The First Reason for a Stay Arises Out of the FAA Itself.

The majority of circuits have concluded that a stay is automatic in interlocutory appeals under the FAA.[1] Further, although the First Circuit has not had an opportunity to join that majority, district courts here have held that this majority rule is not only correct but also foreordained by case law in the First Circuit predating the 1988 amendments to the FAA granting immediate interlocutory appeals. *Combined Energies v. CCI, Inc.*, 495 F.Supp.2d 142 (D. Maine 2007) (granting stay during appeal of trial court's decision declining to compel arbitration and recognizing the "the bedrock principle that once a case is appealed, jurisdiction rests with the court of appeals, not in both the court of appeals and the district court"); *Integen N.V. v. Grina*, 2003 WL 1562200 (D. Mass. 2003) (same; "[t]he First Circuit has not directly decided whether the district court has some jurisdiction pending § 16 appeals [under the FAA], but several factors guide this court to adopt the *Bradford–Scott* approach" that such stays are automatic).

*Bradford-Scott Data Corp. v. Physician Computer Network, Inc.*, 128 F.3d 504 (7th Cir. 1997) is the seminal case holding that stays in FAA cases are automatic because the remaining case and the arbitrability issue on appeal are inseparable. That, of course, is especially true here

---

[1] *See Ehleiter v. Grapetree Shores, Inc.*, 482 F.3d 207, 215 n.6, (3d Cir. 2007) (expressing agreement with "the majority rule of automatic divestiture where the Section 16(a) appeal is neither frivolous nor forfeited"); *McCauley v. Halliburton Energy Servs., Inc.*, 413 F.3d 1158, 1162-63 (10th Cir. 2005) (holding that "upon the filing of a non-frivolous § 16(a) appeal, the district court is divested of jurisdiction until the appeal is resolved on the merits); *Blinco v. Green Tree Servicing, LLC*, 366 F.3d 1249, 1251 (11th Cir. 2004) (finding automatic divestiture unless appeal is frivolous; "When a litigant files a motion to stay litigation in the district court pending an appeal from the denial of a motion to compel arbitration, the district court should stay the litigation so long as the appeal is non-frivolous."); *Bombardier Corp. v. Amtrak*, 2002 WL 31818924, at *1 (D.C. Cir. Dec. 12, 2002) (denying a motion to stay as unnecessary because the circuit court has "exclusive jurisdiction to resolve the threshold issue whether the dispute is arbitrable, and the district court may not proceed until the appeal is resolved").

where the issue on appeal (who interprets the Arbitration Policy and decides what specific relief, if any, the Court may grant) is what the trial court will pretermit by proceeding further.

That logic is reinforced by the late Judge Keeton's concern: "proceedings on the merits in a nonarbitral forum bear heavily on whether the parties can in fact obtain the benefits of arbitration." *Intergen N.V*, *supra* at *3.  Here, judicial determination on whether a TRO is or is not warranted effectively preempts or biases any subsequent arbitral judgment on who should decide.  Plus, continuing would undermine the interlocutory appeal process Congress contemplated when it enacted § 16(a) of the FAA.

Courts declining to embrace the *Bradford-Scott* rule express concerns that appeals might be misused.  That was legitimate speculation when the interlocutory appeal was added to the FAA, but now, thirty years later, it is a myth: there is zero evidence to support it in ensuing cases.  Indeed, the right to ask the court of appeals to dismiss an appeal as frivolous or to affirm summarily further vitiates any legitimacy to that campfire ghost. *Bradford-Scott Data Corp.*, 128 F.3d at 506.

Yet, Optum's Opposition suggests that a stay is never a matter of right.  That is certainly true for stays granted under a court's inherent authority but not for stays that are hinged on specific statutory language.  Here, again, Optum misleads with sound bites from *Nken v. Holder*, 556 U.S. 418, 427 (2009).  There, the Supreme Court began by noting that stays may be granted even when the applicable statute is silent: "Congress's failure expressly to confer the authority in a statute allowing appellate review should not be taken as an implicit denial of that power." *Id.*  Then, the Supreme Court concluded that the statutory provisions in the immigration act were inapposite: "Mindful that statutory interpretation turns on 'the language itself, the specific context in which that language is used, and the broader context of the statute as a whole,' . . . we conclude that the traditional stay factors—not § 1252(f)(2)—govern a request for a stay pending judicial review."

(citation omitted).  The Supreme Court's subsequent admonition that such stays under those traditional stay factors are not a matter of right says nothing about the FAA, which is the operative issue here.

> 2.    The Second Reason for a Stay Arises Out of the Traditional Factors for Granting Stays Pending Appeal.

Here, an immediate stay pending appeal is needed because further proceedings in this Court will deny Smith what he is entitled to under the Arbitration Policy and what he will be seeking on appeal.  That relief is twofold;  it entails a threshold decision by the arbitrator on what relief (if any) may be granted by the Court versus the arbitrator and what discovery may be ordered by the Court versus the arbitrator, and it also entails the benefits of the confidentiality provisions of the Arbitration Policy which mandates "[a]ll proceedings under this [Employment Arbitration] Policy are private" and that "[t]he arbitrator shall maintain the privacy and confidentiality of the arbitration hearing unless applicable law provides to the contrary."  Without an immediate stay, part of the relief to which Smith is entitled may be rendered moot: that is undeniably **irreparable injury** under *Hilton v. Braunskill*, 481 U.S. 770 (1987).

Further, Smith's appeal has **substantial merit**.  While this Court has found that there is nothing for an arbitrator to interpret, Smith's request to compel arbitration is grounded on the Supreme Court's recent decision in *Henry Schein, Inc. et al v. Archer and White Sales, Inc.*  586 U.S. ____, 2019 WL 122164 at *4 (Jan. 8, 2019).  There, the unanimous Court held that delegation clauses (like that in the instant Arbitration Policy ) relegate everything to the arbitrator and, as a result,  district courts have zero power to resolve what is arbitrable or how the arbitration will proceed or what interim remedies the arbitrator should allow:

> When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract.  **In those circumstances, a court possesses no power to decide the arbitrability issue.**  That is true even if the court thinks

that the argument that the arbitration agreement applies to a particular dispute is wholly groundless.

*Id.* at *4 (emphasis added).

Unlike cases such as *Canterbury Liquors & Pantry v. Sullivan*, 499 F. Supp. 144 (D. Mass. 1998) where the request was for a stay of a declaratory judgment that certain state liquor law regulations violated antitrust laws, this is a purely private dispute.  There is no challenge to any statute or any public regulation nor will the issuance or non-issuance of a stay affect public health or safety in any way.  This is a case where the **public interest** is a nonfactor.

But, will a stay **injure Plaintiffs**?  Here, it is important to distinguish between frustration and injury.  First, Plaintiffs are not left without a remedy under a stay; their requests for discovery or other interim relief are perfectly proper before an arbitrator and can be pursued in that forum whilst an appeal is pending and proceedings here are stayed.  That, moreover, can proceed independent of any appeal.  Second, Plaintiffs' frustrations are due to delay but that is self-imposed both by their attempt to outflank their own Arbitration Policy and by the curiosity of their enforceable protocol delegating the threshold issue of who grants what relief to the arbitrator in the first instance.  Third, there is no evidence that Smith's work for ABC will irreparably injure Plaintiffs.  The record evidence before this Court shows that Smith is not in possession of any Optum confidential information, has sworn not to use such information, and is not even working for a company or in a role where he would have any use for such information.  Any injury to Plaintiffs is based on pure speculation.

In short, this is a case where a stay of proceedings pending appeal is doubly warranted.  A stay is mandated by the FAA regardless of the *Hilton* factors.  But, beyond that, a stay is warranted under the *Hilton* factors as well.

### B.      Even With A Stay, May the Court Rule on the TRO? No

Smith's appeal is based on the Arbitration Policy and its delegation clause which requires as a threshold matter that the arbitrator decide "who decides" on what relief is available. This is admittedly a curious and inefficient method, but nonetheless it is the method that the parties have chosen. Further, the Supreme Court has now unanimously confirmed that such delegation clauses be honored even when it appears obvious what the arbitral outcome should be. Smith's request for a stay is predicated on his appeal of this Court's failure to submit that delegation question to the arbitrator.

Here, a stay and any decision on the TRO (whether directly or indirectly under the label of conditions on the stay) are mutually inconsistent. That is so because the stay being sought is to hold that TRO (or its equivalents) in abeyance pending an appellate judgment on whether this case must turn to the arbitrator for a ruling on "who decides" a TRO and what relief (if any) is available before turning that decision over to either the arbitrator or the court. There is no fence-sitting possibility here, and Optum's suggestions and case law for that possibility have no traction.

1.      *United States v. Brooks*, 145 F.3d 446 (1st Cir. 1998*)*

Optum's Opposition begins with *United States v. Brooks*, 145 F.3d 446 (1st Cir. 1998*)*: a case where the First Circuit held that the trial court erred in proceeding after an interlocutory appeal was filed and explicitly rejected the application of the limited exceptions for continued trial court action after appeal: "Like most rules, the rule that either the trial or the appellate court—but not both—may have jurisdiction over a case at any given point in time admits of some exceptions. . . . [Such] shared jurisdiction flourishes in a **circumscribed cluster of situations**, the handling of which is not inconsistent with the prosecution of an appeal." (emphasis added).

None of those applied in that case and none apply here; indeed, Optum's Opposition does not even attempt to play Cinderella's stepsisters and try to fit its foot into those rare glass slippers:

6

*i.e.*, those few collateral issues where "the risk of an intramural collision is small," such as "motions for attorneys' fees, actions in aid of execution of judgment, and orders relating to procedures in aid of appeal." *Id.* at 456.  Optum's requested TRO is none of those.[2]

2.     *Kosilek v. Spencer*, 2012 WL 5240014 (D. Mass. 2012)

Optum's Opposition then offers a soundbite from *Kosilek v. Spencer*, 2012 WL 5240014 (D. Mass. Oct. 24, 2012) (Wolf, J.) without regard to its context.  That case (and FRCP 62 on which it relies) do not authorize the grant of injunctive relief after an appeal is filed but only the modification of an injunction already issued that has been appealed: "if a stay pending appeal [of injunction ordering prison to prepare for and provide sex reassignment surgery] is justified, the court has the authority to grant it by modifying the injunction it has issued to require [only] that the defendant take forthwith all of the actions reasonably necessary to promptly provide Kosilek sex reassignment surgery, such as arranging for a doctor to perform it, if the decision ordering it is affirmed on appeal."

Here, of course, the pending appeal is not of a grant or denial of an injunction but of the failure to compel arbitration, so this approach is wholly inapposite.  This is not *Kosilek* where there is an injunctive order to order; this is the antithesis where an injunction is being added after the appeal—a usurpation of judicial power that is novel and standardless, reminiscent only of Humpty Dumpty's usurpation of the power to make words (like "stay") meaningless. Lewis Carroll, *Through The Looking Glass*, ch. 6 ("But 'glory' doesn't mean 'a nice knock-down argument'," Alice objected. "When I use a word," Humpty Dumpty said, in rather a scornful tone,

---

[2] Optum's suggestion that this Court can grant a TRO (directly or indirectly) in aid of an appeal that disputes the very same issue—*i.e.* what relief the Court has authority to provide—is illogical.  The fundamental question on appeal is to decide the issue Optum asks this Court to rule on in the first instance.  Such a request is not at all similar to the *Brooks* ministerial situations of things like motions for attorneys' fees.

7

"it means just what I choose it to mean—neither more nor less." "The question is," said Alice, "whether you can make words mean so many different things.")

### 3.  The All Writs Act (28 U.S.C. § 1651)

The All Writs Act provides, "The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."  28 U.S.C. § 1651.  Here, however, that statute is unavailing; it cannot recreate the jurisdiction that was divested once Smith filed his Notice of Appeal. *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58, (1982) ("The filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal").

Here, what is now on appeal is who decides—arbitrator or court—which forum had authority to interpret the relief available under the Arbitration Policy, and in turn grant any such relief.  That issue now belongs to the First Circuit; it no longer belongs in this Court.  This may seem impractical but federal courts are, by design, courts of limited jurisdiction and authority. "Although [the All Writs Act] empowers federal courts to fashion extraordinary remedies when the need arises, it does not authorize them to issue ad hoc writs whenever compliance with statutory procedures appears inconvenient or less appropriate." *Pennsylvania Bureau of Correction v. U.S. Marshals Serv.*, 474 U.S. 34, 43 (1985).  Simply stated, the All Writs Act does not permit a trial court to exercise such unbounded powers.

### C.  Does the Record Support Granting Optum Any Relief? No

This Court has listened to two days' worth of testimony from four witnesses.  That testimony establishes that Optum cannot meet its burden to warrant the "extraordinary and drastic remedy" of injunctive relief. *Upromise, Inc. v. Angus*, 2014 WL 212598, at *4 (D. Mass. Jan. 21,

2014).  Nor can Optum show any threat of immediate, irreparable harm; at best, its fears are based on "conjecture, surmise, or . . . unsubstantiated fears of what the future may have in store." *ITyX Solutions, AG v. Kodak Alaris, Inc.*, 2016 WL 8902596, at *8 (D. Mass. Aug. 16, 2016).

<u>1.      Optum's Trade Secret Misappropriation Claims Fail</u>

The arguments in Smith's original Opposition to TRO (ECF No. 23) ring more true after testimony.  Here are the salient points.

First, Optum's witnesses spoke to vague categories of trade secret information that may or may not remain in Smith's head.  Painting in such broad strokes is messy and legally insufficient on the trade secrets that Smith allegedly misappropriated. *Am. Sci. & Eng'g, Inc. v. Kelly*, 69 F.Supp.2d 227, 238-39 (D. Mass. 1999) (denying preliminary injunction on trade secret misappropriation claim because plaintiff's theory of misappropriation suffered from "vagueness and lack of specificity" and the court was "unclear as to exactly what 'trade secrets' were allegedly misappropriated"; the record "simply does not provide" the information necessary to determine whether there were trade secrets that warranted protection).

Second, there is zero record evidence that Smith ever misappropriated any Optum trade secret.  Even assuming that the "Factbook" document that Smith printed on October 29, 2018— nearly 6 weeks before he even had an offer from ABC—does constitute a trade secret, this Court knows from Smith's and Stoddard's testimony and sworn affidavits that Smith has never shared, disclosed, or discussed any Optum confidential information with anyone at ABC.  It is also undisputed that the Factbook was relevant to Smith's job responsibilities at Optum.  Optum's mere speculation on misappropriation does not suffice:

- *Comark Communications, LLC v. Anywave, LLC*, 2014 WL 2095379, at *2 (D. Mass. May 19, 2014) (denying preliminary injunction alleging trade secret theft and breach of contract because plaintiff "has not shown that Defendants acquired and used any of Comark's trade secrets. Defendants have filed affidavits under oath that they do not possess Comark's

property," and "Comark has failed to demonstrate a likelihood that it will be injured if a preliminary injunction does not issue");

- *Compass Bank v. Lovell*, 2016 WL 8738244, at *6 (D. Ariz. Apr. 8, 2016) (denying motions for TRO and expedited discovery where plaintiff believed that defendant had not returned documents upon termination and "might have" trade secret documents because plaintiff's "**speculative belief does not justify granting the extraordinary remedy of a TRO**") (emphasis added).

Third, and finally, there is no factual or legal basis upon which to apply Optum's inevitable disclosure theory. The evidence demonstrates that Smith is working on fundamentally different issues at ABC than he worked on at Optum and that the two companies are not competitors. At ABC, Smith is evaluating data related to the Founders' own employees. It is undisputed record evidence that while at Optum Smith had zero involvement in providing any products or services to the Founders and had no confidential information about any activity, product, or service related to the Founders. ECF No. 23-1, ¶ 5. Smith and ABC have also proactively put measures in place to ensure that Smith does not use or disclose any Optum information in his job at ABC. ECF No. 23-2, ¶¶ 22-25. Moreover, alleged information in Smith's head about Optum's product and services (*e.g.* product profitability) has no relevance or value to ABC, which is an organization focused on a predetermined market (the Founders' employees), an organization with no products, and an organization that does not have any revenue and does not charge for the services it provides.

Legally, the Defend Trade Secrets Act only permits an injunction based on threatened misappropriation when there is actually evidence of threatened misappropriation (here none exists) and "not merely on the information the person knows." 18 U.S.C. § 1836(b)(3). Moreover, Optum's position is that the new Massachusetts Uniform Trade Secrets Act silently changed years of Massachusetts' trade secret law and gave a court the ability to prohibit someone from working entirely (non-compete or otherwise) based on alleged inevitable disclosure. This is absurd. Optum cites nothing in support of its baseless position, and the actual relevant case law rejects that

inevitable disclosure is sufficient for a TRO. *See, e.g., Manganaro Northeast, LLC v. De La Cruz*, 2018 WL 5077180, at \*3 (D. Mass. Aug. 22, 2018) (denying preliminary injunction alleging breach of non-compete agreement where plaintiff sought to ban defendant from working for a competitor due to alleged inevitable disclosure of trade secrets; stating that "the potential disclosure of confidential information, alone, as a result of De La Cruz's employment with PDC does not indicate a likelihood of establishing an actually-occurring contractual breach").

### 2.    Optum's Breach of Contract Claim Fails

The TRO testimony confirms that: (i) the non-compete is unenforceable; and (ii) Smith has not breached it.

The language of Smith's non-compete is important.  It only prohibits him from engaging or assisting in:

> any activity that **competes**, directly or indirectly, with any [Optum] activity, product or service that [Smith] engaged in, participated in, or had Confidential Information about during [Smith's] last 36 months of employment with [Optum].

> *See* ECF No. 1-1, pp. 6 (emphasis added).

Optum's pleadings and its representations in Court were consistent in stating that Optum's interpretation of Smith's non-compete makes it unenforceable.  For example, Optum's pleadings would ban Smith from working in "every dimension of the health system" across the United States. ECF No. 1, ¶ 13; ECF No. 4, p. 4.  Optum's counsel reiterated this position in Court; Smith could go from Bain & Co. to Optum but could not even go back.  Meanwhile, Mr. Weissel (the Optum employee who ordered that Optum sue Smith) testified that Smith would be banned from working in roughly one-third of the health care industry regardless of the position that he took—*i.e.*, Optum's position is that Smith cannot work in approximately 4.3 million jobs.[3]  Under any of

---

[3] The United States health care industry includes 13 million jobs. *See* KFF, "Total Health Care Employment," available at https://www.kff.org/other/state-indicator/total-health-care-

these views, the non-compete is unenforceable. *Tasktop Technologies US Inc. v. McGowan*, 2018 WL 4938570, at *6 (D. Del. Oct. 11, 2018) (denying motion for preliminary injunction to enforce non-compete and finding that the agreement was unenforceable because defendant was "prohibited from working in any company anywhere that provides [integration or task management] services . . . Given the extensive geographic area and competitive businesses encompassed by the Agreement, the Court finds the Agreement is unreasonably broad.").

There is also no evidence that Smith breached his non-compete.  Optum's testimony about what ABC does amounts to "we don't know but they're going to take over the world."  There is no Chicken Little standard for a TRO. *See* Steven Kellogg, *Chicken Little* ("The sky is falling!"). Optum's speculation on this point does nothing to rebut Smith's and Stoddard's unchallenged testimony that Smith is not engaged in any activity that competes with any Optum activity, product, or service that he engaged in, participated in, or had confidential information about during his last 3 years at Optum.  Under either Delaware or Massachusetts law, Smith cannot violate a non-compete by working for a company that is not a competitor:

- *McCann Surveyors v. Evans,* 611 A.2d 1, 4-5 (Del. Ch. Ct. 1987) (denying TRO based on a finding that "defendant is not engaging in unfair competition" and noting that non-competes "will not be mechanically or automatically specifically enforced" because they "deal with the ability of a person to earn a livelihood");

- *Robert Half Int'l, Inc. v. Stenz*, 2000 WL 1716760, at *4 (E.D. Pa. Nov. 17, 2000) (collecting Delaware cases and denying preliminary injunction for non-compete under Delaware law that sought to prohibit employee from working for an alleged competitor because it is "assumed that without using confidential information, the employee is no more effective than an ordinary competitor"; noting that Delaware courts will not enforce a non-compete where the employee is not using proprietary information and that such a result would be a "draconian remedy");

- *Kauzens v. Diamond Diagnostics, Inc.*, 2005 WL 1683665, at *5 (Mass. Super. Ct. June 2, 2005) (denying preliminary injunction on non-compete because absent competition, "[i]t

---

employment/?currentTimeframe=0&selectedDistributions=total-health-care-employment&sortModel=%7B%22
colId%22:%22Location%22,%22sort%22:%22asc%22%7D#.

seems hard to see that [former employee's] work for Beckman Coulter . . . touches in any way on Diamond's secrets or confidential information");

- *Upromise, Inc. v. Angus*, 2014 WL 212598, at *6 (D. Mass. Jan. 21, 2014) (denying preliminary injunction to former employer who sought to bar former senior executive from working for alleged competitor because of factual dispute as to whether the companies were actually competitors; "**Given the parties' conflicting positions disputing the key issue about whether Upromise and Intuition are competitors, the Court cannot say that Upromise has demonstrated a substantial likelihood of succes**s sufficient to warrant the 'extraordinary' remedy of preliminary injunctive relief.") (emphasis added).

### 3. What Should Any Restraints on Smith Look Like?

In the absence of any evidence of misappropriation or breach of contract, there is no basis for a TRO or any conditions on a stay. But setting that aside, any equitable remedy should simply reiterate what Smith and ABC have already done. Smith's and Stoddard's testimony made clear that Smith and ABC take Smith's responsibilities to Optum about confidential information seriously. At ABC, Smith will not assist in any analysis of any Optum or UHG products or services. ECF 23-2, ¶ 22. ABC also required Smith to sign an Acknowledgement on his first day of work stating that he has not retained any documents belonging to a prior employer, will not use or disclose any confidential information belonging to a prior employer, and will immediately contact Erica Davila (ABC's Acting General Counsel) if he has any concerns about those issues. *Id.* at ¶ 25.

These precautions are logical, equitable, and in line with the evidence (or lack thereof) about Smith's wrongdoing. With no likelihood of success on the merits, Optum's pure speculation as to "irreparable harm" does not warrant any relief beyond what is already in place.

## III. CONCLUSION

For the reasons set forth above, Defendant requests that this Court grant Defendant's Motion to Stay Proceedings unconditionally and acknowledge that jurisdiction of this entire dispute belongs to the First Circuit.

Respectfully submitted,

**DAVID WILLIAM SMITH**

By his attorneys,

_/s/ Brian Mead_
John F. Welsh, BBO #522640
Justin L. Engel, BBO #683894
Bello Welsh LLP
125 Summer Street, Suite 1200
Boston, MA 02110
617-247-4100
Fax: 617 247 4125
Email: jwelsh@bellowelsh.com
Email: jengel@bellowelsh.com

Michael J. Sheehan, _admitted pro hac vice_
Brian Mead, _admitted pro hac vice_
McDermott Will & Emery LLP
444 West Lake Street
Chicago, Illinois 60606
(312) 372-2000 (phone)
(312) 884-7700 (fax)
msheehan@mwe.com
bmead@mwe.com

Dated: February 1, 2019

## CERTIFICATE OF SERVICE

I hereby certify that on February 1, 2019, the undersigned filed a copy of the above and foregoing via the Court's CM/ECF system, which will send notification of such filing to all registered participants.

_/s/ Brian Mead_
Brian Mead

14