*  S  E  A  L  E  D  * Attorneys' Eyes Only

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


```
                          )
OPTUM, INC. and           )
OPTUM SERVICES, INC.,     )
                          )
         Plaintiff,       )
                          )                Civil Action
v.                        )                No. 19-10101-MLW
                          )
DAVID WILLIAM SMITH,      )
                          )
         Defendant.       )
                          )
```


BEFORE THE HONORABLE MARK L. WOLF
UNITED STATES DISTRICT JUDGE


MOTION HEARING


January 31, 2019


John J. Moakley United States Courthouse
Courtroom No. 10
One Courthouse Way
Boston, Massachusetts  02210


Kelly Mortellite, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 5200
Boston, Massachusetts  02210
mortellite@gmail.com

APPEARANCES:

Counsel on behalf of Plaintiffs:
Russell Beck
Stephen D. Riden
Hannah Tso Joseph
Lauren Schaefer
Beck Reed Riden LLP
155 Federal Street, Suite 1302
Boston, MA 02110
617-500-8670
rbeck@beckreed.com


Counsel on behalf of Defendant:
Brian A. Mead
Michael T. Sheehan
McDermott Will & Emery LLP
444 West Lake Street
Suite 4000
Chicago, IL 60606
bmead@mwe.com
msheeehan@mwe.com

John F. Welsh, III
Bello Welsh LLP
125 Summer Street
Suite 1200
Boston, MA 02110
617-247-4100
jwelsh@bellowelsh.com

*  S  E  A  L  E  D  * Attorneys' Eyes Only

INDEX

WITNESS                                                    PAGE


MICHAEL WEISSEL

    Direct Examination By Mr. Riden                         40
    Cross-Examination By Mr. Sheehan                        64

JOHN STODDARD

    Direct Examination By Mr. Riden                         82
    Cross-Examination By Mr. Sheehan                       108
    Redirect Examination by Mr. Riden                      119

STEVEN WOLIN

    Direct Examination By Mr. Riden                        124
    Cross-Examination By Mr. Sheehan                       136
    Redirect Examination By Mr. Riden                      142
    Recross-Examination By Mr. Sheehan                     144

```
1                     P R O C E E D I N G S
2     (Case called to order.)
3              THE COURT:  Good morning.  Would counsel please
4     identify themselves for the court and for the record.
5              MR. RIDEN:  Good morning, Your Honor.  My name is
6     Stephen Riden for the plaintiffs, Optum, Inc. and Optum
7     Services, Inc.
8              MR. BECK:  Good morning, Your Honor.  Russell Beck
9     also for the plaintiffs.
10             MS. JOSEPH:  Good morning, Your Honor.  Heather Joseph
11    also for the plaintiffs.
12             MS. SCHAEFER:  Good morning, Your Honor.  Lauren
13    Schaefer also for plaintiffs.
14             MR. SHEEHAN:  Good morning, Your Honor.  Michael
15    Sheehan for the defendant, David Smith.
16             MR. WELSH:  John Welsh for David Smith.
17             MR. MEAD:  Good morning, Your Honor.  Brian Mead for
18    the defendant.
19             THE COURT:  Okay.  You may be seated.
20             Is Mr. Stoddard present and in the hallway?
21             MR. SHEEHAN:  Mr. Stoddard is present.  He's here and
22    he knows he'll be sent to the hallway.  I just wanted you to
23    know he's here this morning.
24             THE COURT:  He may need to make arrangements to be
25    here tomorrow as well in view of what we're going to discuss,
```

* S E A L E D * Attorneys' Eyes Only

1    but he can stay here for the moment.  Are the other witnesses

2    present?

3            MR. RIDEN:  Your Honor, Michael Weissel is in the

4    courtroom right now.  He also understands that he is to leave

5    as needed.

6            THE COURT:  What about Mr. Wolin?

7            MR. RIDEN:  Mr. Wolin is available.  He's outside of

8    the courtroom.

9            THE COURT:  Since we adjourned yesterday, a notice of

10   appeal was filed concerning what's characterized as my decision

11   to deny the motion to compel arbitration.  And this puts the

12   issue of the motion to stay proceedings in sharper focus.

13           Yesterday, after orally requesting a stay, Mr. Sheehan

14   urged me to hear the defendant David Smith's testimony.  And

15   after lunch I asked the parties if they wanted me to halt the

16   proceedings until the motion to stay that had been made orally

17   could be filed and decided.  Neither party asked me to do that,

18   although Mr. Sheehan perhaps qualified what he had said before

19   lunch, slightly, without directly responding to my question.

20           At about 5:45 p.m. yesterday, after the motion to stay

21   had been filed electronically, I discussed the fact that the

22   plaintiffs should be prepared to address and the parties should

23   be prepared to address it.  I said the plaintiff didn't have to

24   spend the night writing a memo but should bring cases.  So

25   that's what I've been working on this morning and the reason

1  that we're starting late.

2      But I am interested in hearing your arguments with

3  regard to the stay since the matter really isn't briefed.  I

4  expect I'll have to take some time to consider how to decide it

5  and that's why I said Mr. Stoddard should be prepared -- I'm

6  ordering that Mr. Stoddard be here tomorrow, if necessary,

7  because this is necessarily going to impede our progress.

8      So it's the defendant's motion for stay.  You may

9  speak to it.

10      MR. SHEEHAN:  Thank you, Your Honor.

11      MR. BECK:  Your Honor, may I suggest one housekeeping

12  matter on that?  I think when we left yesterday, you had

13  offered us the ability to either file -- bring cases with us or

14  to file something.  We did work through the night, my people

15  did, and I picked up with it this morning.  We have a draft

16  that is almost complete.  We're checking on one last legal

17  issue.  We will file it as-is if need be rather than completing

18  the last bit of research to get that to Your Honor so you can

19  have it.

20      THE COURT:  Well, actually, do you have it now?

21      MR. BECK:  I have my notes on a draft.  We don't have

22  it final.  We can get it just -- just have them file it,

23  whatever state it's in.

24      THE COURT:  Sure.  That will be good.  I'm interested

25  in seeing the pertinent cases.  I've read more and have some

* S E A L E D * Attorneys' Eyes Only

1  questions.  But in any event, why don't you go ahead, Mr.

2  Sheehan.

3          MR. SHEEHAN:  Thank you, Your Honor.

4          Your Honor, yesterday -- first, our motion to compel

5  arbitration was to compel -- plaintiffs had asked for three

6  types of relief.  They had asked for extensive discovery, they

7  had asked for an order that would go towards a preliminary

8  injunction hearing, and they also asked for this temporary

9  injunctive relief, emergency injunctive relief.  Our motion to

10 compel arbitration --

11         THE COURT:  Let me see the motion to compel.

12         MR. SHEEHAN:  Our motion to compel arbitration was

13 directed at all requests for all relief that the plaintiffs

14 were seeking.

15         The court, hearing argument yesterday, I think noted

16 that the parties agreed that this case is going to go to

17 arbitration for discovery, for later adjudication.  I argued

18 that it was time for this case to go to arbitration in the

19 first instance.  And that's where the court disagreed, and the

20 court found that it had the authority notwithstanding our

21 motion to compel arbitration and notwithstanding Schein, the

22 Supreme Court case, that it had the authority to conduct a

23 hearing and issue a temporary restraining order.  That's the

24 decision that denied our motion to compel in part, and that is

25 what we've appealed now to the First Circuit.

1          Twice in the court's ruling yesterday the court noted
2     that, and I quote at page 3 of the transcript --
3          THE COURT:  Hold on just one second.  Let me get it.
4          Go ahead, this is the transcript I gave you yesterday?
5          MR. SHEEHAN:  Yeah.  To be clear, it begins at page 2
6     and it goes to page 5, and it's -- it's an excerpt from the
7     January 30 proceeding yesterday.  And at the final paragraph of
8     page 3, the court notes, "In this case the pertinent provision
9     of the contract is not ambiguous."  It's about five lines down,
10    the final paragraph of page 3.  That's a reference to the
11    arbitration policy.  Then again on page 4 --
12         THE COURT:  Hold on just one second.  I'm wondering
13    if -- I know I said that.  I'm just not finding it.
14         MR. SHEEHAN:  It's the paragraph that begins, "Under
15    Delaware law," and about --
16         THE COURT:  Okay.  That's fine.  Okay.  I was looking
17    at a different part of the page.  Go ahead.
18         MR. SHEEHAN:  And then on the next page, on page 4,
19    beginning in the first full paragraph, Your Honor notes, again,
20    that the contract is not ambiguous.
21         Your Honor, I would submit that what the court engaged
22    in in addressing our ruling was an interpretation of the
23    language and addressed the issue of arbitrability in doing so.
24    And our position was that Schein rules that --
25         THE COURT:  It's your position that even if a contract

* S E A L E D * Attorneys' Eyes Only

1    unambiguously says that an issue was not arbitrable, if you

2    disagree, if you dispute that, the court has to refer it to

3    arbitration?

4         MR. SHEEHAN:  Under Schein, yes.  It's not -- once the

5    issue is raised, then the issue is for the arbitrator in the

6    first instance.  And that's exactly what Schein says.  It says

7    even if -- and I'm not -- I don't believe our position is

8    groundless, but Schein says even if the argument is groundless,

9    the issue raised is for the arbitrator in the first instance.

10   That is the quote from Schein.  It says, "When the parties'

11   contract delegates the arbitrability question to an

12   arbitrator," and that's separately in the arbitration policy at

13   issue here in this case.

14        THE COURT:  The question is of interpretation.  I

15   mean, as I pointed out yesterday, Schein also said we have to

16   interpret -- the judges have to interpret the contract as

17   written.  And -- I mean, this isn't time to re-argue the

18   merits, but I've thought about this further.  I've got a better

19   understanding of what your present argument is, but keep going.

20        MR. SHEEHAN:  So that is where our view is the court

21   did rule, the court did deny our motion to compel in part by

22   then saying now we're going to proceed to hear arguments and

23   take evidence on the temporary restraining order that was, what

24   we had argued, should be for the arbitrator in the first

25   instance.

* S E A L E D * Attorneys' Eyes Only

1          So we have now appealed that decision to the First

2    Circuit.  And our motion before the court is to stay these

3    proceedings because the very issue that is now before the First

4    Circuit is the issue that we would be proceeding on here in

5    this court.  And so the majority of the courts, the majority of

6    the circuits provide the rule that the stay should be

7    automatic.

8          THE COURT:  Unless the appeal is -- those courts say

9    unless the appeal is frivolous.

10         MR. SHEEHAN:  There is a court that holds that if the

11   appeal is frivolous, then it's not automatic.  I would submit,

12   Your Honor, that this is not a frivolous appeal.  So we've got

13   the majority of the courts, and we also have a very instructive

14   decision right here in the district court case, the Combined

15   Energy case that Your Honor pointed us to at the end of the

16   proceeding yesterday that's instructive.  It's really a matter

17   of jurisdiction, when the appeal, notice of appeal is filed,

18   the jurisdiction of this issue now rests with the First

19   Circuit.  It's no longer with this court.

20         So I would ask, with that, Your Honor, that the matter

21   be stayed so the First Circuit can decide the issue that should

22   be the issue in the first instance.  The question Your Honor

23   asked me in arguing yesterday, that is, well, how do we

24   interpret this?  That's for the arbitrator, we will say, and

25   that will be our argument at the First Circuit.

* S E A L E D * Attorneys' Eyes Only

1          THE COURT:  Well, do you have any additional cases for

2     me?

3          MR. SHEEHAN:  More cases than what we cited yesterday?

4          THE COURT:  What did you cite?  I think you cited the

5     case I gave you.

6          MR. SHEEHAN:  No.  We -- in the First Circuit?  We

7     only have one other district court case, but I think we cited

8     more cases in the submission in support of our motion to stay

9     to the court.

10          THE COURT:  Hold on a second.

11          MR. SHEEHAN:  Your Honor, I do have a number of cites

12     for the majority of the courts.

13          THE COURT:  Stop.  I want to find your motion to stay.

14          Well, you did cite Intergen, which I read.

15          MR. SHEEHAN:  I misspoke.  I referred to the majority

16     of the Courts of Appeals.  I didn't provide the cites.  I have

17     those cites.

18          THE COURT:  They're in the case I gave you.  Do you

19     have any that --

20          MR. SHEEHAN:  I believe they're mostly in the --

21          THE COURT:  What's that?

22          MR. SHEEHAN:  I do believe they're also cited but not

23     all of them are cited in the Combined Energies case.

24          THE COURT:  So you have some additional cases?

25          MR. SHEEHAN:  I have the Third Circuit cite.

1          THE COURT:  What was that?

2          MR. SHEEHAN:  I believe they're all cited in the

3    second paragraph of the discussion of the Combined Energies

4    case.

5          THE COURT:  So a question that I have is why shouldn't

6    the -- there are cases that I can cite for you that have

7    applied the Hilton factors in determining whether to stay an

8    appeal when the issue is a motion to compel arbitration.

9    Steiner v. Apple is one.  CBS is another.  Steiner is 2008

10   Westlaw 1925197.  CBS is 716 F. Supp. 307.  I raised this

11   yesterday.

12          So the Hilton factors -- the Hilton factors are about

13   whether the stay applicants made a strong showing he's likely

14   to succeed on the merits.  And as I wrote in Canterbury, you

15   wouldn't have to persuade me I'm wrong.

16          And then the second factor is whether the applicant

17   will be irreparably injured absent a stay.  Third, whether the

18   issuance of the stay has substantially injured the other

19   party's interest in the proceedings.  And four, where the

20   public interest lies.  Hilton is a Supreme Court case, 481 U.S.

21   770.  Why shouldn't I apply the Hilton factors at this point as

22   some district courts have?

23          MR. SHEEHAN:  Because the Hilton case does not involve

24   FAA.  And that's a critical distinction, Your Honor.  As the

25   Seventh Circuit noted in the -- sorry.  As the Supreme Court

* S E A L E D * Attorneys' Eyes Only

1   noted from the Seventh Circuit in Griggs, "Whether the litigant

2   may go forward in the district court is precisely what the

3   Court of Appeals must decide."  And that's the issue here,

4   whether this proceeding should continue or should even have

5   begun is the issue for the First Circuit that we're appealing.

6   And that's why the non-FAA cases are not instructive.

7          THE COURT:  Let's see.  I don't know that I have

8   Griggs, but we'll get it.

9          MR. SHEEHAN:  It's also cited in the Combined Energies

10  case.

11         THE COURT:  Print out Griggs, 459 U.S., the second

12  page is 58.  Is Griggs an FAA case?

13         MR. SHEEHAN:  Your Honor, I'd have to go back and read

14  it.

15         THE COURT:  If we -- if you hadn't urged me to hear

16  from Mr. Smith yesterday when I told you I didn't know what I

17  would do and then asked, you know, should we pause and deal

18  with the stay, this would be briefed, and we could have

19  proceeded more deliberately.  But here we are.

20         Because if I don't have jurisdiction, I don't have

21  authority to decide anything.  But if I stay the case and it

22  comes back to me, I'm likely to want to hear more testimony

23  from Mr. Smith.  It was helpful.  It's up to me to decide on

24  the temporary restraining order.  It was helpful for me to hear

25  from Mr. Smith, but one of the difficulties is in deciding

* S E A L E D * Attorneys' Eyes Only

1   whether to grant a temporary restraining order, I have to

2   compare what he did with Optum with what he does for ABC.  And

3   he's only been working there a short time, and he characterized

4   it in a particular way.  That's one of the things I need to do.

5        So he's going to need to testify again, and he's going

6   to have this hanging over him.  You told me yesterday that was

7   one thing he didn't want.  But if I don't have the power, I

8   don't have the power.

9        Why don't I hear from the plaintiff.

10       MR. SHEEHAN:  Your Honor, may I just address that

11  point?  This is a matter of -- I think the parties would agree,

12  certainly the lawyers would agree, when we're in arbitration we

13  hope to be as lucky to have an arbitrator who delves into the

14  issues as much as Your Honor has.  But that's not the issue.

15  The issue is Mr. Smith has claims to assert.  He's going to do

16  so properly in arbitration.  Waiting every day to get there so

17  he can be heard on his claims is bothering -- is hurting him,

18  so this is his right.

19       THE COURT:  In a sense this is delaying that.  The way

20  I read the contract in Schein, I don't think Schein intended to

21  disrupt essentially the uniform -- the way I read Schein, I'm

22  going to compel arbitration.  And in fact -- I mean, I'll have

23  to figure this out, whether I can grant your motion to compel

24  arbitration now.  Because I certainly intended to do it before

25  the end of these proceedings before me, I think.

* S E A L E D * Attorneys' Eyes Only

1          MR. SHEEHAN:  With that, Your Honor --

2          THE COURT:  In fact, I don't think there's even any

3     reason that I have to compel arbitration.  The plaintiffs are

4     willing to go to arbitration, just not on the temporary

5     restraining order issue.  You should be out there pursuing the

6     process to select an arbitrator.  I saw that it's in the

7     policy -- I don't remember if it's in the policy or one of the

8     cases, but you're supposed to get nine candidates from the AAA

9     and then you go through a process.

10          MR. SHEEHAN:  There's also a quicker process, Your

11    Honor.  And if they had honored their own contract, I'd submit,

12    Your Honor, the chances are we'd have been before an arbitrator

13    on these issues before we showed up this week in Boston.

14          THE COURT:  But you can invoke the arbitration clause,

15    too, can't you?

16          MR. SHEEHAN:  Last thing we want are separate

17    litigations.  We want the issues together, Your Honor.  It's

18    only fair to Mr. Smith.

19          THE COURT:  Well, we'll go step by step.  What does

20    the plaintiff say?

21          MR. BECK:  Good morning, Your Honor.  I think there's

22    a threshold issue that we've bypassed.  Rule 4 of the Federal

23    Rules of Appellate Procedure provides -- it's Rule 4(a)(1)(C).

24          THE COURT:  Hold on just one second.

25          MR. BECK:  I'm sorry.  Not C.  2 -- 4(a)(2).

* S E A L E D * Attorneys' Eyes Only

1          THE COURT:  4(a)(2).

2          MR. BECK:  It's filing before entry of judgment.

3          THE COURT:  Hold on just one second.

4          Go ahead.

5          MR. BECK:  And it provides, "A notice of appeal filed

6   after the court announces a decision or order," which is what

7   you did yesterday, "but before the entry of the judgment or

8   order," which is where we are right now, "is treated as filed

9   on the date of and after the entry."  There is no pending

10  appeal.  It's a threshold issue.  You haven't lost

11  jurisdiction, regardless of all the other issues and the stay

12  and everything else.

13          And I suggest, Your Honor, that given where we are

14  procedurally, that we have a bit more time to spend doing our

15  research and responding to their motion and that we continue

16  with the preliminary -- the TRO hearing now, get that resolved

17  before Your Honor enters any order that would divest the court

18  of jurisdiction at that point.

19          THE COURT:  Well, this relates to the time for filing

20  notice of appeal.

21          MR. BECK:  That's right, Your Honor.  And section 1

22  talks about the timing is after an order.  As you've noted,

23  there has been no order.  Section 2 then clarifies that the

24  difference between a decision, as you indicated yesterday,

25  versus -- or an order, as you indicated yesterday, that's been

1  announced but has not been entered.  Your order has not yet

2  been entered.  There is no divesting of your jurisdiction.

3       THE COURT:  I think off the top of my head that Rule

4  4(a) goes to when the time starts running to file a notice of

5  appeal.  And although I probably said -- I usually say that I

6  may convert this into a more formal memorandum and order.  If

7  the filing of an order would cause their appeal to mature and

8  then divest me of jurisdiction, perhaps I ought to issue the

9  order.  But anyway, go ahead.

10      MR. BECK:  Well, Your Honor, on that piece, I think

11  the machinations at this point in terms of trying to avoid

12  having Your Honor decide whether or not to protect the

13  interests of Optum have been mired, and I think that given

14  where we are and given procedurally and all the procedural

15  hoops they tried to jump through, I think now we are at a place

16  where Your Honor still has jurisdiction.  We are in the middle

17  of a process designed to protect Optum and balance the

18  interests of the parties.  And again, what they're looking for

19  is another free pass.  They've tried multiple different

20  mechanisms for doing that.

21      THE COURT:  What were the other mechanisms?

22      MR. BECK:  They filed, under Schein, a motion to

23  compel arbitration and looping into that language that clearly

24  under the contract doesn't apply.  And they tried to tell Your

25  Honor that you didn't have the ability, notwithstanding the

* S E A L E D * Attorneys' Eyes Only

1   clear language in that agreement, notwithstanding <u>Teradyne</u>,

2   that you didn't the ability to protect Optum in the interim

3   while the case is going to arbitration.  That was the first

4   one.  This is the second one.  At each turn, they have extended

5   this process while simultaneously complaining about the

6   extension of this process.

7           THE COURT:  Well, they did urge me to go ahead

8   yesterday afternoon and hear Mr. Smith.  Go ahead.

9           MR. BECK:  At this point it's just premature.  The

10  ruling on this motion is premature, and so we would request

11  that we have the ability now to finish up the work that we were

12  doing, get --

13          THE COURT:  How long will that take?

14          MR. BECK:  I'd like to have the day, Your Honor, so

15  after this is over I can go back to the office and read the

16  cases and make sure that the brief is done.  We can have it for

17  you to have a hearing on it tomorrow and --

18          THE COURT:  What about later today?

19          MR. BECK:  I'm going to be --

20          THE COURT:  This is what I was offering you all the

21  opportunity to do yesterday, and the defendant urged me to hear

22  from Mr. Smith instead.

23          MR. BECK:  And then file their notice of appeal after

24  that, after Mr. Smith testified, before anybody on our side

25  testified.

* S E A L E D * Attorneys' Eyes Only

1          THE COURT:  All right.  I think -- I don't want to

2     give you until tomorrow to file your brief.  But I am going to

3     give you time to do that today.

4          MR. BECK:  Thank you, Your Honor.

5          THE COURT:  Let me ask you the following.  And I think

6     you have a copy of your brief there.

7          MR. BECK:  I have handwriting --

8          THE COURT:  I don't need to see it.  But what are some

9     of the key cases?

10         MR. BECK:  This is what we've been able to find so

11    far, Your Honor, and it's now been filed in the form that it's

12    in.  It's not complete, but it's what we were able to put

13    together.  We certainly have, Your Honor, the Kosilek v.

14    Spencer case, 2012 Westlaw 5240014.  That's at page 2.

15         THE COURT:  Sorry.  Which one is that?

16         MR. BECK:  Kosilek.

17         THE COURT:  I remember the case, but there are a

18    number of decisions.

19         MR. BECK:  I'm sorry.  It's Kosilek v. Spencer.  It's

20    2012 Westlaw 5240014 at star 2.

21         THE COURT:  Is that the one on the stay?

22         MR. BECK:  Yes, it is, Your Honor, in which you

23    reference section 62(c) and talk about, "while an appeal is

24    pending from an interlocutory order" --

25         COURT REPORTER:  I'm sorry.  You're mumbling.

* S E A L E D * Attorneys' Eyes Only

1      MR. BECK:  I apologize.  "While an appeal" -- it's

2  Rule 62(c) of the Federal Rules of Civil Procedure.  "While an

3  appeal is pending from an interlocutory order or final

4  judgement that grants dissolves or denies an injunction, the

5  court may suspend, modify, restore or grant an injunction on

6  terms for bond or other terms that secure the opposing party's

7  rights," and you reference that Rule 62(c), "codifies the

8  inherent power of the courts to make whatever order is deemed

9  necessary to preserve the status quo and to ensure the

10  effectiveness of the judgment."  That's the case that we are

11  primarily citing for that piece, Your Honor.  Then we get into

12  the issues of -- sorry.

13      THE COURT:  That's actually -- I think the question

14  I'm going to have on that is, 62(c) relates to an appeal

15  pending from an interlocutory order or final judgment that

16  grants, dissolves or denies an injunction.  And I haven't made

17  a ruling on the motion for temporary restraining order.  I've

18  just ruled that I have the authority to decide the request.  So

19  that's going to be an issue.

20      MR. BECK:  We will address that issue, Your Honor, but

21  I think in the meantime you haven't made an issue on -- a

22  decision on arbitrability, an order.  So I think where we are

23  at this point is, there are a number of things that are still

24  in flux, but I think Your Honor does retain, under Teradyne,

25  the power to issue an injunction, to preserve the rights of the

* S E A L E D * Attorneys' Eyes Only

1    parties.  United States v. Brooks, 145 F. 3d 446 at page 456,

2    First Circuit, 1998, talks about pending an appeal the court

3    retains the ability to issue orders relating to the procedures

4    in aid of appeal.  I would say that an injunction -- temporary

5    restraining order is certainly in aid of the appeal to ensure

6    that the appeal isn't frustrated.

7           THE COURT:  Well, that's going to be of great interest

8    to me because this is what I was getting at yesterday.  Could

9    the parties agree or could I order that pending appeal, for

10   example, Mr. Smith not work for ABC or communicate with ABC?

11   Because I don't think any -- I don't think my clerks or I have

12   found -- my clerks -- I haven't seen a case where the issue was

13   whether the district court was deprived of jurisdiction to

14   continue a TRO hearing pending an appeal of a matter relating

15   to the Federal Arbitration Act.  So Brooks, that's 145 F. 3d

16   446 did you say?

17          MR. BECK:  Yes, yes.  It is at page 456.

18          THE COURT:  Could you print that, please, Christine.

19          MR. BECK:  To be clear, Your Honor, the particular

20   context that we're in right now has not been resolved by the

21   First Circuit.  It's an open issue.  I think everybody agrees

22   on that.

23          THE COURT:  You're going to have to keep your voice

24   up.

25          MR. BECK:  That's not usually my problem.  The

* S E A L E D * Attorneys' Eyes Only

1   particular issue under the circumstances that we have right now

2   has not yet been addressed by the First Circuit.  I don't mean

3   to suggest otherwise.  I think we have agreement of all sides

4   around that.

5          THE COURT:  What do you mean by --

6          MR. BECK:  Meaning that we have an issue of the

7   Federal Arbitration Act, post-Henry Schein, taking Teradyne

8   into account, it doesn't appear to divest you of jurisdiction.

9          THE COURT:  I mean, this is the nub of the issue.  If

10  I had discretion, if this was a discretionary matter and I was

11  only being asked -- for example, I said this yesterday, to

12  order discovery pending appeal, I would stay the matter because

13  a delay in discovery wouldn't cause irreparable harm to the

14  plaintiff and it might be unnecessary expense.

15         But here you continue to maintain that you're being --

16  that Optum is being irreparably harmed during the pendency --

17  well, being irreparably harmed and you want that to stop,

18  pending arbitration, pending appeal at this point.

19         MR. BECK:  Yes, Your Honor.  And the reality is that

20  the cases that the defendant has cited, in Judge Keaton's case

21  the Intergen matter was a discovery issue.  I know you provided

22  that case yesterday.  Discovery, as you say, is clearly outside

23  of the scope we're talking about.

24         THE COURT:  Why don't you keep going.  Are those the

25  two key cases, Kosilek and Brooks?

* S E A L E D * Attorneys' Eyes Only

1    MR. BECK:  No.  Those are on the issue of the stay not

2  being warranted as a matter of right.  There's also Boston Taxi

3  Owners Association v. City of Boston.  That's 187 F. Supp. 3d

4  339 at 341, and that cites -- I believe that cites, but if not

5  separately, Nken v. Holder, 556 U.S. 418 at 427, in which the

6  Supreme Court observed that a stay is an intrusion into the

7  ordinary process of administration and judicial review and,

8  accordingly, is not a matter of right even if irreparable

9  injury might otherwise result, which brings you back to the

10  same Hilton analysis that Your Honor had identified yesterday,

11  and Hilton is cited as well.

12    THE COURT:  The Second and Ninth Circuits say that a

13  stay is discretionary but provided guidance concerning the

14  discretion -- and again, I'm articulating this because you're

15  all going to have to address it.  Britton and Motorola, they

16  say, for example, Britton, 916 F. 2d at 1411, quoting Professor

17  Moore, "Where an appeal is taken from a judgment which does not

18  finally determine the entire action, the appeal does not

19  prevent the district court from proceeding with matters not

20  involved in the appeal."

21    It appears to me at the moment that that exception

22  wouldn't apply in this case.  In other words, involved in the

23  appeal is my power to -- the court's power to issue a temporary

24  restraining order.

25    MR. BECK:  Pending the arbitration.

* S E A L E D * Attorneys' Eyes Only

1          THE COURT:  What's that?

2          MR. BECK:  Also that would be pending the arbitration,

3   not pending the appeal, which is two different issues.  The

4   court still has that power.  The court has the power to issue

5   equitable relief in various contexts.

6          We're in a different context again.  We're in the

7   context of moving up on appeal now and again, exposing us to

8   the irreparable harm.  I think the court still has the power

9   independent of whether you can issue interim relief in aid of

10  arbitration.

11         THE COURT:  And the case that you say most directly

12  gives me the authority to -- my authority to condition a stay

13  pending appeal is which case?  Is that Brooks or something

14  else?

15         MR. BECK:  I would say it's Brooks and Kosilek.

16  Brooks being the First Circuit and Kosilek being your decision.

17  I think that read in light of Boston Taxi Owners and Nken v.

18  Holder, those four cases together.  I would take a look at all

19  four because I think all four speak to the issue of the timing

20  and the court's powers.

21         THE COURT:  And if I recess now, how long do you think

22  it will take you to complete your memorandum?

23         MR. BECK:  A few hours, but I recognize the time of

24  day.

25         THE COURT:  No.  It's -- well, is the plaintiff going

*  S E A L E D  *  Attorneys' Eyes Only

1   to want to respond?  Because what the plaintiff has given me is

2   pretty skimpy.  It basically gave me what I gave you.

3        MR. SHEEHAN:  I think so.  I mean, I would certainly

4   want to read it and have time to digest it.

5        THE COURT:  Fine.  So you can get started on this.

6   You know what cases they're going to cite.  It's now 11:00.

7   I'm going to take a recess.  I'm going to look at one or two

8   things and come back and give you a schedule.  But as I said,

9   the witnesses are ordered to stay here.  I think -- I don't see

10  where Brooks says that conditions can be imposed upon a stay.

11       MR. BECK:  Your Honor, on page 456, right at the very

12  bottom, the last full paragraph, right in the middle, it

13  says --

14       THE COURT:  Hold on a second.

15       MR. BECK:  I apologize.

16       THE COURT:  I'm sorry.  What's the language you want

17  me to look at?

18       MR. BECK:  The court talks about, in that paragraph --

19       THE COURT:  Which paragraph?

20       MR. BECK:  The last full paragraph on --

21       THE COURT:  The way mine is printed out, it's not

22  clear.  How does the paragraph start?

23       MR. BECK:  It starts, "By its nature."

24       THE COURT:  Okay.

25       MR. BECK:  And in the next sentence it's talking about

* S E A L E D * Attorneys' Eyes Only

1    the situations involving the balancing of the jurisdictions of

2    the courts.  And it says that these situations -- well, I'll

3    read you the whole paragraph, Your Honor.

4         "By its nature, any suggestion of shared jurisdictions

5    sensitive and thus the administration of this principle

6    requires a delicate touch.  At most shared jurisdiction

7    flourishes in a circumscribed cluster of situations" --

8         THE COURT:  Not too fast.  And louder.  The

9    stenographer is remarkable and she's transcribed things for me

10   already this morning, but it's only going to work if you speak

11   loudly and clearly.

12        MR. BECK:  I will.  "At most, shared jurisdiction

13   flourishes in a circumcised" -- "circumscribed cluster" --

14   sorry -- "of situations of handling" --

15        THE COURT:  This isn't painful.

16        MR. BECK:  Yes -- "in a circumscribed cluster of

17   situations, the handling of which is not inconsistent with the

18   prosecution of an appeal.  These situations include the

19   processing of such peripheral or ancillary aspects of the case

20   as motions for counsel fees, actions in aid of execution of a

21   judgment that has been appealed and not stayed, and," then the

22   key language, "orders related to procedures in aid of the

23   appeal."  The TRO is such an order.

24        THE COURT:  How do I know the TRO is such an order?

25        MR. BECK:  Because, as Your Honor has referenced in

* S E A L E D * Attorneys' Eyes Only

1   Kosilek -- I don't have the exact language out of Kosilek, Your

2   Honor, but the notion that the status quo to preserve the

3   parties' rights pending the appeal, lest the appeal be

4   pointless.  If we're not protected during that interim process,

5   we lose our rights.

6          THE COURT:  This is what concerns me.  The contract to

7   me is perfectly clear.  And the language I cited from the Third

8   Circuit yesterday about this agreement not being in dispute,

9   you'll find verbatim in First Circuit cases, too.  And my

10  concern is that if this matter is -- one of the arguments of

11  primary focus of the temporary restraining order proceeding is

12  the contention that Mr. Smith has confidential information that

13  has been disclosed or will be disclosed if he works for ABC.

14  And I'm asked to issue a temporary restraining order that would

15  run for 14 days and potentially 28 days so the parties can go

16  to an arbitrator.  And one of the things I've thought about --

17  well, if it's only a temporary restraining order, it would

18  expire by its terms.

19          There would be further litigation, probably, as to

20  whether I had the authority to issue a preliminary injunction

21  as a form of temporary relief under the contract.  But even if

22  I did, or if you had an arbitrator promptly, if I issued an

23  order, I might -- as I understand it, the arbitrator would also

24  have the authority to issue a preliminary injunction under the

25  rules of the AAA.  That's at least in one of the cases.  And if

* S E A L E D * Attorneys' Eyes Only

1    I issued an order and it was still running, I might authorize

2    the arbitrator to end the temporary restraining order.  Or I

3    might deny the motion for a temporary restraining order.

4          For what it's worth, the plaintiffs' case may get

5    stronger the longer Mr. Smith works, or he's going to get paid

6    perhaps to do less than he would do if he didn't have the

7    threat of a temporary restraining order hanging over him.

8          But those are practical considerations.  Right now the

9    question is whether I have the authority to do anything and

10   what the source of my authority is.  This is an indication of

11   why -- you're telling me about cases, including one of mine,

12   that didn't spring to mind.  So it needs to be briefed.

13         MR. BECK:  If I may, Your Honor, on that, I agree it

14   does need to be briefed.  But again, I go back to where I

15   started.  There is no entered order and Your Honor has the

16   power.  And we have all the witnesses here.  We've brought them

17   in.  They've been waiting.

18         THE COURT:  Well, here, I think we ought to do the

19   following.  We'd be further along now, maybe hearing from Mr.

20   Stoddard, or maybe I might have sent you all home, if

21   Mr. Sheehan hadn't said to me at about at lunchtime yesterday,

22   I urge you to hear from Mr. Smith.  And when I offered him the

23   opportunity to say, I've changed my mind, we would like to

24   brief this issue or argue this issue, that's exactly the way I

25   started yesterday afternoon.

1          Here, I'm going to take a break.  I'm going to look at

2   some of these cases and think about it.  But I'm ordering that

3   you talk.  And A, this is going to be briefed.  And I have

4   major matters.  I mean, I canceled my criminal cases for this

5   afternoon because I could see this was going to take some time,

6   and it was my goal to decide this this afternoon.  That won't

7   be achieved, even if I have the authority.  But I'm ordering

8   that you talk and see if you can come to some agreement as to

9   how to proceed.

10          I think two things immediately come to mind for me.

11   One, as I said yesterday, you can agree to conditions

12   concerning a stay, if I stay the matter.  Two, you can agree

13   that I should hear the additional testimony to the extent

14   necessary to decide the TRO, and, when I can, I'll decide it.

15          If I grant a TRO, I'm going to order the matter to

16   arbitration.  Although I don't even know if I need to order it

17   at that point, the parties agree to it.  And if I deny the TRO,

18   I'm going to order the case to arbitration.  But, you know,

19   this is an intriguing issue, and it goes to my authority, which

20   I always take very seriously, even when the parties don't raise

21   it.  And you've got -- maybe the issue will go to the Supreme

22   Court.  Maybe the circuits will split on this or something.

23   But, you know, this may take some time to resolve.  So if you

24   can be -- if you can reach, in about the next ten minutes, an

25   agreement on how to proceed, I'll be interested in what that

1    is.  If not, I'll giving you a briefing schedule.  Court is in

2    recess.

3              (Recess taken 11:10 a.m. - 11:39 a.m.)

4              THE COURT:  I spent the break reading the plaintiffs'

5    cases.  Did the parties come to any agreement?

6              MR. BECK:  No, Your Honor, we have not.

7              MR. SHEEHAN:  We have not, Your Honor.

8              THE COURT:  As I looked at those cases -- you may be

9    seated.  Recognizing both the importance and particularly the

10   urgency to the plaintiff and the defendant, I've put this on a

11   schedule and worked hard to try to make an informed decision on

12   the motion for a -- on all the issues as expeditiously as

13   possible.  We were here until 5:45 p.m. yesterday.  Reading the

14   plaintiffs' draft memo and the cases cited, I have the

15   following thoughts that you'll address in the briefing I'm

16   going to order.

17             One, even when there's a right to interlocutory

18   appeal, generally a stay is not mandatory, or at least that's

19   the principle in many cases.  Although I think most of the

20   cases -- I'm curious about the extent to which that principle

21   applies to interlocutory appeals as opposed to appeals of final

22   judgments.  In any event, Nken helpfully reminded me of the All

23   Writs Act.  Federal courts, federal judges have the authority

24   to issue all writs necessary or appropriate in aid of their

25   respective jurisdictions and agreeable to the usage as

* S E A L E D * Attorneys' Eyes Only

1    principles of law.

2         And the essence of the plaintiff's argument, as I

3    understand it, is that if I don't decide the temporary

4    restraining order and this matter is appealed, and the appeal

5    will inevitably take some time, it will suffer irreparable

6    harm, particularly in the form of disclosure of confidential

7    information in violation of the Massachusetts statute, among

8    other things.

9         I believe, or I wonder I guess, under the All Writs

10   Act the court -- if I stay the case, I would have authority to

11   impose conditions that would preserve the potential for the

12   court or conceivably the arbitrator to issue temporary

13   injunctive relief.  And I think if I was considering that

14   question at the moment, I would use the Hilton factors to make

15   the decision.  And this is at least at the moment an

16   interesting issue because the conditions on a stay might

17   parallel a potential restraining order, and ironically,

18   conceivably, last longer than a TRO could last, which is a

19   maximum of 28 days.

20        So I think you've raised serious issues and that I

21   should get briefing on them.  So it's now almost noon.  I'm

22   ordering that -- actually, here is what I propose.  I'll hear

23   you on the schedule.  I've now given you some further thoughts,

24   necessarily tentative because they come from a glance -- from

25   reading quickly parts of the decisions the plaintiff cites.  I

* S E A L E D * Attorneys' Eyes Only

1   am inclined to order the plaintiff to file its brief this

2   afternoon, say at about 3:30 or 4:00, and the defendant to file

3   his brief tomorrow morning early and continue this hearing on

4   Monday, which will require yet another alteration of my

5   schedule, with the witnesses present in case I decide to

6   proceed with the hearing on a temporary restraining order.

7          Does anybody want to be heard on that schedule?

8          MR. BECK:  Yes, Your Honor.  In terms of the briefing,

9   we will do whatever Your Honor recommends.  However, in terms

10  of the witnesses who have flown in from across the country and

11  been here for two days, ours at least, and given the procedural

12  status of this, just as a purely practical matter, one of

13  convenience, one of taking into account the witnesses, can we

14  have the hearing, the evidentiary component of the hearing go

15  forward?  That doesn't cause anybody any irreparable harm.

16  It's just evidentiary testimony at which we'll give Your Honor

17  the background to make the decision on both the TRO and what

18  conditions, if any, you may impose on a stay.

19         MR. SHEEHAN:  Your Honor, I recognize the

20  inconvenience.  I also fly in and out.  But I was grateful to

21  be gone from Chicago the past few days.  I think that this is

22  an issue of jurisdiction, and as much as I understand that it

23  makes the process a little awkward and inefficient, I think

24  this is the first issue for the court to decide.  And if the

25  court determines that we're wrong, again, and retains

1    jurisdiction, then we'll proceed with our witnesses.

2         THE COURT:  Well, it's not just a question of

3    retaining jurisdiction but of granting a stay and imposing

4    conditions on the stay.

5         MR. SHEEHAN:  I understand.

6         THE COURT:  Just as a practical matter, this isn't

7    McDonald's.  We're not open 24/7.  I have hearings next week in

8    a case involving Exxon, Conservation Law Foundation, where they

9    want to litigate the existence of climate change.  And this is

10   a continuation of the hearings that started some time ago with

11   lawyers flying in from Louisiana and New York, and it's going

12   to take me several days to prepare to resume these hearings.

13   I'm going to be away from Boston several days the following

14   week, realistically.

15        MR. BECK:  Your Honor, may I --

16        THE COURT:  I'm sorry.  Go ahead.

17        MR. BECK:  I apologize, Your Honor.  An alternative

18   request then.  If they're not amenable to moving forward with

19   the hearing, can we have Mr. Smith not work during the interim

20   period and not communicate with them during the interim period?

21        MR. SHEEHAN:  Mr. Smith will abide by the

22   sequestration -- actually, he's not part of the sequestration

23   order.  Your Honor, we wouldn't agree to that, and I think

24   issuing that order is going to the nub of the matter.

25        THE COURT:  Well, all of this, you know, the

* S E A L E D * Attorneys' Eyes Only

1   foreseeable conditions on a stay would be the functional

2   equivalent of a temporary restraining order.  It is actually a

3   reason to hear some testimony today because it would relate to

4   conditions for a stay which overlap with the sort of -- I mean,

5   essentially it's a form of a TRO analysis.

6        MR. SHEEHAN:  But Your Honor, that's an issue you've

7   asked us to look at, and we're certainly going to brief it.

8   Our look at the law and our look at things that we need to look

9   at more closely, cases the plaintiffs cited this morning, is

10   that with the jurisdiction moving to the First Circuit and with

11   the issue being what it is, that it's on appeal, the court

12   would not have the authority to issue the type of condition to

13   the stay that you've suggested, Your Honor.  Not to mention we

14   also don't think, if it did, it should, because there would be

15   no irreparable harm.  And we will address that as well in our

16   brief.

17        THE COURT:  There would be no irreparable harm?

18        MR. SHEEHAN:  No irreparable harm whatsoever, and

19   certainly none that plaintiff --

20        THE COURT:  I mean, that's -- particularly in this

21   case where there's such a close connection between reasonable

22   likelihood of success on the merits and irreparable harm, why

23   would there be no irreparable harm?

24        MR. SHEEHAN:  Well, certainly first there should be --

25   there would be no irreparable harm that the plaintiff could not

* S E A L E D * Attorneys' Eyes Only

1  have avoided.  And as the clock ticks, still it's within their

2  power to not avoid.  And all they have to do is do what they

3  could have done a month ago and every day in between and every

4  day that passes, and that is, go to arbitration, utilize the

5  expedited procedures and be heard right there where they

6  promised they would be, where they contracted to be in

7  arbitration, and where the rest of this matter would be.

8          THE COURT:  I think Mr. Smith contracted to be in

9  Federal Court.  The question, you know, you raise is whether

10  that involves some interpretation of the contract that's --

11  Mr. Smith also -- nobody's argued this, but he also in the

12  contract agreed that, I think, that disclosure of confidential

13  information would be a type of irreparable harm and it would

14  warrant injunctive relief if it was, whatever the appropriate

15  stand is, demonstrated that he did it.

16          So I don't know why you're telling me that if he

17  disclosed confidential information there would be no

18  irreparable harm.  The cases are the legion that it is, and

19  unless I'm misremembering, he said, you know, he agreed to that

20  in his contract.

21          MR. SHEEHAN:  He agreed that if in fact he did that it

22  could cause irreparable harm.  And in that document, that is

23  what is stated.  I don't think that's the issue.  I think the

24  issue right here is, first of all, if Your Honor is focusing

25  on, for example, October 29, if that is the concern, there are

* S E A L E D * Attorneys' Eyes Only

1     a number of things we could say about that.  You know, there

2     was no disclosure of a trade secret.  The evidence shows that.

3          But bottom line, what is done is done.  That's not the

4     issue before the court.  The only issue before the court, as

5     the court has noted, because the rest will go to arbitration,

6     is their fear of tomorrow, the next day, the next day something

7     happening.  Not what's happened in the past.

8          THE COURT:  Well, what's happened in the past is also

9     relevant as to whether, you know, he's violated his noncompete,

10    whether he violated the nondisclosure agreement.  I mean, the

11    whole idea of a temporary restraining order is to determine

12    what happens until we get in front of the arbitrator.

13         MR. SHEEHAN:  And the only issue when we asserted our

14    appeal and before the court had moved to stay is will the delay

15    of this proceeding cause irreparable harm.

16         THE COURT:  Right.  And if he --

17         MR. SHEEHAN:  That's where we say it --

18         THE COURT:  If there's confidential information that's

19    being used, or even if it hasn't been used but will be used

20    imminently, that would be irreparable harm.

21         MR. SHEEHAN:  But that's pure speculation.

22         THE COURT:  But that's why I wanted to hear the

23    testimony.  In fact, you asked me yesterday to listen to

24    Mr. Smith.  Now Mr. Stoddard is here.  I'm still interested in

25    hearing from Mr. Stoddard.  I mean, I think --

* S E A L E D * Attorneys' Eyes Only

1          MR. SHEEHAN:  I'm interested in hearing from Mr. Wolin

2     and Mr. Weissel.

3          THE COURT:  Actually, so am I.

4          MR. SHEEHAN:  Sure.

5          THE COURT:  I have arranged my schedule with the hope

6     that I'd hear all of their testimony this morning, that I'd

7     take a break and I'd decide the motion for temporary

8     restraining order this afternoon.  And then if I denied the

9     motion for temporary restraining order, or if I allowed it --

10    but if I denied the motion for temporary restraining order,

11    you'd go to arbitration and I'd stay or dismiss the case.

12         MR. SHEEHAN:  And we're comfortable with the merits of

13    our case, Your Honor, and I'm also interested in that.  But the

14    very small point on irreparable harm in the context of a stay

15    while the very issue is on appeal still requires the court to

16    look at basic equitable principles.  And here, when plaintiff

17    sits on their hands and do nothing --

18         THE COURT:  You're sitting on your hands.  You can

19    invoke the --

20         MR. SHEEHAN:  I'm not asking for emergency injunctive

21    relief and arbitration.

22         THE COURT:  No, but you can start the arbitration

23    process.

24         MR. SHEEHAN:  But that suggests that I should petition

25    on plaintiffs' behalf.  I've suggested this to counsel for a

* S E A L E D * Attorneys' Eyes Only

1    month.

2         THE COURT:  Look.  This is wasting time.  I'm going to

3    take a brief break.  All the witnesses should go outside.  And

4    I think, since they're here, I think I may hear the witnesses.

5    But I just want to reflect on it briefly because I do think

6    that if I come to the conclusion that I have the authority

7    under the All Writs Act or otherwise to condition a stay, the

8    testimony I hear will be relevant to that, even if I don't

9    decide the TRO.

10         MR. BECK:  If I could add one other thing.  I'm

11   listening to Mr. Sheehan, who is arguing the merits but telling

12   you that you can't hear the merits, so we should have

13   witnesses.

14         THE COURT:  Yesterday he urged me to listen to his

15   client.  Now he doesn't want me to listen to anybody else.

16   We'll take about a five-minute break.

17         (Recess taken, 11:55 a.m. - 12:05 p.m.)

18         THE COURT:  Okay.  On reflection, it's my present view

19   that I'll have the authority under the All Writs Act at least

20   and perhaps more explicit bases to put conditions on any stay

21   that may be necessary or appropriate.  The testimony, I want to

22   hear from Mr. Stoddard and others, to some extent will be

23   relevant to that as well as relevant to the merits of the

24   motion for a temporary restraining order if that needs to be

25   decided by me, and, therefore, we should bring in Mr. Stoddard

1  as the next witness.

2          MR. SHEEHAN:  He's right outside, Your Honor.

3          MR. BECK:  Your Honor, would it be possible to have

4  Mr. Weissel in first?  He was our corporate representative and

5  also it will set the stage for you to understand the Optum

6  context before then hearing kind of how it transitions over to

7  the ABC context.  And I think from our standpoint in terms of

8  giving you the evidence --

9          THE COURT:  I'm sorry.  You want me to hear --

10  actually, Mr. Stoddard should step out again.  I'm sorry.

11          You want Mr. Weissel why?

12          MR. BECK:  We'd like to set the stage with the context

13  of Optum first so you can have then have in context the

14  testimony you'll hear from Mr. Stoddard.

15          THE COURT:  How long do you expect to be with

16  Mr. Weissel?

17          MR. RIDEN:  I believe we could get through his

18  testimony within about a half an hour, give or take.

19          MR. SHEEHAN:  I have no -- plaintiff wants to put on

20  their case in the order they want to put it on.  I would just

21  note Mr. Weissel was not one of the affiants.  It's supposed to

22  be a limited bit of testimony.

23          THE COURT:  I mean, what's the essence of his

24  testimony going to be?  That one could be a customer and a

25  competitor?

* S E A L E D * Attorneys' Eyes Only

1          MR. RIDEN:  Well, Your Honor, circumstances have

2     changed since we filed our affidavit, certainly, and

3     Mr. Weissel has come here.  He's far more senior than

4     Mr. Wolin.  He reports to the president of Optum, who in turn

5     reports to the CEO of Optum.  So Mr. Weissel is one of ten

6     senior executive board members at Optum, senior team members at

7     Optum.

8          So what the topics are I think Mr. Weissel -- and I

9     think it's going to be very educational for all of us in this

10    court.  He's going to talk generally about Optum.  He's going

11    to talk very briefly about what David Smith did at Optum,

12    because that's more what Mr. Wolin, as Mr. Smith's direct

13    supervisor, is set to talk about.  Then we're going to talk

14    about just a very little bit -- he can put the Fact Book into

15    context because I believe he was one of the authors of it, and

16    then he can talk about why ABC is a competitor.  He is, we

17    believe, the best witness for this testimony.  And he can also

18    talk about what Mr. Smith can do.

19          THE COURT:  All right.  I'll give you 30 minutes to do

20    it.  Let's call Mr. Weissel.

21          MICHAEL WEISSEL, Sworn

22    DIRECT EXAMINATION BY MR. RIDEN:

23    Q.   Could you please introduce yourself to the court.

24    A.   I'm Michael Weissel.

25    Q.   Where do you live, Mr. Weissel?

* S E A L E D * Attorneys' Eyes Only

1    A.    Newton, Massachusetts.

2    Q.    Where do you work?

3    A.    At Optum.

4    Q.    And what is your title there?

5    A.    Group executive vice president responsible for strategy

6    and product.

7    Q.    And how long have you had that title?

8    A.    Three years for this title.  I've been at Optum for six

9    years.

10   Q.    And if you could describe your reporting chain up to the

11   top of Optum?

12   A.    I report to Dirk McMahon, who is the president and COO of

13   Optum, and he reports to Andrew Witty, who is the CEO of Optum.

14        THE COURT:  And I have the authority to impose time

15   limits.  You said you could do this in 30 minutes.  It's 12:10,

16   and I expect the direct examination is going to be done by

17   12:40.

18        MR. RIDEN:  I have a timer running, Your Honor, and I

19   think we know I can speak fast.

20   Q.    What was your role at Optum with respect to Mr. Smith?

21   A.    So Dave reports in kind of a dual role underneath me, so

22   Mr. Wolin and Mr. Seddon, who are other witnesses that have

23   been called, Dave technically reports to Steve Wolin in the

24   strategy group, but his responsibility has covered both

25   activity in the strategy team as well as activity in the

* S E A L E D * Attorneys' Eyes Only

1   product team.

2   Q.   Have you ever been deposed before?

3   A.   No.

4   Q.   Have you ever given testimony under oath before?

5   A.   No.

6   Q.   This is your first time out?

7   A.   Yes.

8   Q.   We're going to talk a little bit about what Optum is.

9   First of all, what is UnitedHealth Group, basically?

10  A.   UnitedHealth Group is the holding company of two

11  enterprises.  One is UnitedHealthcare, a large insurance

12  carrier, and the other is Optum, which is a health care

13  services company.

14  Q.   Do they do complementary tasks?

15  A.   Yes.  Often Optum supports UnitedHealthcare, but it

16  supports a number of other large companies throughout the

17  county as well.

18  Q.   And what does Optum do, sir?

19  A.   Optum has three primary lines of business.  The first one

20  is Optum Rx, which is our pharmacy care management business.

21  This is really about helping people get their prescriptions,

22  get their prescriptions paid for.  That business also has a

23  direct mail facility, so we fulfill prescriptions for certain

24  individuals there as well.  I think there's about 66 million

25  individuals across the United States who are covered under this

* S E A L E D * Attorneys' Eyes Only

1  entity.

2      The second major part of Optum is Optum Health.  There's a

3  number of different businesses that sit inside of Optum Health.

4  Population health management, which I think is a lot of what

5  we're talking about here today, is a key business in that.

6  This is where we have wellness services to help keep people

7  healthy.  It's where we do care management or case management

8  for people with specific diseases.  We have centers of

9  excellence for folks who might need help with a transplant or

10 have cancer or other kinds of surgeries.  We have a behavioral

11 health unit that helps people with mental health issues.  And

12 we also have a financial services business that helps people

13 save and pay for care.  Those are the big ones off the top of

14 my head.

15 Q.   Is there a third one?

16 A.   Sorry.  The other part of Optum Health which is important

17 to understand is Optum Care.  And here we're in the business of

18 primary care.  So just like you would go see your normal

19 primary care doc, as well as outpatient surgery centers, urgent

20 care centers.  And we will send nurses into people's homes for

21 house calls.  I think we'll do a million house calls this year

22 for frail and elders.

23     And them the third division of Optum is OptumInsight.

24 That's really our technology and data services that sit inside

25 of that business.  Large businesses helping a very wide number

*  S  E  A  L  E  D  *  Attorneys' Eyes Only

1    of folks in the industry do analytics, health insurers do their

2    analytics on their populations.  Could also be revenue cycle or

3    risk adjustment activities to help hospitals or physicians with

4    their patient panels.

5    Q.    As a general matter, does Optum address pain points for

6    its customers?

7    A.    That's what we're in the business of doing, yes.  In any

8    particular arena, whether it be employers or payors or hospital

9    systems, we're always looking at what those pain points are to

10   try to understand where is their new market opportunity or what

11   is it that our products can and should do to take care of their

12   needs.

13   Q.    At a fairly general level, can you describe what Optum

14   does for JP Morgan Chase and subsidiaries and Berkshire

15   Hathaway, to the extent you know?

16   A.    For JP Morgan Chase, they're a very large user of

17   UnitedHealthcare.  Roughly two-thirds of their employee base is

18   covered by JPMC.  Underneath UnitedHealthcare is Optum.  We

19   have well over 15 or 16 different services that we provide:

20   wellness, care management, case management, treatment decision

21   support for people who need second opinions.  I believe there's

22   some fitness services that we provide.  So it's a long list.

23   We could certainly get it if someone wanted to see it.

24   Q.    And how about for Berkshire Hathaway?

25   A.    For Berkshire Hathaway, I'm not aware of all the services.

* S E A L E D * Attorneys' Eyes Only

1  I know we do work for one of their subsidiaries, and it's a

2  similar list of products and services.

3  Q.   How many employees does Optum have?

4  A.   Roughly 150,000.

5  Q.   And how many millions of individuals does Optum service?

6  A.   Individual consumers, in excess of 120 million, somewhere

7  in that range.

8  Q.   And how many health plans?

9  A.   Around 300.

10  Q.   And approximately how many pharmacies are in Optum's

11  network?

12  A.   In the retail network where people can go pick up their

13  prescriptions, there's -- I don't know -- 60 plus thousand

14  pharmacies, I believe.

15  Q.   Focusing on Optum corporate strategy where Smith worked.

16  What does Optum corporate strategy do in particular?

17  A.   So our role in corporate strategy is really to think about

18  what's the future of the enterprise.  So we take a look at

19  market trends, significant market trends.  We're trying to

20  understand where all of those different kinds of customers I

21  just mentioned might be going, whether it's payors or providers

22  or other insurance companies.  It could be a whole mix of

23  folks.  We're looking at those trends and we're identifying

24  what we would call either pain points or white space where

25  there is opportunity.

* S E A L E D * Attorneys' Eyes Only

1      In addition, for products and services that we currently

2   have today, our job is to take a look at those on the strategy

3   side and understand how are they doing, how are they

4   performing, where are there new opportunities for us to enter

5   new markets, general corporate strategy activity.

6   Q.   And how about on the product side where Smith also worked?

7   A.   So on the product side, so Optum has roughly over 450

8   products in its portfolio today.  Our job in corporate product

9   is really to understand what that portfolio looks like, how are

10  the different products and services performing, all the way

11  down to, you know, a specific level of financial performance.

12  We roll them up into various categories, somewhere between as

13  high as sometimes 24 categories of products to make those 450

14  manageable where we look at P and L activity around those.

15  We're quantifying.  Are they growth products?  Are they core

16  products?  Are they products we might not want to be in?  So

17  that's a big part of what we do.

18      We're trying to build a product culture, so we're doing

19  all kinds of work related to job function, job functionality,

20  how product managers will do their work and develop new

21  products.  We're in the process of thinking about agile and how

22  do we get quicker to bring products to market.  So that's the

23  product responsibility.

24  Q.   Elena Avramov, is she a former employee of Optum?

25  A.   Elena Avramov, she left -- I don't know the exact date she

* S E A L E D * Attorneys' Eyes Only

1    left.   October-November timeframe.

2    Q.    And did she work with Mr. Smith?

3    A.    Yeah.   They both worked on the corporate strategy team.

4    Q.    And do you know where she went?

5    A.    She went to work at a health system in New Jersey.

6    Q.    Did she have a noncompete?

7    A.    She did have a noncompete.

8    Q.    Was she -- when she announced her resignation, was she

9    allowed to work after she announced her resignation for a

10   period of time?

11   A.    She was.

12   Q.    For how long?

13   A.    I'm going to say it was three or four weeks probably that

14   she worked.   But her situation is somewhat different than

15   Dave's.   She went to a hospital system.   And all of the things

16   that I mentioned that we do -- we support and we serve hospital

17   systems, but hospital systems are not a competitor to us.

18   They're not producing products and services that we think, you

19   know, that compete with us.   So in her case there was no issue

20   related to a noncompete.

21   Q.    She had a noncompete.   She didn't go to competitor.   She's

22   allowed to work.

23   A.    Correct.

24   Q.    And you haven't sued her or even sent her a demand letter?

25   A.    Nothing.

* S E A L E D * Attorneys' Eyes Only

1  Q.   Okay.  Focusing on Mr. Smith briefly, did he work on

2  population health services, that project that was provided to

3  JP Morgan?

4  A.   You have to separate, I think, the way you ask the

5  question.  So population personnel services is a product and

6  service of Optum.  It is provided to JP Morgan.  He would not

7  have worked specifically on that account, but he did work

8  extensively on our population health services strategies back

9  in 2017 where we were looking at -- that business was not

10 performing as well as we would have liked, so we were doing a

11 full analysis of where were the opportunities with that

12 business, what are new products and services we might offer.

13 What is the turnaround to help them be where they need to be in

14 the marketplace.

15 Q.   So he has extensive insight about --

16      THE COURT:  Why don't you do this in a non-leading

17 manner, please.

18 Q.   What kind of insight does Mr. Smith have into Optum's

19 population health services?

20 A.   Based on his role in the products space, he would have a

21 full understanding of Optum's strategy around that portfolio of

22 products.

23 Q.   Was Mr. Smith a good employee?

24 A.   Yes.

25 Q.   Did you like him?

1    A.    Yeah, I did.  Over the summertime actually we were in the

2    process of and we actually got him promoted during the course

3    of the summertime.  We don't publish these kinds of lists, very

4    rarely, but every year I'm required to put forward a kind of

5    succession planning document for the enterprise.  And in a

6    scenario where Mr. Wolin would have been unable to perform his

7    duties for some period of time or for some reason, Dave was on

8    that list as one of my, you know, fill-ins or stand-ins on an

9    interim basis to lead the --

10   Q.    Is this lawsuit any type of personal vendetta?

11   A.    Absolutely not.

12   Q.    Is Optum trying to smear him?

13   A.    No.

14   Q.    Is Optum trying to intimate its employees?

15   A.    No.

16   Q.    Did you call Mr. Smith after he left?

17   A.    I did.

18   Q.    Tell us about that.

19   A.    All of this was starting to happen and we were realizing

20   the nature of -- you know, that we thought this would be

21   competitive with us and we were concerned about it.  I knew

22   that we were drafting a letter, a legal letter that was going

23   to be given to him that was going to lay out, you know, the

24   issues as we saw them.

25        And so because I had a personal relationship with Dave and

* S E A L E D * Attorneys' Eyes Only

1   I felt it was an appropriate thing to do, that I just didn't

2   want a letter from our chief legal officer kind of coming over

3   the transom to him without him knowing, I called him and had a

4   brief discussion letting him know a letter was on the way.

5   Q.   Was there anything else you talked about?

6   A.   I think the conversation lasted maybe four or five

7   minutes, so I don't recall anything else.

8   Q.   When Mr. Smith was working for Optum, what kind of

9   information did he have access to that may or may not be useful

10  to a competitor?

11  A.   So the strategy team is unique in that it's a relatively

12  small group of individuals that, you know, sit at corporate at

13  Optum.  The strategy team itself is only 14 or 15 people, and

14  the product team is somewhat similar sized.  There are very few

15  places in Optum, given our breadth in size, where people get to

16  look across the portfolio of products that we have and the

17  portfolio of the enterprise that we have in a way that Dave was

18  able to and the way that a lot of people on our strategy team

19  are able to.

20      And so he's going to have access to some inside thinking

21  on where we're headed from an overall corporate strategy

22  perspective.  On the product side, he was one of really less

23  than five individuals who had access to the P and L activity of

24  specific products that we have.  So he'll have access to lots

25  of different information.  He has the opportunity to ask for

* S E A L E D * Attorneys' Eyes Only

1    all kinds of different information in his day-to-day job as

2    well.

3    Q.   Did you have any involvement with this document that has

4    been discussed in this case called the Fact Book?  Are you

5    familiar with the Fact Book?

6    A.   I am, yes.

7    Q.   What is the Fact Book?

8    A.   So over the summer, this past summer as we have -- we have

9    a new CEO who came in in July, and he asked us to rethink what

10   Optum's corporate strategy should be and are we headed in the

11   right direction, how does the enterprise fit together, all the

12   good questions a new CEO would ask.  He asked us to start a

13   strategy project.

14        So the first thing we did as part of that is really do our

15   own analysis of trends that are happening in the marketplace,

16   and it was a look at what we thought would happen between now

17   and say 2030 in the industry.  Everything from how fast are

18   prices rising, what are the number of chronic -- what chronic

19   conditions are going to be most important to the health of the

20   population, how many people will become polychromic.

21        Honestly, we filled a good size room with paper relative

22   to all the facts of that project.  The Fact Book itself was

23   kind of our attempt to summarize all of that information into,

24   I don't know, 50, 60 pages of something that was digestible,

25   that brought all those trends into which ones we thought were

* S E A L E D * Attorneys' Eyes Only

1    most important, and also included after each set of trends what

2    we thought Optum's response should be to those trends in terms

3    of how we would go after them.

4    Q.    Confidential document?

5    A.    Yes.

6    Q.    Highly confidential?

7    A.    Yes.

8    Q.    So could you talk took a little bit about the OES

9    socialization deck for Optum Enterprise Strategy?

10   A.    Yeah.  So the OES stands for Optum Enterprise Strategy.

11   At the end of the activity where we worked across the senior

12   management team, 14 of us at the most senior levels of Optum,

13   so myself but all of the -- and Dirk McMahon's direct reports,

14   we settled on what our strategy would be.  And we needed to

15   find a way to summarize that, something simple and high level

16   enough that it could be shared with other people inside of the

17   company.  That is a short 14- or 15-page document that

18   highlights the summarization of the trends, the most important

19   ones, summarizes the strategies, the competencies that we think

20   are most important for us to build our business on, and how we

21   would go to market.  And it's not just a set of slides.  It

22   came with a set of speaking notes as well for anybody who might

23   need to present it.

24   Q.    Confidential document?

25   A.    Yes.

* S E A L E D * Attorneys' Eyes Only

1   Q.    Highly confidential?

2   A.    Yes.

3         MR. RIDEN:  And just for the record, I'll represent

4   the Fact Book is attached to Mr. Wolin's affidavit in the

5   complaint as Exhibit 6.  The Optum Enterprise Strategy document

6   that we were just discussing was attached to Mr. Wolin's

7   affidavit in the complaint as Exhibit 7.

8   Q.    After Mr. Smith left Optum, did you have an opportunity to

9   go into his office?

10  A.    I did because I wanted to just see what material was left.

11  And certainly after there had been some discussion about what

12  had been printed and we started to see some of those things, I

13  wanted to see if that information was left in the desk, in a

14  file cabinet, whatever state it may be in.

15        So I can't actually remember the date.  I think it was

16  probably right around the time I had the phone conversation

17  with Dave.  I walked down to his office myself because I wanted

18  to go through it and just see what was there and where

19  everything was.  There wasn't very much left in it, honestly,

20  and there were just a few things from really more like 2017

21  left in a couple of file cabinets but mostly it was empty.

22  Q.    Did you find the Fact Book there?

23  A.    I did not.

24  Q.    Did you find the Optum Enterprise Strategy document there?

25  A.    No.

* S E A L E D * Attorneys' Eyes Only

1   Q.   Is it a typical thing for you in your senior position to

2   go searching people's offices, or is this unique?

3   A.   That's the first time I've ever done that.

4   Q.   If the information contained in the Fact Book and Optum

5   Enterprise Strategy were to go to a company that is new to the

6   market, what would be the impact of that?

7   A.   Well, I mean, anybody who is developing new products is

8   going to want to understand where the competition is headed and

9   the kinds of products the competition is making.  So I think it

10  gives an opportunity to kind of know where are the holes in our

11  strategy, what are the products and services we're trying to

12  deliver, what would be unique about what we're trying to

13  deliver?  I think it's an opportunity to kind of, you know,

14  attempt to leapfrog whatever the product and service might be

15  that we have.

16      I think that -- you know, the product profitability

17  information, while it won't give you information into how we

18  price a particular product for a particular client, it

19  certainly gives information about what products are performing

20  well and successfully and making money versus which products

21  aren't.

22  Q.   Speaking of new entrants, I'm going to transition to

23  talking about ABC.  When I say ABC --

24  A.   I'm sorry, can you repeat --

25  Q.   Speaking of new entrants, I'm going to turn to ABC.  When

* S E A L E D * Attorneys' Eyes Only

1  I'm speaking of ABC, do you know who I'm referring to?

2  A.   Yes.

3  Q.   Who is ABC?

4  A.   It is the joint venture between Amazon, Berkshire Hathaway

5  and JP Morgan Chase.

6  Q.   Was there any significance -- was there anything done

7  internally when ABC, when it was announced that that joint

8  venture was started?

9  A.   Well, there was a lot of things done.  I very clearly

10  remember the announcement date because it was about a year ago

11  this week probably.  We have an annual global growth conference

12  where all of our salespeople come to.  We were at that

13  conference, ready to actually go on stage and talk about the

14  next year, when the announcement came out.

15      As you can imagine, our stock price dropped 5 or 6 percent

16  that day based on the market's reaction to that announcement.

17  I don't remember how long it continued to drop, another couple

18  of weeks probably, almost 10 percent total drop at that point.

19      So we were paying very close attention to whatever this

20  would be.  There wasn't a lot of information.  I'd say there's

21  still not a lot of information, but we pay very careful

22  attention to what it is, and we also pay a lot of attention to

23  the folks who founded it.  Because, you know, they themselves

24  are disrupters, and so we fully expect that this entity which,

25  from what I've read, said will have a million or so employees

* S E A L E D * Attorneys' Eyes Only

1 that it will be taking a look at, that it intends to develop

2 new services or products to serve those employees, and then

3 once it has that, it will take them to the rest of the market.

4      So I don't know.  I have not seen any of their material

5 other than what's written in the press.  I just know that every

6 time anything comes out, you know, I always say to my team,

7 Anytime they sneeze, our stock catches a cold.  So the market

8 is definitely paying attention and thinks that this is going to

9 be impactful on us.

10 Q.   Do you think the market believes that they're a

11 competitor?

12 A.   I do.

13           MR. SHEEHAN:  Objection, Your Honor.

14           MR. RIDEN:  I withdraw the question.

15 Q.   Does Optum or do you believe that ABC is competitor of

16 Optum?

17 A.   I do.

18 Q.   Why?

19 A.   I think, you know, it's just -- it's a natural, I think,

20 inclination to come to.  They have come out with the pure

21 intent to say that they're going to disrupt the health care

22 market.

23 Q.   What does that mean?

24 A.   That they're looking at very large -- a set of very large

25 employers to understand what those employee needs might be in

* S E A L E D * Attorneys' Eyes Only

1    the same way that we are.  And they intend to develop sets of

2    services to serve those employees who are actually currently a

3    set of our customers, at least in JP Morgan's case and

4    certainly a couple of subsidiaries of Berkshire Hathaway's.

5        I don't know exactly what their intent is relative to how

6    they would take those things and, you know, take them to

7    market.  I understand that they say they're not here for

8    profit.  But probably 50 percent of the health care industry

9    with which we compete would say the same thing.  Every Blue

10   Cross Blue Shield plan in the country, other than Anthem, is

11   not for profit.  50 percent of the hospital systems in the

12   United States are not for profit.

13       So I don't know, when they say that, you know, that

14   doesn't mean that they won't want to monetize the intellectual

15   property that they would have created from new products and

16   services that they would find for those people.

17   Q.   I'm going to show you -- I'm going to put on the monitor

18   here an email.  If somebody could help me do the focus here.

19   We'll come back to that once we get the --

20           MR. SHEEHAN:  Excuse me, Your Honor, before we do

21   that, could I see the document?

22           MR. RIDEN:  I'm going to show Mr. Weissel what was

23   discussed at length yesterday during Mr. Smith's testimony.

24   It's Exhibit 2 to Mr. Smith's testimony.

25   Q.   Do you recognize this email, Mr. Weissel?

* S E A L E D * Attorneys' Eyes Only

1    A.    Well, I don't recognize -- I recognize the point of the

2    email, but it wasn't sent to me originally.  But I know what

3    it's about.

4    Q.    What is it about?

5    A.    As part of the work that our new CEO essentially asked us

6    to do, he was asking a lot of information about how do you

7    think about the competition and who are our biggest competitors

8    and who are people we should be worried about.  As part of that

9    I asked actually Dave to help me begin to pull together a list

10   of our top competition.  He went --

11   Q.    Dave Smith?

12   A.    Dave Smith.  Sorry.  And he went, and we have many

13   different lists inside of Optum of the competition.  They're

14   not all consistent.  And each business unit also has a bit of

15   its own list.  So this was an attempt on our part to try to say

16   can we pull the list together, can we talk about who we think

17   are the most important ones, who are the ones the Optum

18   executive team should pay attention to, who are the ones we

19   want to make sure we're reporting out to the board once in a

20   while on.  That was the list we were working to create.

21   Q.    Now, I direct your attention to the second page of this

22   document.  Do you see reference to ABC there?

23   A.    I do.

24   Q.    And what does nontraditional disrupter mean in your

25   understanding?

* S E A L E D * Attorneys' Eyes Only

1  A.   So there are people who are very clearly in the health

2  care space that we could look at and very easily point to,

3  Express Scripts or somebody and say, Boy, you know, it's very

4  clear where and how they're competing with us today; they're

5  kind of in the traditional business.

6       There are other sets of competitors that we could call

7  disrupters.  These are people who have made very public

8  statements about wanting to get into the marketplace and

9  significantly change the way something is working in health

10 care.

11      And I don't want anybody to think we don't want things to

12 change in health care.  We're working extremely hard to try to

13 figure out what that is, too.  We know it needs to be better.

14 So this is a company that always has our attention any time we

15 have a discussion about it.

16 Q.   Is there any significance to the fact that Amazon is a

17 founder of ABC?

18 A.   Well, to us there is, because we also consider Amazon

19 itself to be a significant disrupter.  They've publicly stated,

20 you know, a number of different times their desire is to enter

21 the health care market.  They recently made a large purchase of

22 a pharmacy benefit manager called PillPack for a billion

23 dollars that competes with Optum Rx.  So we are extremely

24 focused, like we are with all of our competitors, on what

25 somebody like Amazon would be doing and think that they will be

1   someone who will make a big attempt to disrupt the marketplace.

2   And they're not alone.  There's a number of these large

3   technology-oriented companies that, you know, we see in the

4   same light.

5          THE COURT:  What do you mean when you characterize a

6   company as a disrupter?

7          THE WITNESS:  So they're not coming in as a

8   traditional health care -- from a traditional health care

9   angle.  They might be coming in with, you know, a different way

10  to approach the market or a different skill set than the

11  traditional competitors would.

12         That could be -- so in Amazon's case, we mostly think

13  about Amazon today as, you know, a place we go online to buy

14  stuff, right?  I know I've got plenty of boxes coming to my

15  house every day.

16         But when they go out and buy a pharmacy benefit

17  manager to start delivering prescription medications to people

18  at home, then that is -- it feels a little out of -- right --

19  what their core would have been.  But it will be disruptive in

20  some way based in how they might use their client relationships

21  and all the customers they currently have to enter a market

22  which you wouldn't traditionally have thought of them entering.

23  Q.   We are short on time, so I want to get to two quick

24  topics.  We'll get to what Mr. Smith can do under the terms of

25  his noncompete in your view.

* S E A L E D * Attorneys' Eyes Only

1       Are there circumstances where a customer of Optum's is

2   also a competitor?

3   A.   It happens all the time.  I don't know if -- I don't think

4   it's a made-up word, but I call it coopertition.  These are

5   people that are both partners of ours as well as competitors

6   with ours.

7       I mean, a good example of that would be somebody like CVS

8   Health.  So with Caremark, which is their pharmacy benefit

9   manager, they and Optum Rx are competitors, and no one in the

10  industry would think any different.  But CVS retail, where

11  people pick up their prescriptions, and Optum are strong

12  partners.

13      I have a large number of examples of companies where we

14  compete with them, but at the same time we cooperate.  That's

15  true with many health insurers who have portfolios of their own

16  that they sell but also use Optum's services.

17  Q.   Do you recall ever saying anything about this coopertition

18  concept about ABC at any point?

19  A.   I'm sure I must have.  I think about them as potentially

20  both.  I think that they could be a potential partner of ours.

21  I think it's clear, as they take care of their employees, that

22  that is very possible.  And we'd welcome the opportunity,

23  right, to serve employers in the best way we can.

24      But at the same time, I think about them as competition

25  because at the same time they are potentially creating products

1   and services that will also compete with us.  So that makes us

2   wary about, you know, about how we would work with them for the

3   same reason.

4   Q.   Thank you.  My last topic is what Mr. Smith can do.  Is it

5   Optum's position that Mr. Smith cannot work anywhere in health

6   care?

7   A.   Absolutely not.

8   Q.   What can he do?

9   A.   So the health care space, you know, in the United States

10  it's about a $3.2 trillion industry.  Optum would say that we

11  have businesses in market size, you know, that we think for

12  ourselves is somewhere in that 800 billion to $1 trillion

13  range.  So that leaves 2-plus trillion dollars of spots inside

14  the health care system where Dave could go work with no

15  competitive issues whatsoever.

16  Q.   What is an example?

17  A.   There's a number of examples.  He could go work for a

18  hospital system, Mass. General, Children's, just like Elena

19  did.  That would be not a problem.  He could work in the

20  medical device arena, not a problem.  He could go work in the

21  life sciences industry, pharmaceutical, biotech, that he would

22  be fine here.  He could go work at a health insurer and most

23  parts of the health insurer, maybe not exactly the pure pop

24  health side, but he could go work in that.  I mean, I could

25  come up with a number of others in this $2.2 trillion of

 1   opportunity.

 2       I think the challenge on this particular spot more than

 3   anything is that the place that he chose to go is squarely in

 4   the population health management space, and he has expertise

 5   from the work that he did that's squarely in the population

 6   health management space.  And I think that's where the primary

 7   issue in this case from our perspective appears.  But there's

 8   plenty of places in health care that Dave could go work and

 9   there would be no conflict.

10   Q.   When does Optum choose to enforce its noncompete

11   agreements?

12   A.   Well, any time that we feel it's appropriate because

13   someone is going to a spot where they would be violating their

14   noncompete.

15   Q.   Would it be -- is it a violation in Optum's view of

16   Mr. Smith's noncompete agreement if he goes to work for the

17   pharmacy benefit management space?

18   A.   Probably not.

19   Q.   How about data analytics?

20   A.   Probably not there either.

21   Q.   But focusing on the population health management?

22   A.   Correct.

23       MR. RIDEN:  I have no further questions right now.

24   I'm going to check with my team for the last 30 seconds.

25       Okay.  No further questions.  Thank you very much,

1    Mr. Weissel.

2    CROSS-EXAMINATION BY MR. SHEEHAN:

3    Q.   I wasn't able to write it down word for word, but I think

4    you just said what this was all about was really where

5    Mr. Smith had gone to ABC, correct?

6    A.   It's about the work that he'd be doing.  So it's not about

7    the company itself.  It's about what the company does.

8    Q.   Sir, I don't remember the name, Elena?

9    A.   Elena.

10   Q.   Could you --

11   A.   Avramov.

12   Q.   She left.  She was part of the same team as Mr. Smith?

13   A.   She was.  He was at a higher level than her when he left,

14   but yes.

15   Q.   She had access to the very same Facebook and other

16   documents?

17   A.   Fact Book.

18   Q.   Fact Book.  I'm sorry.

19   A.   Everybody has Facebook.

20   Q.   Not me.

21   A.   She would have had similar access to Dave, yes.

22   Q.   Okay.  And when she left -- first of all, did you direct

23   this lawsuit to be filed?

24   A.   I'm not sure I understand the question.

25   Q.   Was it your direction, did you direct on behalf of the

* S E A L E D * Attorneys' Eyes Only

1   company that this lawsuit be filed?

2   A.   Ultimately he reported to me, so I worked with our lawyers

3   to make the appropriate decision on what we felt was the right

4   thing to do.

5   Q.   Okay.  So it was your decision?

6   A.   Yeah.

7   Q.   And did you direct that Mr. Smith's emails and print usage

8   be investigated?

9   A.   I did.

10  Q.   Okay.  Did you do the same for Ms. -- I'm sorry, her name?

11  A.   Elena?

12  Q.   Yeah.

13  A.   I did not.

14  Q.   So we don't know whether she printed out the same Fact

15  Book or the OES socialization document.  We don't know, do we?

16  A.   We don't.  Of course she didn't go -- she went -- as I

17  stated before, she went to a hospital system.  We're not -- we

18  don't run companies like Mass. General or the hospital system

19  she went to in New Jersey.  Therefore, there was no need to do

20  that because we did not foresee it as a conflict.

21  Q.   I understand.  So the answer is we don't know?

22  A.   We don't know.

23  Q.   And we don't know how many times she may have printed out

24  the Fact Book or the OES socialization document, right?

25  A.   We have no idea.

1  Q.   In fact, did you check the print usage?  Did you have your

2  investigator check the print usage by others on the strategy

3  team, how often they printed out those documents?

4  A.   No.

5  Q.   So sitting here, you don't know whether, just like

6  Mr. Smith, they also from time to time printed out those

7  documents while they were working at Optum?

8  A.   I do not know.

9  Q.   Did you check to see whether or not she had -- Elena had

10  emailed documents from Optum to her home or --

11  A.   I did not.

12  Q.   -- to the cloud?

13  A.   I did not.

14  Q.   Did you do that with anyone else on the strategy team?

15  A.   I have had no one else on the strategy team go to someone

16  I would consider to be a competitor, so no.

17  Q.   If you take a look at the document that your counsel put

18  up on the screen, you know that list of competitors?

19  A.   Yeah.

20  Q.   Right there on the first -- the first category, you've got

21  Top Care Delivery Competitors, and Regional Health Systems is

22  listed as, what, a competitor?

23  A.   Well, there are -- there could be certain regional health

24  care systems that we would -- who have lines of service which

25  could compete with us that we might consider a competitor.

* S E A L E D * Attorneys' Eyes Only

1   That's not true in the case where Elena went.  But it's

2   possible that there are health systems out that that have

3   ancillary businesses, and those ancillary businesses could be

4   competing with us, yes.

5   Q.   So it's your position, sir, that you get to decide where

6   your employees get to work next within the health care

7   industry; is that it?

8   A.   Absolutely not.

9   Q.   And I think your testimony, sir, was that you saw that the

10  Fact Book or this OES document could be useful for a company

11  that was looking to develop products; is that right?

12  A.   That's correct.

13  Q.   Okay.  Sir, as you and your colleagues sort of noodled the

14  issue in September of 2018 as to, well, what do we think of

15  ABC, fair to say -- well, first of all, in the document it was

16  not listed as a competitor but a disrupter, right?

17  A.   Well, I'm not sure I see a distinction.

18  Q.   Okay, yeah.  And you coined a phrase here today in court.

19  What was that?

20  A.   Coopertition.

21  Q.   Coopertition.  But you all didn't really have much

22  information other than what you were reading in the press; is

23  that fair to say?

24  A.   There would be no other way to have information.

25  Q.   But today, today, wouldn't you agree that Mr. Smith, who

1  has worked for the company, probably has more insight into what

2  that company does than you do today?

3  A.   I would hope so.

4  Q.   So when he says the company is not involved in the

5  development of products, you don't have any basis to dispute

6  that, do you --

7  A.   The only basis I have to dispute it --

8  Q.   -- other than guessing?

9  A.   Well --

10  Q.   You don't have any information on that, do you?

11       THE COURT:  Ask him if he had any basis.

12  A.   So the basis that I would have is they have publicly

13  stated that as they find solutions for their 1.2 million

14  members that their plan is to figure out how to make that

15  available to the rest of the market.  I don't know if that

16  means they're going to give it away for free or they're going

17  to create product out of it.  I just know that's what I have

18  read.

19  Q.   When you hire your employees, sir, you hire from within

20  the industry often, don't you?

21  A.   Certainly.

22  Q.   You hire from companies within the health care industry,

23  right?

24  A.   Yes.

25  Q.   And you hire from companies that compete with Optum,

1    right?

2    A.   On occasion, I'm sure, as often, as large as we are with

3    150,000 people, I'm certain that there are people in our

4    company who have worked for others.  I can't speak to what

5    their restrictions might have been or how we use them, but I'm

6    certain that we must.

7    Q.   I'm going to get there.  So is it fair to say you hire

8    from Well Tech or IBM Health?

9    A.   I don't have anybody on my team from there.

10   Q.   Aetna?

11   A.   Do you mean Well Talk?  Yeah, I have an employee from Well

12   Talk on my team, yes.

13   Q.   How about Aetna or the Blue Cross companies?

14   A.   Anybody on my team specifically from Aetna or Blue Cross,

15   no.  To be clear, most of the people on my team come from

16   strategy consulting.

17   Q.   Okay.  Let's talk about those first, and we'll broaden it

18   out a little bit.  The ones that come from strategy consultants

19   had worked with health care companies as a consultant, correct?

20   A.   Of course.

21   Q.   You knew about that, right?

22   A.   Of course.

23   Q.   And did you ask them to sit out a year or six months or so

24   so that they wouldn't use or disclose company information?

25   A.   Any employee who would come to us who would have a

* S E A L E D * Attorneys' Eyes Only

1    restrictive covenant relative to a noncompetition, the answer

2    would be we would review it and we would make a decision as we

3    hired that employee as to whether or not they needed to sit out

4    or what things they could or couldn't work on.  And I've had

5    cases in the past where I've had people -- I haven't hired

6    people or that we would not work with people because of it.

7    Q.   Set aside the restrictive covenant.  How about the fact

8    that they had just worked with health care companies as a

9    consultant and now they're working for Optum?

10        Were you concerned, sir, that they might inevitably have

11   to use or disclose their prior clients' information in doing

12   their job for Optum?

13   A.   No.

14   Q.   Why not?

15   A.   Because I'm not -- I'm hiring them for a wide variety of

16   reasons, and I expect that they will uphold whatever

17   confidentiality obligations they have to do their work.

18   Q.   You could trust that, right?

19   A.   Sure.  But -- I would say trust, but at the same time, if

20   I think there's a particular area that is sensitive, I won't

21   let them work on it.

22   Q.   And sir, so what you thought would be a fair approach in

23   those instances is there might be areas that you would not have

24   them work on; is that a fair to say?

25   A.   It's incredibly dependent on the individual and the scope

*  S  E  A  L  E  D  * Attorneys' Eyes Only

1  of what we're talking about.

2  Q.    Certainly.  You came from Oliver Wyman, right?

3  A.    I did.

4  Q.    Before that you had been to Duke grad school?

5  A.    I am, yeah.

6  Q.    You joined Oliver Wyman in 1996 and you were there all the

7  way to 2013?

8  A.    That's correct.

9  Q.    In fact, Mr. Wolin was at Oliver Wyman also, right?

10  A.    I have a number of employees on my team who came from

11  Oliver Wyman.

12  Q.    Well, you and Mr. Wolin also went to Duke grad school?

13  A.    We did.  Although --

14  Q.    Old classmates?

15  A.    Yeah.  That's not quite how we ended up together, but yes.

16  Q.    Well, I wasn't going to ask you how ended up together at

17  Oliver Wyman.  I was going to ask you about how you ended up

18  together at Optum.  Did you hire him?

19  A.    I did.

20  Q.    Now, when you were at Oliver Wyman, did you have any

21  restraints, any post-employment restraints when you went to

22  Optum?

23  A.    Did he?

24  Q.    Did you?

25  A.    Did I?  I did.  I had a noncompete agreement with Oliver

* S E A L E D * Attorneys' Eyes Only

1    Wyman myself when I came to Optum.

2    Q.    Which included a nonsolicitation?

3    A.    That's correct.

4    Q.    Right.  How long was that?

5    A.    You know, I don't remember.  I'm sure it was a year.  I'm

6    sure it was a year, but I don't actually remember.  It's been

7    six years since I left, and I don't remember what my

8    restriction was.

9        I can tell you that for certain because, if you want to

10   cut to the chase, every single person I hired from Oliver Wyman

11   had been gone from Oliver Wyman, had left and gone to business

12   school, had gone somewhere else.  Steve might be the exception.

13   But there were many conversations with Oliver Wyman, and they

14   had no objections.

15   Q.    What measures did you take, sir, to protect your clients'

16   information from when you were working at Oliver Wyman and you

17   came over to Optum to make sure you didn't in any way

18   inevitably disclose their confidential information?

19   A.    So the first thing that's really important to understand

20   about when I came to Optum is that Optum was my largest and

21   primary client.  For three years prior to joining the

22   enterprise, I had worked closely with United and Optum.  So a

23   good portion of my client work was actually related to the

24   company that I was coming to, so there would be no conflict.

25       For any company that I had worked for in that time period

1   that could have been a potential conflict, most of my clients

2   were insurance carriers that I worked with, so large payors of

3   some kind of another.  The work that I was doing at Optum was

4   really not competing with those.  If anything, they would have

5   been clients of mine.

6        And so again, there was nothing.  At the same time, I

7   didn't take any information of any kind with me on any of those

8   clients.  I have, you know, nothing.  So that's what I did.

9   Q.   Like Mr. Smith, right?

10  A.   I can't speak to what Mr. Smith did or didn't do.  I think

11  that's probably for him to speak to.

12  Q.   And he has.  Sir, what was that term again, coopertition?

13  A.   Coopertition.

14  Q.   So when you left from Oliver Wyman and you came to Optum,

15  might it be characterized a coopertitioner?

16  A.   I don't understand the question.

17            MR. RIDEN:  Objection.

18  Q.   Does that term fit there, too, with the customer -- the

19  clients that you were working for on behalf of Oliver Wyman,

20  do --

21            THE COURT:  Stop.  There was an objection.  Put a new

22  question, and we'll see if there's another objection.

23  Q.   Okay.  Referring to the clients that you worked for while

24  you were at Oliver Wyman, and now you moved over to Optum, I

25  think your testimony was you didn't see a problem because you

1   were now working for a customer and the customer was Optum

2   while you were at Oliver Wyman, right?

3          MR. RIDEN:  Objection, Your Honor.

4          THE COURT:  Sustained.  Just for planning purposes,

5   you've taking about 15 minutes.  It's my intention to give you

6   the same 30 minutes I gave the plaintiff, so you might want to

7   keep that in mind.

8   Q.   Sir, you are the one that directed the lawsuit.  You

9   didn't submit any testimony by an affidavit when you filed a

10  complaint with this court; am I right?

11  A.   That's correct.

12  Q.   And no affidavit from you in support of your reply brief.

13  Am I right about that?

14  A.   I haven't filed an affidavit.

15  Q.   None whatsoever.  And so you understand that the very

16  first time anyone has heard about Mr. Smith's office being

17  searched from a witness is when you took the stand right here

18  today?

19  A.   Okay.

20  Q.   Okay.  And your testimony is you've never done that

21  before, and you walked in there on probably the day, the same

22  day that you called him?

23  A.   Yeah, I think afterwards.

24  Q.   So the earliest it would have been was December 21; that

25  was the day that you called Mr. Smith, right?

* S E A L E D * Attorneys' Eyes Only

1   A.   I honestly don't remember the exact date, but if that's

2   the day, I'm sure that's right.

3   Q.   Which was seven days after he had already left the

4   company?

5   A.   Yes.

6   Q.   And you described it as an office that was pretty empty?

7   A.   It was.  I did ask -- I did ask people if anybody had been

8   in his office, and I know that no one was using his office.

9   And our people travel a lot.  So I don't suspect that anyone

10  tampered with his office, but I wouldn't know.

11  Q.   Sir, you directed the investigation of Mr. Smith's

12  computer and his emails?

13  A.   I asked to see the information that was being pulled.  It

14  might have been that Steve Wolin actually put the formal

15  request in, but he and I certainly discussed the need to do so.

16  Q.   And sir, if you're going to check to see what's in

17  someone's office before the cleaning people come, wouldn't you

18  think it would be prudent and appropriate to do that before the

19  evening of that day?

20  A.   It hadn't totally occurred to me.

21  Q.   Or the next day?

22  A.   The same thing.  Once I realized the extent of having seen

23  the forensic material that showed what had been printed and

24  what emails had been sent and some of the activity that had

25  taken place, at that point I thought I should look and see if

1    those things are sitting on his desk.  Because if they're

2    sitting on his desk, I know exactly where they are.  If they're

3    not on his desk, I don't know what happened to them.  He could

4    have easily thrown them away.  I don't know.  I'm not accusing

5    Dave of anything.  I just didn't know.  I wanted to see what

6    was there and what he left and maybe what he looked at before

7    he left.

8    Q.   And you're not accusing Dave of anything, you are saying

9    from the stand, but you understand the papers that the lawyers

10   filed at your direction are making accusations?

11   A.   I understand.

12   Q.   How about in the phone call to Mr. Smith that day, did you

13   ask him, Hey, where are those?

14   A.   I did not.

15   Q.   This is the person that you had on the list to be the

16   successor to Mr. Wolin or to step in an interim basis?

17   A.   Yes.

18   Q.   A person you trusted, respected?

19   A.   Yeah.

20   Q.   But you didn't ask him?

21   A.   Well --

22   Q.   You didn't ask him --

23   A.   So in conversations --

24   Q.   Sir, can you answer my question?

25   A.   I did not.

* S E A L E D * Attorneys' Eyes Only

1   Q.   Sir, when you talked about the company, ABC, in the

2   September -- I think it was like a war-gaming session, right --

3   did you use that term that you used here in court today?

4   A.   I'm not sure exactly which piece are you -- I think we

5   had -- so this is different than the document that was shown.

6   I think you're talking about an off-site.

7   Q.   Right.

8   A.   So we had an off-site of the strategy team at the new

9   Celtics facility.  And as part of that, we looked at five or

10  six different competitors.  Amazon was one of the competitors

11  that we did look at.  And included in our discussion of Amazon

12  was ABC.

13  Q.   Okay.  And you understand Amazon is a separate company --

14  A.   I do.

15  Q.   -- from ABC?

16  A.   Sure.

17  Q.   And sir, in your discussion with ABC, I'm just asking, had

18  you coined that term then or was that --

19  A.   No.  That's a term that we've been using for a few years

20  at least.

21  Q.   Did you use it in that meeting?

22  A.   I don't remember exactly what I said in that meeting

23  related to the word coopertition.  I'm certain that I said that

24  I don't know exactly what they are, that they could be a

25  competitor; they could be a customer.  You know, I'm not

* S E A L E D * Attorneys' Eyes Only

1    exactly sure, but it was somebody that we were watching and

2    that we war-gamed around for a reason.

3    Q.   And so you don't dispute that that day, in that meeting,

4    you may have said to the group there, including David Smith,

5    you know, I view them as a customer, correct?

6    A.   I'm sure I could have said that.

7    Q.   You don't dispute that.  And you may have even said, I

8    view them more as a customer than a competitor?

9    A.   It's possible that I said as much as or more as a customer

10   than as a competitor.  But the context of the discussion was

11   also important that day.  A number of employees in the room

12   panicked, were very scared about this company taking over the

13   world.  And so my job in that meeting is to make sure that they

14   understand that we take their competition very seriously, but

15   let's not overlook the chance that they could be a customer of

16   ours as well.

17   Q.   So you panicked.  This company may -- what did you say,

18   take over the world?

19   A.   I don't think I used the word panicked.  I don't think I

20   panicked.  I think I had employees who were very worried about

21   this, so I said that phrase.  And I still -- no one knows yet.

22   They could be a customer, or they could be a competitor, or

23   they could be both.  I think we're in the same situation that

24   we were in in September.

25            MR. SHEEHAN:  I have no more questions for

1    Mr. Weissel.

2         THE COURT:  Is there any redirect, briefly?

3         MR. RIDEN:  None, Your Honor.

4         THE COURT:  All right.  Thank you.  Have you been

5    informed of what's called the sequestration order?  You can't

6    tell any other potential witness what you were asked or

7    answered, and you can't --

8         THE WITNESS:  I am aware.  I didn't even read the

9    paper this morning for fear of something.

10        THE COURT:  You're excused.

11        MR. RIDEN:  And Your Honor, with respect to

12   Mr. Weissel's continued presence, now that he's testified, is

13   the sequestration order lifted with respect to him to sit in

14   the courtroom for further testimony?

15        MR. SHEEHAN:  I would just say, Your Honor, if that's

16   the case, what if we wanted to put him back up on the stand at

17   some point to clarify --

18        THE COURT:  So he's not excepted from the

19   sequestration order.

20        MR. RIDEN:  Okay.

21        THE COURT:  And there may be further proceedings in

22   this case.  You know, right now this is primarily with regard

23   to potential conditions on a stay.  And if there's not more

24   testimony for a TRO, there may be at some point for a

25   preliminary injunction, or he may be a witness in the

* S E A L E D * Attorneys' Eyes Only

1   arbitration proceeding, so the sequestration order is still in

2   full operation.  You may be excused.

3          THE WITNESS:  Thank you.

4          THE COURT:  It's 1:00.  Who do you want as the next

5   witness?

6          MR. RIDEN:  Mr. Stoddard.

7          THE COURT:  We'll take a break until 1:45 and resume

8   with Mr. Stoddard.  Is there anything further before we do

9   that?  Here.  I have to -- the order of the witnesses is going

10  to be what?  Stoddard, then who?

11         MR. RIDEN:  Mr. Wolin and then, based on the

12  defendant's request, Chris Andrews, our forensics expert.

13         THE COURT:  So three more witnesses?

14         MR. RIDEN:  We're not calling Mr. Andrews.

15         THE COURT:  I know.  Up to three more witnesses.  Are

16  there any other witnesses, Mr. Sheehan?

17         MR. SHEEHAN:  No other witnesses.

18         THE COURT:  Because I'm aiming to finish the testimony

19  no later than 4:00 today.  And then I'll give you a briefing

20  schedule.  But you can come back at 2:00.

21         MR. RIDEN:  Is that a briefing schedule for --

22         THE COURT:  Motion to stay.

23         MR. RIDEN:  Okay.

24         THE COURT:  Basically I'm going to have both of you

25  file memos tomorrow.  Well, try to get back by 1:45.

* S E A L E D * Attorneys' Eyes Only

1           (Recess taken 1:02 p.m. - 1:45 p.m.)

2           THE COURT:  Who is going to be the next witness?

3           MR. RIDEN:  I believe it's Mr. Stoddard, Your Honor.

4           THE COURT:  Okay.  One thing that came into somewhat

5     sharper or finer focus in Mr. Weissel's testimony is he

6     testified that in his opinion the noncompete wouldn't keep

7     Mr. Smith from doing many things for ABC or others.  He just

8     couldn't do population health management.  Essentially I think

9     that was the essence of it.  So I think -- and maybe this would

10    come from Mr. Wolin, Mr. Stoddard, you know, what's in greater

11    detail for a layperson is population health management, and

12    what did Mr. Smith do at Optum and what's he doing or likely to

13    soon be doing at ABC.  You might want to keep that in mind in

14    the continuing questioning, but you may call Mr. Stoddard.

15          MR. RIDEN:  Just a couple of housekeeping matters,

16    Your Honor.  Can Mr. Weissel leave?  He had been here

17    originally as our -- not only our witness but also our designee

18    for negotiating purposes.

19          THE COURT:  No, he can't leave.

20          MR. RIDEN:  And as far as briefing schedule, you

21    mentioned before the lunch that you would be talking about a

22    briefing schedule, just to let our people back at the farm

23    know, if you have a schedule in mind yet for tomorrow.

24          THE COURT:  Tomorrow morning, maybe about 10:00 or

25    maybe 11:00 at the latest.

* S E A L E D * Attorneys' Eyes Only

1          MR. RIDEN:  Okay.  Thank you, Your Honor.  And is

2     there time for argument tomorrow?

3          THE COURT:  What's that?

4          MR. RIDEN:  Is there time for argument tomorrow or

5     Monday?

6          THE COURT:  Maybe not tomorrow.  Maybe not at all.

7          MR. RIDEN:  Great.  Thank you, Your Honor.  I'd like

8     to call Mr. Stoddard to the stand.

9          THE COURT:  Just wait one minute, please.

10          JOHN STODDARD, Sworn

11     DIRECT EXAMINATION BY MR. RIDEN:

12     Q.   Good afternoon, Mr. Stoddard.

13          THE COURT:  Hold on a second.  You may proceed.

14     Q.   Good afternoon, Mr. Stoddard.  My name is Steven Riden.

15     I'm an attorney.  I represent Optum, Inc. and Optum Services,

16     Inc., the plaintiffs in this action.  I'll be referring to them

17     as Optum.

18          Could you please identify yourself for the record?

19     A.   Sure.  My name is John C. Stoddard.  I go by "Jack," so

20     you can refer to me as "Jack."

21     Q.   Hello, Mr. Stoddard.

22     A.   That's fine as well.

23          THE COURT:  Let me ask you this.  How much time do you

24     request with this witness?

25          MR. RIDEN:  I think 30 -- I'm hoping to get this done

* S E A L E D * Attorneys' Eyes Only

1  in 30 minutes.

2  THE COURT:  Well, no more than 30 minutes.  Go ahead.

3  Q.  Okay.  I'm setting my timer.

4  Mr. Stoddard, McDermott, Will & Emery, are you familiar

5  with that law firm?

6  A.  I am.

7  Q.  Do they represent ABC?

8  A.  They do.

9  Q.  And when I say "ABC," do you know what I'm referring to?

10  A.  I do.

11  Q.  What is ABC?

12  A.  That's referring to the joint venture created by Amazon,

13  JP Morgan and Berkshire Hathaway.

14  Q.  Does it have a more formal name?

15  A.  It does not.

16  Q.  Does it have a technical legal name?

17  A.  It does.  It's TCORP2016 -- it's in the documents.  But

18  that's our technical legal name, and it's in our filings.

19  THE COURT:  Could you please pull that microphone a

20  little closer to you and speak into it loudly.

21  THE WITNESS:  Is that better?

22  THE COURT:  Yes, I think.

23  Q.  We're talking about the same entity, TCORP, ABC and the

24  partnership, we're talking about, all in one, the same entity?

25  A.  That's correct.

* S E A L E D * Attorneys' Eyes Only

1  Q.   Does Michael Sheehan represent ABC?

2  A.   Yes.

3  Q.   Did you work for Optum at some point?

4  A.   I did, over a decade ago.

5  Q.   When did you work for Optum?

6  A.   2005 to 2009.

7  Q.   And what was your role there?

8  A.   I had a number of different roles, but the two primary

9  ones were senior vice president of employer solutions and then

10  senior vice president of international.

11  Q.   What did you do as senior vice president of employer

12  solutions?

13  A.   I was responsible for driving -- managing a team and

14  driving revenue by selling our products to large employers,

15  also selling services through the channel UnitedHealthcare, as

16  well as retaining and managing the customer account team for

17  those customers.

18  Q.   How about your role as senior vice president for

19  international?

20  A.   That was a new venture, and I was deployed to the United

21  Kingdom to build a business model for international expansion

22  for Optum.

23  Q.   When you were at Optum, who did you report to?

24  A.   I had a number of different executives.  There was a lot

25  of change at the time I was at Optum, but I reported to Rob

*  S  E  A  L  E  D  * Attorneys' Eyes Only

1  Webb, Don Owens and Mark Stadler.

2  Q.    And what were their titles, respectively?

3  A.    Chief executive officer of Optum Health and chief growth

4  officer for Optum.

5  Q.    Do you claim to be a co-creator of Optum?

6  A.    No.  That's absurd.

7  Q.    Are you familiar with at least one newspaper article that

8  references you as the co-creator of Optum?

9  A.    I did read that article, and it purported that.  But that

10  is not true, and it's not something I've ever represented.

11  Q.    Were you part of the executive team that created Optum?

12  A.    I was an executive at Optum when it was created, that's

13  correct.

14  Q.    How big was Optum when you were there, when it was

15  created?

16  A.    It was -- so it was called Specialized Care Services.  It

17  was a holding company within United that had a number of

18  different companies.  The team that I was part of, we brought

19  those together.  And one of those entities was called Optum.

20  And we branded the entire entity as Optum.  So the size would

21  vary because it would change as we added new companies to it,

22  but there were probably 5,000 people at the time in Optum and

23  revenue roughly 5 billion at the time.

24  Q.    5,005 billion?

25  A.    Roughly.  You would know better than I would.

1   Q.   And Optum has grown since then, right?

2   A.   Significantly, I believe.

3   Q.   To 160,000 employees; is that right?

4   A.   I'm not familiar, but that number seems in range.

5   Q.   Did you have any restrictive covenants when you were

6   working with Optum, for instance, a noncompete?

7   A.   I do not recall.  I'd have to -- it was over a decade ago

8   when I signed that.  It was probably 15 years ago when I would

9   have signed it, so I don't recall.

10  Q.   When you left Optum did you go to work -- who did you go

11  work for?

12  A.   I went to help launch a company called Accolade.

13  Q.   What did Accolade do?

14  A.   Accolade was a business that was creating a new category,

15  which was trying to simplify the health care experience for

16  patients.  We created what we called Accolade Health Assistant,

17  which is somebody to work with families to help them navigate

18  the health care system, navigate their benefits and simplify

19  care to get the right care.

20  Q.   Was it competitive with Optum?

21  A.   I do not believe so.  It did not offer -- Optum did not

22  offer those services at the time.  We were creating a new

23  category.  So it was in the health care space, but I would not

24  consider it competitive.

25  Q.   When you left Optum to go start Accolade, did you receive

* S E A L E D * Attorneys' Eyes Only

1   any demand letters from Optum?

2   A.   I recall receiving a letter just reminding me of my

3   existing noncompete, nonsolicitation and to reinforce my

4   confidentiality requirements.

5   Q.   As you testified about that letter, does it refresh your

6   recollection that you were bound by a noncompete while you were

7   at Optum?

8   A.   Again, I don't recall if it was.  I do recall, as with

9   most companies, you do agree to protecting confidential

10  information and nonsolicitation.  Whether or not it was an

11  employment agreement, I don't recall.  I'd have to look back.

12         THE COURT:  You've got a limited amount of time.

13  We've got to get three witnesses done and hopefully speak to

14  all of you before 4:00.  Go to the heart of this matter,

15  please.

16         MR. RIDEN:  Okay.

17  Q.   You weren't sued by Optum, were you?

18  A.   No.

19  Q.   How did you come to ABC?

20  A.   I met Todd Combs, who works for Berkshire Hathaway.  He

21  collected a handful of people and asked them to come help our

22  new CEO start to form a team.  So I came, I met with our new

23  CEO, and we connected on shared values and mission and

24  experience, and he asked me to join the team.

25  Q.   Todd Combs, is he an employee currently of ABC?

* S E A L E D * Attorneys' Eyes Only

1    A.    No.  He's on the board.

2    Q.    And he's an employee of Berkshire Hathaway?

3    A.    That's correct.

4    Q.    Were you bound by any restrictive covenants when you went

5    to ABC?

6    A.    No.

7    Q.    Like a noncompete?

8    A.    No.

9    Q.    When did you start at ABC?

10   A.    In September 2018.

11   Q.    And what are your responsibilities there?

12   A.    I am the chief operating officer.

13   Q.    And that's your title, correct?

14   A.    That's correct.

15   Q.    What are your responsibilities as chief operating officer?

16   A.    Responsible for helping run the business, helping develop

17   our strategy, helping work with our customers, build those

18   relationships, understand their needs and help create solutions

19   that will advance our mission.

20   Q.    Can you describe a typical day of your life at ABC?

21   A.    Sure.  I get up early.  I work out.  I get to the office

22   by 7:00.  I usually triage email and Slack messages that have

23   come in overnight.

24   Q.    Your office is in Boston?

25   A.    That's correct.  My home is in Philadelphia, but I commute

* S E A L E D * Attorneys' Eyes Only

1    up.  I spend various parts of the day working on hiring and

2    recruiting.  We're an early stage company.  Talent acquisition,

3    bringing people on is a critical part of my role.  I spend time

4    thinking about our strategy.  That includes working directly

5    with our chief executive officer and our executive team around

6    how we're going to achieve our objectives.

7         I work with our head of finance on budgets and strategy

8    and resource plan.  I work with our customers to understand

9    their needs and priorities, and I deal with a lot of inbound

10   email and Slack messages.

11   Q.   As do we all.  And who are ABC's customers?

12   A.   We are focused on supporting the employees and families of

13   the three entities that have come together, the founding

14   entities of the organization.  So the employees and families of

15   Amazon, the employees and families of JP Morgan Chase, and the

16   employees and families of the Berkshire Hathaway portfolio of

17   companies.

18   Q.   What's the total number of people who are identified

19   within that set of people you've described, roughly?

20   A.   It's around a million.

21   Q.   Is it just -- is that million just the employees, or that

22   covers the employees and their families?

23   A.   The number is, you would appreciate, it covers the covered

24   beneficiaries.  So that's what that number refers to.  Your

25   Honor, those are the ones who have insurance and their

* S E A L E D * Attorneys' Eyes Only

1    dependents that are covered.  So that's the number I'm

2    referring to.

3    Q.    How many employees does ABC have?

4    A.    We're growing rapidly, but we have less than 20 employees

5    at this point.

6    Q.    Who from ABC is here in the courtroom today?

7    A.    Our head of communications, our seconded legal counsel,

8    and our director of strategy and research.

9    Q.    Who is your seconded legal counsel?

10   A.    Erica Davila.

11   Q.    What does ABC do?

12   A.    We are focused on improving the health outcomes and

13   experience for the families and employees of the founding

14   entities.

15   Q.    What does that mean?

16   A.    Well, we're still working that out.  So I joined in

17   September.  We've been asked to solve a very big problem, which

18   is figure out new ways of health care.  That combined entity is

19   spending $4 billion of its own money.  The employees are

20   spending a lot of money.  And what they hear and what we hear

21   is that their experience is not ideal.  They have a poor

22   experience.  They're not getting the care they need, and the

23   costs continues to raise.

24        That is the problem we've been asked to fix.  We've been

25   asked to look at the full spectrum of what are the options, how

* S E A L E D * Attorneys' Eyes Only

1   can we crack the code, who can we have partner with, and how

2   can we derive better outcomes, in the order of better

3   experience, better quality and then lower costs.

4   Q.   When you say "crack the code," what do you mean?

5   A.   It means we've been asked to look holistically at the

6   health care experience, the health care system and the health

7   care spend that is encompassed by that $4 billion in spend and

8   find new solutions, find partners, find ways to actually crack

9   the code, meaning derive better satisfaction, better outcomes

10  and lower costs.

11  Q.   Does ABC have any products?

12  A.   We currently do not have any products.  We are in the

13  process of determining the best approach to solve and derive

14  the outcomes that I just described.

15  Q.   That process of coming up with products, is Mr. Smith

16  involved with that?

17  A.   He is involved with the process of helping us determine

18  what our strategy should be and helping us think about what

19  tests we might want to deploy and helping us think about these

20  complex problems that I just described.

21  Q.   When does ABC expect to have any products?

22  A.   "Products" is a relative term.  So we expect to have

23  solutions, is how I would describe them.  Many of those

24  solutions, our preference for scale and speed is to actually do

25  those through partners, to find new configurations of

1   solutions, to look at data and rethink certain process

2   investments.  If necessary, we will think about building

3   products, if that doesn't exist in the market.

4       So I would think in 2019 our focus is going to be on

5   deploying tests through partnerships predominantly.

6   Q.   What do you mean by "deploying tests"?  What does that

7   mean?

8   A.   It means as we examine these complex spaces, we will look

9   for possible new approaches or different ways to think.  Let me

10  give you an example.  So if you think health care insurance is

11  difficult, right?  We might run a test to say let's simplify

12  benefits, let's think about what it could be if you were to get

13  rid of traditional complexity in health care that health

14  insurance companies create.  So what if we were to make it

15  easier for people to get primary care?  What if we made

16  maintenance medications less expensive?  We could design a

17  test.  We could figure out what that would cost.  We could

18  derive what we think the expected outcomes would be.  And then

19  we could ask a employer to go and deploy it.

20      A test is where you don't deploy it full-scale.  You would

21  actually take a scientific method and try it and see what the

22  results are and see what that drove in terms of patient

23  experience, patient satisfaction and cost.  And based upon the

24  results, if you're deriving some insight that is creating

25  better value on those dimensions, we would then recommend to

1    our employers to start to scale those.  That's an example of

2    the test.

3    Q.   Is Mr. Smith involved in that?

4    A.   He is not involved in that particular example.  You asked

5    what a test was.

6    Q.   Has he been involved in the testing process?

7    A.   He's been with our company since January 17.

8    Q.   Is that a yes or no?

9    A.   That's a no.

10           THE COURT:  Here.  Let him answer the question.

11   A.   He's been with us two weeks.  So he's involved with

12   looking at complex problems.  He has not yet been involved in a

13   test.

14   Q.   Has ABC yet received any payments for products or

15   services?

16   A.   No, we have not.

17   Q.   Who is providing the funding for ABC?

18   A.   The founding entities.

19   Q.   Has it issued any invoices yet?

20   A.   Has "it"?  Who is "it"?

21   Q.   Has ABC issued any invoices?

22   A.   No.

23   Q.   Does it have a bank account?

24   A.   Yes.

25   Q.   Does it have a professional staff, like accountants?

* S E A L E D * Attorneys' Eyes Only

1    A.    Yes.

2    Q.    Does it have an IT department?

3    A.    Yes.

4    Q.    It has a communications department, right?

5    A.    Yes.

6    Q.    Does it rely upon the founders outside for any

7    professional service support?

8    A.    Yes.

9    Q.    Does it rely on all three founders or one in particular?

10    A.    All three.

11    Q.    What is the relationship between the three founders and --

12          THE COURT:  Look, you know, this may be of great

13    curiosity to you and there's no objection.  But what does the

14    relationship of the three founders have to do with whether

15    conditions should be imposed on a stay, or a temporary

16    restraining order should be imposed?  I don't think this is

17    relevant.  It's not a useful use of very limited time.  Get to

18    the point.

19    Q.    Does ABC compete with Optum?

20    A.    No.

21    Q.    Why not?

22    A.    We're in fundamentally different parts of health care.  So

23    Optum is trying to sell as many products as it can to as many

24    different parts of the market.  It is trying to maximize its

25    profit in return for its shareholders.  It builds and operates

* S E A L E D * Attorneys' Eyes Only

1 products.

2     We, in contrast, are focused on the employees and the

3 benefit to their families of the three founding companies.  We

4 are a purchaser of products, as I mentioned.  We are not --

5 that's our preferred path.  We are not trying to create value

6 for shareholders.  We're trying to create value for families

7 who are trying to use the health care system.

8 Q.   Through its vendor selection process, does ABC have the

9 ability to influence whether the founders select Optum's

10 products?

11 A.   Not currently, but it's possible that we could.

12 Q.   In what way is ABC involved in population health

13 management?

14 A.   It is -- we're not currently involved.

15 Q.   Are you developing any population health management

16 strategy?

17 A.   Today we are not developing any population health

18 strategy.

19 Q.   Do you have any plans to develop a population health

20 management strategy?

21 A.   Sure.  We are looking at -- so to understand, we have a

22 population that we are responsible for.  We are looking at

23 their health.  We are looking at the drivers of their

24 experience, and we are going to look for solutions to help them

25 get better care through partners, is our preference.

* S E A L E D * Attorneys' Eyes Only

1   Q.   Okay.  Would you agree that the employees of the three

2   founders could be used to run tests for these solutions before

3   solutions are rolled out to the general public?

4   A.   The current approach is to run tests inside before scaling

5   them to the founding employees.

6   Q.   Is there any plan, once you've scaled it to the founding

7   employees, to scale it further past the founding employees to

8   other companies, for instance?

9   A.   There is no plan today, but it's a possibility.

10  Q.   Can you commit that ABC won't compete with Optum during

11  2019?

12  A.   Commit?  You know, I don't want to box the company, but

13  that is not in our plans.

14  Q.   How did you first learn about Mr. Smith?

15  A.   Mr. Smith first introduced himself to our CEO after he was

16  announced.  Our recruiter then engaged with him as we were

17  looking to start to add talent that matched his profile.

18  Q.   Did you have an opportunity to interview Mr. Smith?

19  A.   I did.

20  Q.   Did he ask you what he would be doing for ABC?

21  A.   Yes.

22  Q.   And what did you tell him?

23  A.   I told him that we're an early-stage company and the job

24  is still forming, but the general contours of his job will be

25  looking at complex problems, understanding the patient

1    experience, looking at why existing solutions have or have not

2    worked, helping us analyze these problems, recommend solutions

3    and then ultimately helping us test, deploy and measure these

4    tests that I described earlier.

5    Q.    What else did you tell him?  What are some of the details

6    you told him about any of those areas?

7    A.    I told him that we were looking at a full spectrum

8    approach to this problem, which I think is very appealing to

9    people who care about health care.  We are looking at all

10   ranges of complexity; why it's hard to get the primary care,

11   why its costs are very difficult to understand; why health

12   insurance is so complicated; why big employers have invested

13   all this money and their experience is still not great for

14   their employees, why they're frustrated, why their costs

15   continue to rise.  These are big problems that our founders

16   have asked us to look at.

17   Q.    And then did you tell him specifically what he would be

18   doing at ABC if he was hired?

19   A.    In that interview?

20   Q.    Yes, sir.

21   A.    No.

22   Q.    Did you tell him how much he would be paid if he was

23   hired?

24   A.    No.

25   Q.    Did you meet with him again at any point before he was

1 actually hired?

2 A.   No.

3 Q.   Did he tell you what he was doing for Optum during that

4 interview?

5 A.   He told me what his role was but nothing specific about

6 his work.

7 Q.   Other than that one interview that you had with him -- was

8 that in person?

9 A.   I'm sorry?

10 Q.   That interview was in person?

11 A.   Yes, it was.

12 Q.   Did you have any other telephonic interaction with him

13 prior to him being hired?

14 A.   I had a telephone conversation after an offer was extended

15 to him.

16 Q.   And what did you tell him then?

17 A.   I said I hope you join our mission.

18 Q.   Okay.  How many people are there in Mr. Smith's -- first

19 of all, what is Mr. Smith's job description now?

20 A.   His job description is, he's part of a team of directors

21 of strategy and research.  They're focused on looking at these

22 complex problems, helping us shape our strategy and then

23 testing solutions as we come to ideas about what we want to

24 test or deploy.

25 Q.   How many people are on that team?

* S E A L E D * Attorneys' Eyes Only

1    A.    There are five people on that team.

2    Q.    Going back previously to that interview you had with him

3    in person, did you discuss with him the health care market

4    generally?

5    A.    Broadly, yes.

6    Q.    Did you talk at all about the direction the market would

7    be taking?

8    A.    I asked him his -- you know, how does he think about the

9    broad sectors of the market.

10   Q.    And what did he say?

11   A.    He was very articulate about understanding that there are

12   hospital systems, there are rising costs, there's a migration

13   to value-based payment.  He talked about the role of payors.

14   He talked about employers.  He was very articulate about the

15   different contours of the market, but we, again, spoke nothing

16   specifically about Optum.

17   Q.    What else did he say about the direction of the market

18   during that meeting?

19   A.    I don't recall.

20   Q.    Have I exhausted your memory about everything he said

21   about the direction of the market during that meeting?

22   A.    Yes.

23   Q.    Okay.  Other than Mr. Smith, where did the other people on

24   that team come from?

25   A.    They have very similar profiles to Mr. Smith.

1  Q.   What companies?

2  A.   Sorry.  I was about to answer your question.

3  Q.   I apologize.  Continue.

4  A.   They come from, like Mr. Smith came from Bain and has

5  consulting experience and has a top MBA.  All of the other

6  members of that team are similar.  So Harvard Business School,

7  MIT, Sloan MBAs and then they have consulting experience like

8  Mr. Smith, who was at Bain.  There's one from Boston Consulting

9  Group, one from Deloitte, one from PriceWaterhouseCoopers.

10 Q.   Well, Mr. Smith was also from Optum.  Are there any other

11 people on his team from Optum?

12 A.   We have one other that does have experience at Optum.

13 Q.   Who is that?

14 A.   Caitlin Fleming.

15 Q.   Is there anybody else at other -- anybody else at ABC,

16 other than you, Caitlin Fleming and Mr. Smith, who have worked

17 at Optum before?

18 A.   No.

19 Q.   Is there a written set of guidelines defining what

20 Mr. Smith can work on at Optum -- at ABC that takes into

21 account the fact that he was exposed to certain information at

22 Optum?

23 A.   Yes.

24 Q.   It's a written set of guidelines.  Who drafted that?

25 A.   We have a -- we have written that we have no interest in

1   his -- and we've had him sign two of these, that we have no

2   interest in his existing information and we know he has

3   confidential information which we have no interest in having.

4   I would have to check whether or not we've written down what we

5   have created precautions to ensure that, given this situation,

6   that there is nothing that he'll work on that reflects back on

7   the work that he did at Optum.

8   Q.   As you sit here today are you aware of any specific

9   precautions that ABC is taking to protect Optum's confidential

10  information?

11  A.   Yes.

12  Q.   What are they?

13  A.   We are not putting him on anything that we know of in the

14  public domain that relates to anything with Optum, and we have

15  asked him to identify anything that we're not aware of that

16  might overlap with what he has done at Optum and share that

17  with Ms. Davila.

18  Q.   Do you know what's on that list?

19  A.   Which list?

20  Q.   The list of things he's not to be working on at ABC.

21  A.   I have not seen the document, but I know it's in my head

22  about what's public around what Optum does.

23  Q.   Can you give some examples of things that he's not to be

24  working on at ABC in light of this circumstance?

25  A.   We would not have him, for example, look at solutions in

* S E A L E D * Attorneys' Eyes Only

1  the pharmacy space.  We would not have him look at solutions in

2  the health care benefits administration.

3  Q.    What else?

4  A.    Specialty networks.

5  Q.    What else?

6         THE COURT:  What's a special network?

7         THE WITNESS:  Specialty network would be a network for

8  specialized conditions, transplants or behavioral health, for

9  example, and we would not have him look at anything in the

10 provider space given Optum's role there.

11 Q.    What else?

12 A.    That's all I can think off the top of my head.

13        THE COURT:  May I ask you -- may I interrupt for just

14 a moment?

15        MR. RIDEN:  Yes, Your Honor.

16        THE COURT:  Are you familiar with the term "population

17 health management"?

18        THE WITNESS:  I am.

19        THE COURT:  What does population health management

20 mean to you?

21        THE WITNESS:  I'd say there's two broad definitions.

22 One is typically at the public health level, so looking at flus

23 and influenzas and trying to think about public policy related

24 to population health.  The second one, which is typically more

25 in the context of large employers, is looking at the cost

* S E A L E D * Attorneys' Eyes Only

1    drivers, the different needs of the population and then putting

2    together a set of strategies for identifying needs, engaging

3    with people and supporting them in their health care journey.

4         THE COURT:  And does Mr. Smith now do population

5    health management work or related work -- say work, for ABC?

6         THE WITNESS:  I would not characterize it as such.

7    It's such a broad term, Your Honor, that there's overlap with

8    every part of health care in that term.  So there may be pieces

9    of what he's doing, for example, you know, I described looking

10   at data, for example, so I don't want to say there's nothing,

11   but not in the way I've described it to you.

12        THE COURT:  And how does what he does for ABC or will

13   do after he's worked more than two weeks, if he's permitted to,

14   how does what he does now or will do in the near future, you

15   expect, differ from population health management?

16        THE WITNESS:  It's such a broad term, Your Honor.  You

17   heard it's everything from every person in the country, which

18   is influenzas and disease --

19        THE COURT:  I'm talking when you do population health

20   management in the second way you described it, looking at an

21   employer's population of covered individuals.

22        THE WITNESS:  It's a question I don't -- I'm not

23   trying to parse words.  It's just that's such a broad term that

24   I don't want to represent something and then someone come back

25   and say, Well, wait a second, that could be in population

* S E A L E D * Attorneys' Eyes Only

1  health.

2         THE COURT:  I'm not -- I appreciate your being

3  careful, and I want to be as transparent as possible.  If, by

4  agreement or the order of somebody with the authority to issue

5  the order, Mr. Smith was directed not to do population health

6  management work for ABC, would that be an order you can

7  understand and obey?

8         THE WITNESS:  We would -- I would want to define it

9  with you to make sure that, you know, we're not -- we have no

10  interest in Optum's information.  We have zero interest in

11  their competitive information.  We don't want him to have it.

12  And if there's a clean way we can define that that allows us to

13  help the population we're serving and manage their health and

14  get better care, I'm fine with that.

15         It feels like it's -- sorry.

16         THE COURT:  All right.

17         THE WITNESS:  It feels like it's a catchall phrase

18  that's so broad that I probably couldn't, unless we could

19  define it more specifically, Your Honor.

20         THE COURT:  Could it be defined in some negative way,

21  meaning, by agreement or conceivably by order, Mr. Smith can't

22  do or won't do X, Y, Z, which are under the broad umbrella of

23  population health management?

24         THE WITNESS:  If we can define it and be clear on X, Y

25  and Z, Your Honor, absolutely.

1          THE COURT:  Do you know Mr. Weissel, who you might

2     have seen out in the hallway, he testified before you?

3          THE WITNESS:  I've met him, yes.

4          THE COURT:  Have you ever spoken to him about matters

5     relating to this case?

6          THE WITNESS:  Yes, but it was in mediation.

7          THE COURT:  Well, I'm glad you tried that, but it

8     sounds to me like that's how all of this ought to be resolved.

9          Here, go ahead.  I used up some of your time, but I do

10    need some time at the end with all of you.

11    BY MR. RIDEN:

12    Q.   You've listed several areas, pharmacy health care

13    benefits, specialty something --

14    A.   I don't have the website in front of me, but that's what I

15    would refer to.

16    Q.   Sure.  Those are some areas that ABC has decided on its

17    own to keep Mr. Smith away from, according to your testimony.

18    Are there any technological barriers that prevent him from

19    getting access to that information on ABC's systems?

20    A.   There is none, if we had it.

21    Q.   So there's no -- there's no formal ethical wall we would

22    say as lawyers that bars him from accessing certain areas of

23    the system based on these apparent conflicts; is that right?

24    A.   No.  He can access the information that's available on our

25    system.

1  Q.   He has complete access to the information available on

2  your system?

3  A.   Not complete.

4  Q.   He has access to all the information related to the areas

5  of work that ABC does that we're talking about; is that right?

6  A.   Yes.

7  Q.   I presume not payroll, et cetera?

8  A.   Correct.

9  Q.   Is it a generally collaborative environment over at ABC?

10  A.   Very much so.

11  Q.   Has everybody there been informed of these restrictions

12  that ABC has decided upon for Mr. Smith?

13  A.   I can't say everybody has.

14  Q.   Why not?

15  A.   Because I don't know that.

16  Q.   Is there anything stopping him from putting documents or

17  information onto ABC's computer systems?

18  A.   Technically, I would not imagine so.  Again, we're not

19  looking for him to load anything that's inappropriate onto our

20  site.

21  Q.   Were the guidelines that ABC came up with for sort of

22  defining what Smith couldn't do based on these apparent

23  conflicts, did anybody at ABC reach out to anybody at Optum to

24  determine whether or not those would be acceptable guidelines?

25  A.   I'm not aware.  I'd have to ask our counsel.

* S E A L E D * Attorneys' Eyes Only

1  Q.   Are these types of guidelines in place for anybody else at

2  ABC?

3  A.   No, because this is the first time we've had a chance to

4  visit each other in court.

5  Q.   Has ABC received demand letters from companies other than

6  Optum?

7  A.   No.

8  Q.   Does ABC have any offers outstanding to any other Optum

9  employees?

10  A.   No.

11  Q.   Has it interviewed any other Optum employees?

12  A.   Not that I'm aware of.

13  Q.   Has ABC's recruiter been told to target any of Optum's

14  employees?

15         MR. SHEEHAN:  Your Honor, I'm going to object to this.

16         THE COURT:  Sustained.  What is the relevance?

17         MR. RIDEN:  Just looking to see if there's --

18         THE COURT:  This is not -- you asked for limited

19  discovery with regard to the TRO.  You've had far more than the

20  limited discovery.  It just happens to be incidental to my

21  trying to get the information to make, if it's up to me, a

22  well-informed decision on something that is profoundly

23  important apparently to your client and to Mr. Smith.

24         But this is not the opportunity to be a vehicle for,

25  you know, getting information about somebody you characterize

1  as a competitor that's not at the heart of this.  And now your

2  30 minutes are up.  I used a few of the minutes.

3        MR. RIDEN:  Can I have one question, Your Honor?

4        THE COURT:  Yes.

5  Q.   If a TRO is entered preventing Mr. Smith from working for

6  ABC, does ABC plan to pay him anyway?

7  A.   Yes.

8        MR. RIDEN:  Can I ask a follow-up, Your Honor?

9  Q.   Has that been communicated to Mr. Smith?

10  A.   It just was.

11        MR. RIDEN:  Thank you very much.

12        MR. SHEEHAN:  I've only got a few questions, Mr.

13  Stoddard.

14  CROSS-EXAMINATION BY MR. SHEEHAN:

15  Q.   Just a point of clarification.  There was some questioning

16  I think by Your Honor about Mr. Smith's work on population

17  health.  Just to clarify, that work is with regard to the

18  founders, right?

19  A.   That's true.  The only work we're focused on is the

20  employees and their families for our founders.

21  Q.   You testified that you have zero interest and you, meaning

22  you the company, have zero interest in Optum's information.

23  Can you explain why you have zero interest in that?

24  A.   Sure.  We are looking for new solutions.  Many of the

25  employers already have Optum solutions, and their competitors,

*  S E A L E D  *  Attorneys' Eyes Only

1  United, Aetna, Signa, CVS, their direct competitors are our

2  vendors.  We wouldn't exist unless there was a need to come up

3  with and find a new solution to the problems.

4      These employers are spending billions of dollars.  They're

5  not getting the value that they want out of that investment.  I

6  can understand why, when their customers create our entity and

7  put them on notice that the status quo is no longer good

8  enough, that there is a fear of change.  So I understand that.

9  But that is not competitive to their business.  It is about

10  finding new solutions for our employees and their families.

11  Q.    Sir, I'm going to go to the nub of it and just make this

12  quick.  I'll make it quick, but I want you to give a full

13  answer to the court.  And that is, do you believe Mr. Smith can

14  do his job at ABC without using or inevitably having to use the

15  confidential information he learned along the way at Optum?

16  A.    I do.

17  Q.    Can you explain your answer; why is that?

18  A.    Well, it gets back to, first, we are a fundamentally

19  different type of entity than Optum.  So that's the first

20  thing.

21      They are focused on selling products to as many

22  companies -- employers as possible in all the different markets

23  to make a profit.  We are focused on improving the outcomes for

24  our employers.  We are focused on purchasing those solutions,

25  where possible.

1        And his role is to help us look at complex problems,

2    understand why things have worked, why things haven't worked,

3    and help make recommendations on where we can improve the

4    experience, the quality of care and the outcomes for those

5    families that we're responsible for taking care of.

6        When I interviewed him, I was focusing our time at

7    Starbucks on what his motivation is, what his mission is.  Was

8    he focused on patients?  Did he want to make a change in his

9    career?  Did he want to make a difference in the health care

10   system?  That's what I was focused on.

11       Beyond that, I was focused on his expertise that he gained

12   from Bain in the consulting, right?  Could he handle complex

13   problems?  Can he look at data?  Can he help make

14   recommendations?  Can he come up with -- can he simplify and

15   vet complexity?  All that said, this is the kind of person who

16   can help come and help us on this mission and on this

17   challenge.

18   Q.   And in addition to all of that, sir, and in light of the

19   fact that we're here in this courtroom, has the company taken

20   further measures to make sure that Mr. Smith would not use or

21   disclose anything that he's got in his head about Optum?

22   A.   Yeah.  We have told him we have no interest in Optum's

23   business plans, their strategies, their anything.  We have none

24   of that.  We have asked him to attest to that.  We said we

25   don't ever want you to give it to us if you have it.  And we

* S E A L E D * Attorneys' Eyes Only

1    have put in protocols that I described before that says from

2    what we know about Optum, we're not going to have you work on

3    anything that could overlap; and if we do come to anything that

4    we're not aware of that you did work on, because we don't know

5    exactly everything you've done, that you raise it and we'll

6    make sure that we put you on different work.

7    Q.   Okay.  And any reason not to trust him to follow that

8    protocol?

9    A.   I have no reason not to trust him.

10          MR. SHEEHAN:  If I could just have a moment, Your

11   Honor?

12          THE COURT:  Yes.

13          MR. SHEEHAN:  I have no more questions for Mr.

14   Stoddard, Your Honor.

15          THE COURT:  I've got just a couple, and then you can

16   follow up if you want.

17          Mr. Stoddard, I think the parties have agreed you met

18   with Mr. Smith on October 29, 2018 at a Starbucks.  About how

19   long did you meet?

20          THE WITNESS:  It was about 40, 45 minutes.  It was

21   quick.

22          THE COURT:  And have you ever heard from Mr. Smith or

23   anybody else about an Optum Fact Book?

24          THE WITNESS:  Not until I read the documents in this

25   case.  It never came up in our discussion.

*  S E A L E D  * Attorneys' Eyes Only

1          THE COURT:  And since it came up in the case, have you

2     discussed the Fact Book with Mr. Smith?

3          THE WITNESS:  No.

4          THE COURT:  Some of this I think you already answered.

5     Has ABC designed any products yet?

6          THE WITNESS:  Not yet.  We are exploring a broad range

7     of things that we could possibly do, and we're trying to now

8     narrow down to what we will do in 2019.

9          THE COURT:  What products -- if there's an objection

10    to this being in open court, I might entertain --

11         MR. SHEEHAN:  I was starting to think as you were

12    starting to ask yesterday --

13         THE COURT:  We didn't have a problem yesterday.

14         THE WITNESS:  Right.

15         THE COURT:  You mentioned that you're exploring, ABC

16    is exploring a broad range of things you could possibly do in

17    terms of designing products.  Is that confidential information

18    to ABC?

19         THE WITNESS:  Yes.

20         THE COURT:  All right.  I told you yesterday I wanted

21    to do this surgically.  So if there's anybody in the courtroom

22    not employed by ABC or Optum, you're going to have to go

23    outside for a short period of time.  Please go.

24         MR. BECK:  And counsel as well.

25         THE COURT:  What's that?

1          MR. BECK:  And counsel as well.

2          THE COURT:  You want counsel to go?

3          Counsel can stay.

4          MR. BECK:  That's fine, Your Honor.  Thank you.  In

5     house counsel as well can stay?

6          THE COURT:  They can stay.  I think four people left,

7     but they shouldn't go far, or maybe five.

8          MR. SHEEHAN:  Your Honor, if what you're going to do

9     is inquire into strategy plans of ABC, I think the limitation

10    on hearing that and seeing that, in the normal course, we would

11    say would be limited to counsel of record in the case, and we

12    would ask everyone else to be excused.  We'd normally in a case

13    have a protective order in place.

14         THE COURT:  You could have negotiated a protective

15    order.  Here.  Now Mr. Beck will have to respond to this.  The

16    request is that in-house counsel be excused, too.  What's your

17    position on that?

18         MR. RIDEN:  Well, we have both in-house counsel in the

19    room as well as someone from the communications department in

20    the room from Optum.

21         THE COURT:  Nobody from the communications department

22    needs to hear this.  That person at a minimum should leave.

23    The person in the communications department I assume is not

24    giving legal advice.

25         MR. RIDEN:  That's correct, that's correct.

1          THE COURT:  Out.

2          **\* \* \* SEALED SESSION OF PROCEEDINGS \* \* \***

3          THE COURT:  So who is left?

4          MR. RIDEN:  We have the chief legal officer of Optum,

5     Your Honor.

6          THE COURT:  Her name is?

7          MR. RIDEN:  Marianne Short, former judge.

8          THE COURT:  So you want Ms. Short excluded?

9          MR. SHEEHAN:  And Ms. Davila would leave the room as

10    well.  Both are inside counsel, and this is one where we would

11    say this is, you know, limited only to counsel.

12         THE COURT:  Fine.  I'm excluding them as well.  They

13    should step out, and that means that the people remaining in

14    the room can't tell anybody not in the room what was said while

15    they were excluded.  Fine.

16         So my next question --

17         MR. RIDEN:  If I may, Your Honor, I apologize.  The

18    only issue with excluding Ms. Short is that she is part of the

19    team that's advising Optum on strategy.  We recognize the

20    tension --

21         THE COURT:  Litigation strategy, or strategy for the

22    company?

23         MR. RIDEN:  Litigation strategy.

24         MR. SHEEHAN:  There are ways to address -- this is a

25    routine occurrence.  Counsel knows where there's attorney's

1  eyes only and --

2          THE COURT:  Sometimes.

3          MR. SHEEHAN:  And Ms. Davila plays that same role, but

4  they are also both, remember, potentially witnesses in the

5  matter.

6          THE COURT:  I'm going to leave them out for now, but I

7  may allow you, if it's of practical significance in terms of --

8  because I am going to encourage you again to try to reach a

9  resolution, but just leave them out for now until we see what

10  the answers are.

11          MR. RIDEN:  Okay.

12          THE COURT:  Let's see if I can remember what the

13  question is.

14          THE WITNESS:  Can I just ask --

15          THE COURT:  You told me that ABC is exploring a broad

16  range of --

17          THE WITNESS:  Your Honor, can I ask a clarification

18  question?  I'm sorry.

19          THE COURT:  Yes.

20          THE WITNESS:  Is the record public or --

21          THE COURT:  This part of the record will not be

22  public.  There's a transcript, but this will be excerpted from

23  the public record.  That's why I --

24          THE WITNESS:  Thank you.  I'm looking at our

25  incredible stenographer, and I'm like, hmm.  Thank you.

* S E A L E D * Attorneys' Eyes Only

1          THE COURT:  So the question was, you said that while

2     ABC has not designed any products yet, you could possibly do

3     that and were trying to now narrow down to what we will do in

4     2019.  So what products is ABC considering trying to develop,

5     say, in 2019?

6          THE WITNESS:  Yeah.  So the big problems that we're

7     trying to tackle -- and this is a huge, complex problem, right?

8     One of which is related to -- and what's going to be sort of

9     unfulfilling for you, Your Honor, is I started in September,

10    right?  So we are trying to tackle this problem.  My team has

11    just come in place less than a month ago.  So when I tell you

12    we are looking at or we're focusing in, it's possible it's

13    going to change, just because we're at such an early stage

14    company.

15          But the primary terrain we're looking at are things

16    around insurance complexity.  I have already shared that with

17    the court, right?  So today people get high-deductible plans.

18    It's very difficult for the employees when we talk to them to

19    be able to understand what's covered, to afford their coverage.

20    These are fulfillment center workers.  These are call center

21    workers.

22          So one of the things we are looking at is can we

23    reinvent what insurance looks like in terms of benefit design.

24    The way that's product, if you call it a product, and I put it

25    in quotes, employers will try changing it in a number of

* S E A L E D * Attorneys' Eyes Only

1   states, deploy it, and we'll see if that works.  Right?  That

2   will help us learn results.  Did people go to get primary care,

3   were they able to stay on their medications.  That's an

4   example.

5          We are looking to establish -- and this is the area

6   where Mr. Smith is now focused -- is what data do we need to be

7   able to do our job better, right?  What datasets should we get

8   from the spend that we have and how should we analyze that data

9   to understand where there's variation in care, quality, where

10  prices don't match value, where doctors are performing.  We're

11  trying to understand.  And there's so much opacity right now on

12  what good looks like in health care.  We've asked Dave to focus

13  on that area.

14         What the answer is, that I can't tell you.  That team,

15  he's not the only one doing the analysis, but that's an area we

16  want to tackle.  We are looking at how do we make primary care

17  more central in health care, how do we make it easier for

18  doctors to do good care and to spend more time, not less time.

19  Because today they don't get to spend enough time with

20  patients.

21         Ironically, Optum is one of the largest providers of

22  primary care in the country.  I had already said to our chief

23  executive officer before all this took place, we should go

24  partner with Optum because they might be a good partner to help

25  us think about primary care.  That's why this is so crazy to

1    me, that they think of us competitors when I see us as

2    potential partners.

3            Another area we're looking at is what solutions exist

4    out there that we could help assemble or bring together to help

5    improve the care of our patients.  There's been billions of

6    dollars spent on point solutions in things like maternity,

7    cancer, musculoskeletal.  We need to analyze what works, what

8    doesn't, why do these companies exist, why haven't people

9    achieved them.  But if we can figure out which ones work, let's

10   bring those together and help get those to our patients.

11           But we haven't built a product in any of those, if

12   you're listening to the thread.  We're looking, we're

13   analyzing, we're assembling, we're partnering.  And any company

14   that leans in and wants to help us with this, the competitors,

15   are the kinds of companies that we would love to do business

16   with.

17           Another is, you can imagine our employers are -- just

18   given who supports us, are incredibly allergic to market

19   inefficiencies.  So we are studying, but we don't have a

20   product, how does the pharmacy work, for example, what are the

21   opportunities for big employers to actually get a better

22   understanding of what a drug should cost, and how do we help

23   patients afford them and stay compliant.

24           THE COURT:  What within that is Mr. Smith doing?

25           THE WITNESS:  Mr. Smith is doing nothing in that area.

* S E A L E D * Attorneys' Eyes Only

1          THE COURT:  Nothing in what area?

2          THE WITNESS:  In the pharmacy area.  Because Optum,

3    like CVS and Express Scripts, are among the three largest

4    pharmacy benefits managers in the country.  We have no plans to

5    go in and compete in that space.  But we will look and say,

6    could we contract with one of them to get more transparency?

7    Can we actually understand what costs are?

8          Those are examples of how we're trying to fix the

9    system.  We're fortunate that we have a million lives and three

10   big employers.  That doesn't make us a competitor.  That makes

11   us a very informed customer.

12         THE COURT:  All right.  Do my questions -- are there

13   any questions that either side would like to ask on this

14   confidential information?

15         MR. SHEEHAN:  No, Your Honor.

16         MR. RIDEN:  Just a few, Your Honor, just to get

17   clarification as to which ones Mr. Smith is working on.

18   REDIRECT EXAMINATION BY MR. RIDEN:

19   Q.   I heard about five areas, and you said that Mr. Smith is

20   working on one of them.  And that is -- I lost it.  Which one

21   is he working on?

22   A.   He's working on data.

23   Q.   Data, right.

24   A.   What data do we have, what insights can we glean from that

25   data around cost and quality of care so that we can help then

* S E A L E D * Attorneys' Eyes Only

1   make that available as we think about helping patients choose

2   doctors that are going to help them get better outcomes on the

3   quality side at the best price.

4   Q.   Is that the only one of those five areas that he's working

5   on?

6   A.   Currently it's actually two areas.  One is what data, and

7   the other is the analysis.  So in my mind those are two

8   separate areas.  One is basically infrastructure.  We're

9   setting up our company, so we have to figure out what data do

10  we need.  And the second is what's the analysis that you would

11  put on top of that data to drive more transparency and quality.

12  Q.   So he's doing the data, not the analysis?

13  A.   He's doing both of those two areas because, to your point,

14  they're related, right?  So in my mind I have them as two

15  separate teams and projects, but he's on both of those because

16  they both tie back to the data.

17  Q.   Okay.  Is he working in any other areas currently at ABC?

18  A.   No.

19  Q.   And are there plans to put him -- in 2019, are there plans

20  to put him into any of these other areas?

21  A.   There are no plans, no.  As we hit certain milestones on

22  our analysis or on our test, we might have more capacity and

23  we'll move him around or add new pieces of work.  We have a

24  tremendous backlog that we have, and this is the primary areas

25  that we're focused on right now.

* S E A L E D * Attorneys' Eyes Only

1          MR. RIDEN:  If the court will indulge me, I want to

2     drill down get a sense of what literally he's looking at.

3          THE COURT:  What's the question?

4          MR. RIDEN:  I'm not trying to get confidential

5     information.

6          THE WITNESS:  That's all it feels like you've done.

7          THE COURT:  Well, so far this is relevant to what

8     somebody needs to decide.

9          THE WITNESS:  Okay.

10         THE COURT:  What's the next question?  Don't answer it

11    if there's an objection.

12    Q.   Is he looking at -- I'm trying to figure out if he's

13    looking at medical records -- basically the level of

14    abstraction.  Is he looking at individual medical records?  Is

15    he looking at higher levels of abstraction of many medical

16    records?  Is he looking at things that are the 35,000-foot mark

17    for these companies?  I'm just trying to figure out what detail

18    he's looking at.

19    A.   In the two weeks he's been in our company, he's helped

20    stand up part of the project, how are we going to approach the

21    work, what data sources are there, where does that data come

22    from; is it from our in the employer's set of data, from the

23    health plan that we have, from the pharmacy, from the doctor,

24    from the consumer.  It's doing the strategy work around what

25    are the data elements that we would want, how would we use

* S E A L E D * Attorneys' Eyes Only

1   them, what's the use case, how do we get that data, and how do

2   we act on it.

3          THE COURT:  Okay.

4   A.   As a purchaser of $4 billion of health care spend, those

5   are the receipts that we have for where that money goes, and

6   there's great insights to be gained around how people are using

7   the health care system and where quality resides.

8          THE COURT:  So when you say what data should we get,

9   are you talking about data from the founders' companies or a

10  wider universe?

11         THE WITNESS:  Well, it's data from the -- only the

12  companies, and some of that data would be housed by their

13  vendors.

14         THE COURT:  But it's only about the founders'

15  companies?

16         THE WITNESS:  That's right.  It's only about the

17  employees and their experience.

18         THE COURT:  All right.

19  BY MR. RIDEN:

20  Q.   I just want to make sure that we're clear.  So he's

21  focussing on the identification of datasets side.  Is the

22  analysis side to come afterwards?

23  A.   That's a concurrent project to say, okay, what would we do

24  with that data, how would we think about looking at -- do you

25  look at it by episodes, do you look at it by doctor, do you

* S E A L E D * Attorneys' Eyes Only

1  look at it by condition.  There's different ways you can think

2  about looking at the data to draw the insights that help us

3  then figure out, Boy, this doctor is getting the same outcomes

4  at a lower cost.  That's interesting to us.  This person is

5  going to a doctor that costs much more, why is that, with less

6  quality.  Those are the insights we're trying to gain to help

7  make the system work better for these families.

8          THE COURT:  All right.  That's it.

9          Do my questions or those answers suggest any further

10  questions?

11          MR. SHEEHAN:  No, Your Honor.

12          THE COURT:  All right.  Mr. Stoddard, your testimony

13  is complete.  But I'm ordering that you stay here because I'm

14  probably going to sit down with you and your counterpart at

15  least in about an hour, if not sooner, okay?

16          THE WITNESS:  Happy to.

17          THE COURT:  So please stay accessible out there.  And

18  somebody should go and -- have you been informed of what's

19  called the sequestration order?  You can't say what you were

20  asked or answered to anybody else who might be a witness?

21          THE WITNESS:  I have been informed.  Thank you.

22          THE COURT:  Thank you.  So let's get Mr. Stoddard --

23          MR. SHEEHAN:  You mean Mr. Wolin.

24          THE COURT:  And the public.

25          * * * END OF SEALED SESSION * * *

* S E A L E D * Attorneys' Eyes Only

1        THE COURT:  Mr. Wolin should approach the witness

2  stand and be sworn, please.

3        STEVEN WOLIN, Sworn

4        MR. RIDEN:  I'm shortening this outline, Your Honor.

5        THE COURT:  All right.  It's five minutes of 3:00.

6  How much time did you hope to have with Mr. Wolin?

7        MR. RIDEN:  15 minutes.

8        THE COURT:  Excellent.

9        MR. SHEEHAN:  I can beat that.

10        THE COURT:  Now we're going in the right direction.

11  DIRECT EXAMINATION BY MR. RIDEN:

12  Q.    Okay.  Could you please identify yourself for the record.

13  A.    Sure.  Excuse me.  My name is Steven Wolin.

14  Q.    Where do you live, Mr. Wolin?

15  A.    I live in Sudbury, Massachusetts.

16  Q.    Where do you work?

17  A.    Optum Services, Inc.

18  Q.    And what's your title there, sir?

19  A.    Senior vice president.

20  Q.    How long have you been in that position?

21  A.    I've been with the company for four years.

22  Q.    And describe your reporting chain up.

23  A.    Sure.  I report to Mike Weissel.

24        THE COURT:  Pull that microphone closer to you and

25  speak into it loudly and clearly, please.

* S E A L E D * Attorneys' Eyes Only

1          THE WITNESS:   Okay.

2     A.   I report to Mike Weissel, who is the head of corporate

3     strategy of product, who then reports to Dirk McMahon,

4     president of Optum, who then reports to Andrew Witty, who is

5     the CEO.

6     Q.   And what do you do you for Optum generally?

7     A.   I run corporate strategy and business acceleration for

8     Optum.

9     Q.   What was your role with respect to Mr. Smith?

10    A.   Dave reported to me since I took over the group in about

11    mid-2017.

12    Q.   Have you ever been deposed or given testimony before?

13    A.   I have not.

14    Q.   What does Optum do for a large employer like Coca-Cola?

15    A.   Optum can do one of several things for them, or multiple.

16    So we have a pharmacy benefits manager business, and that

17    basically is in the business of paying claims on people buying

18    prescription drugs at retail stores.  It also runs a pharmacy

19    that might sell some pharmaceuticals to those companies'

20    employees through the mail.  So that's one set of services.

21         We have an entire set of services around disease

22    management and wellness, which would be programs that we have

23    to have folks counseled on diseases they might have, whether it

24    be cancer or a cardiac problem or something else, as well as

25    wellness coaching around people who are trying to quit smoking

* S E A L E D * Attorneys' Eyes Only

1    or lose weight or other objectives.

2    Q.   Does this fall under the umbrella of population health

3    management?

4    A.   Correct, yeah.

5    Q.   So everything you've described fits within the umbrella of

6    population health management for Coca-Cola?

7    A.   No.  Sorry.  The last, the wellness and disease management

8    programs do.  The pharmacy business is a separate business

9    which is called Optum Rx.

10   Q.   I'm going to focus for the next stretch on Mr. Smith in

11   particular.  When did he join Optum?

12   A.   I believe he joined in June or July of 2016.

13   Q.   And what was his role then?

14   A.   Well, he did not report to me at the time he joined, but

15   he was a member of the corporate strategy team when he joined.

16   Q.   Did that role change?

17   A.   It changed to some degree after I took over the group in

18   that we had designated Dave to be the head of product strategy,

19   in which case he basically straddled the reporting line between

20   myself and Nick Seddon, who ran product, so he continued to

21   report to me.  About 80 to 90 percent of his work was in

22   product strategy that Nick mostly oversaw.

23   Q.   Nick?

24   A.   Seddon.

25   Q.   And what did he do as vice president of product?

* S E A L E D * Attorneys' Eyes Only

1  A.   He would have done a number of things.  He led a long

2  initiative for the company to examine all of the products in

3  our portfolio and determine the profitability of those

4  products.  As part of that work he also was engaged with the

5  PHS business, as you mentioned before.

6  Q.   Population health services?

7  A.   Correct.  To go even beyond that and talk to them about

8  the attractiveness of those products, which products must be

9  invested in, which products maybe should be sunset, other

10  modifications or other decisions that might be made around

11  those products, the full strategy around how those products are

12  managed and sold.

13  Q.   Was he at all involved in comparing Optum's products to

14  other products in the marketplace?

15  A.   Presumably as part of that work he did do that, but

16  certainly not for the purposes of purchasing it but for the

17  purposes of us competing, yes.

18  Q.   So part of his job was researching competitive

19  intelligence and other products in the workplace, in the

20  market?

21  A.   That would be, yeah.  He also led other projects as part

22  of this.  He led a rather lengthy project that helped us

23  determine how to house our data analytics, that is next

24  generation.  So those would be things like machine learning,

25  artificial intelligence.  He helped architect how Optum would

* S E A L E D * Attorneys' Eyes Only

1   pursue those technologies.

2   Q.   As part of that did he ever identify for what you just

3   described, identifying datasets?

4   A.   Could you explain that a little more.

5   Q.   Like identifying patient datasets to be fed into the

6   computers for an artificial intelligence program?

7   A.   He would not have been doing that.  He would have been

8   talking about whether others should be doing that and

9   strategizing whether that's an approach that should be

10  considered by others in the organization, but he wouldn't

11  directly have been doing that himself.

12  Q.   He worked alongside people who did precisely that type of

13  thing?

14  A.   Correct.

15  Q.   Would he ever be focused in connection with that work on,

16  you know, trying to find different outcomes that worked better

17  than other certain outcomes for patient population?

18  A.   Again, he would be in -- he would be helping others in the

19  company define how to do that.  So he is not, you know, the

20  scientist in that, so to speak, but rather the one that helps

21  architect how Optum is going to go ahead and do that.  So he

22  would do kind of the high level analysis of that, and other

23  people would take care of more the work side of things, how to

24  do it, implement it and execute it correctly.

25  Q.   Do you have any understanding of approximately what value

* S E A L E D * Attorneys' Eyes Only

1    Mr. Smith received for the noncompete agreements, restrictive

2    covenants that he signed?

3    A.    I do.  I believe it was in the area of $150,000.

4    Q.    Do you know why he was asked in particular to enter into a

5    noncompete agreement?

6    A.    I believe all of the employees that receive equity

7    compensation are asked to do that.

8    Q.    What artificial intelligence technologies did Mr. Smith

9    work with?

10   A.    So again, I don't think Dave would have worked with any of

11   those technologies directly himself but rather, again,

12   architect how the organization would handle those technologies

13   to further -- effectively further analyze and come up with

14   recommendations of how to improve members' health.

15   Q.    And to analyze outcomes, right?

16   A.    Correct.

17   Q.    Did Mr. Smith -- was he asked to sign his noncompete

18   agreement on the day he started work?

19   A.    No.

20   Q.    Was there effectively some period of months when he didn't

21   have a noncompete there?

22   A.    Correct.

23   Q.    If he had left Optum before he agreed to take the

24   restricted shares, would he have been bound by a noncompete

25   agreement?

* S E A L E D * Attorneys' Eyes Only

1    A.   He would not have, as far as I know, at least.

2    Q.   Did the value of his investing of those shares go up over

3    period of time?

4    A.   Yes.

5    Q.   Can you tell me some examples of confidential information,

6    broadly speaking, that Mr. Smith had access to?

7    A.   Sure.  So he had access to the, as I mentioned, the

8    product line profitability of every product line within Optum,

9    which is something that is quite confidential and not only not

10   disclosed to the street but not broadly known by more than a

11   handful of people within Optum, as it's core to our

12   competitiveness.

13       He had access to work with what the corporate strategy

14   team in general was doing, and so he would have been generally

15   aware of projects that we might be doing looking at

16   acquisitions or other activities similar to that in the

17   marketplace.  He had data and had an ongoing project that had

18   the information about the profitability of clients for certain

19   lines of businesses of ours, including where the profitability

20   came from.

21       And then as I mentioned, he would have general knowledge

22   about any of the approaches we were taking to develop our

23   products, change the direction of the company, other

24   investments, capital investments, otherwise we were making.

25   Q.   Did he have awareness of the company's data and analytics

1  programs?

2  A.   He did.

3  Q.   He had full awareness of the company's product development

4  strategy?

5  A.   He did.

6  Q.   Was there something unique about the fact that Mr. Smith

7  had roles in both the strategy and product side?  Was he fairly

8  unique in the company for having those two areas of expertise?

9  A.   Yeah.  Dave was the only person in the organization that

10  was designated to have that role.  There were folks that worked

11  for Dave on a periodic basis for six months at a time, but he

12  was the only one designated into that role.

13  Q.   Was Caitlin Fleming one of those people?

14  A.   She was.

15  Q.   Was he also aware of Optum's corporate strategy?

16  A.   He was certainly aware of Optum's corporate strategy.

17  Q.   What's the value of his knowledge of that area to a new

18  entrant to the marketplace?

19  A.   Well, I mean, he would be aware of, you know, the places

20  where Optum has decided that there is attractive markets to go

21  after that we had prioritized and the moves that we had made to

22  go after those markets and, likewise, the places and products

23  that we had decided not to go after.

24      He would also be aware of, as you look at those

25  opportunities that Optum is targeting, what at least Optum

* S E A L E D * Attorneys' Eyes Only

1    views is the best way to target that, the right capabilities

2    that would be needed to be to successful there and how to be

3    competitive and successful in those spaces versus other

4    competitors.

5    Q.    And similarly, what's the value to a new entrant in the

6    marketplace to Smith's knowledge of Optum's product development

7    strategy?

8    A.    Well, I think it would give a pretty big jump start to, as

9    I said, what places might be attractive for a new entrant to

10   target, what places Optum may or may not be targeting, and then

11   in the places where we are targeting, what we believe is the

12   right approach to targeting that space, so what capabilities we

13   think are important there, how we're developing those

14   capabilities.  And to give you the opportunity to understand,

15   if you were competing with us as a company, what our moves are

16   going to be and therefore what moves might be sensible as a

17   counteraction to that.

18   Q.    And how about Smith's familiarity with Optum's population

19   health management programs that you testified about earlier,

20   how would that be helpful to a new entrant to the marketplace?

21   A.    Well, I think his area in that -- his expertise in that

22   area or the knowledge that he built in that area is probably

23   the greatest that he may have built within the organization in

24   the last year plus.

25        And so we run programs that run the gamut of different

* S E A L E D * Attorneys' Eyes Only

1   ways to improve health for employees of our clients, and Dave

2   would have a pretty good understanding, I would say an

3   excellent understanding, of what are the drivers of success

4   with those programs, things like engagement, things like what

5   are the right ways to try to outreach to patients, what are the

6   algorithm approaches that we would have to try to treat or help

7   those patients treat themselves, et cetera.

8   Q.   I'm going to focus your attention in these last couple of

9   minutes here just on the weeks leading up to Mr. Smith's

10  departure.

11      Now, on December 4, in your affidavit you talk about how a

12  person came to you to talk about their concern of what

13  Mr. Smith was doing.  Now, in your affidavit it says one person

14  came to you.  And that might have been my mistake.  How many

15  people came to you that day, on December 4?

16  A.   It was three people that came to me at the same time.

17  Q.   And what did they tell you?

18  A.   They told me that they were uncomfortable with Dave having

19  gone to some junior members on the team looking for them to

20  send him information about the corporate strategy work, which

21  is referred to as Optum Enterprise Strategy, because it was a

22  project that he wasn't working on and they had no reason to

23  believe that that was information that he needed, and it was

24  probably the most top secret project that the corporate

25  strategy team has worked on in in my tenure there.  So there

* S E A L E D * Attorneys' Eyes Only

1    was a concerned not only that he was asking for the information

2    but instead of asking myself or other more seniors members of

3    the team that he was going to the most junior members on the

4    team for that information.

5    Q.   Have you ever had that experience before where not one but

6    where three people came to complain about this type of thing?

7    A.   No.

8    Q.   Did it raise a level of concern in your mind?

9    A.   It did to the point where I scheduled a lunch with Nick

10   Seddon during our offsite.  We excused ourselves and spent the

11   bulk of that lunch talking about the commentary and how to have

12   a conversation with Dave about it.

13   Q.   And did that conversation ever take place?

14   A.   It did not take place.  We had come to the conclusion that

15   since we were near the end of the year and we were right around

16   review time that it might make sense to have a joint

17   conversation inclusive of the review we were giving him.  And

18   then a week later we found out he was leaving the organization,

19   so it never happened.

20   Q.   When Mr. Smith told you he was leaving Optum, what did he

21   tell you about his role for ABC?

22   A.   He told me he didn't really know much about his role, that

23   he viewed it as a research role but had not much information

24   beyond that about what it was.

25   Q.   I have one more question and then my time is up, I

1  believe.  When Mr. Smith -- did Mr. Smith talk to you about his

2  noncompete agreement?

3  A.   He did.

4  Q.   Did he tell you any reason why he thought it was or was

5  not enforceable?

6  A.   Yeah.  In the second meeting I had with Dave that day, I

7  mentioned to him that I thought he ought to consider his

8  noncompete agreement that stems from the equity he received.

9  And he mentioned to me that he had spoken to an attorney about

10  it and that his -- he had no vested options or other equity

11  remaining and, as a result, felt like he didn't have any

12  exposure from that noncompete agreement as a result.

13  Q.   So he felt his noncompete agreement at that point was just

14  null and void?

15  A.   Yes, or that he --

16       THE COURT:  What's that?

17  A.   Or he did not have any exposure because he already sold

18  the stock associated with it.

19  Q.   So when he left, based on what he told you, he believed

20  that he was just simply not bound by a noncompete agreement; is

21  that right?

22  A.   That's correct.

23       MR. RIDEN:  Okay.  I have no further questions for the

24  moment, Your Honor.

25       THE COURT:  Thank you.

* S E A L E D * Attorneys' Eyes Only

1          MR. SHEEHAN:  If I could just have a moment, Your

2    Honor.

3          THE COURT:  Yes.

4    CROSS-EXAMINATION BY MR. SHEEHAN:

5    Q.   Good afternoon, Mr. Wolin.

6    A.   Good afternoon.

7    Q.   Do you know a woman by the name of Mimi McCauley?

8    A.   I do.

9    Q.   Did you hire her?

10   A.   I did.

11   Q.   And so she works on the strategy team; is that right?

12   A.   That's correct.

13   Q.   Same team that Mr. Smith worked for?

14   A.   Correct.

15   Q.   And where did you hire her from, sir?

16   A.   She worked for organization called --

17         THE COURT:  Please keep your voice up.

18   A.   Well Talk.

19   Q.   And in her position at Well Talk, what did she do; what

20   was her role?

21   A.   She had a myriad of activities.  She was -- she had some

22   roles with them in helping them develop their operations.  She

23   did work some strategy for them.  And she also had, as I

24   understand it, a fair bit of client-facing roles.  So she would

25   work with clients specifically on products and services that

* S E A L E D * Attorneys' Eyes Only

1   were being deployed by Well Talk.

2   Q.   A competitor of Optum, right?

3   A.   It is a competitor, yes.

4   Q.   And she worked in the, would it be fair to say, population

5   health management?

6   A.   Well, Well Talk is really in the wellness space for the

7   most part.  It's kind of an adjacent business to the population

8   health management.

9   Q.   And so you hired her, you brought her on this summer,

10  right, just this summer, right, 2018?

11  A.   Yeah.

12  Q.   Did you have her sit out a year?

13  A.   No.

14  Q.   Did you have her sit out a month?

15  A.   No.

16  Q.   You put her to work?

17  A.   Correct.

18  Q.   Did you build any walls or any firewalls in the computer

19  system to keep her away from any information at all?

20  A.   No.

21  Q.   Did you admonish her as to certain things she wouldn't

22  work on, or did you restrict her in any way?

23  A.   We didn't.  We don't work actively on any of the wellness

24  products today, and she is not working on any wellness products

25  at this point.

* S E A L E D * Attorneys' Eyes Only

1    Q.   So it happens.  But you didn't sit down and have a

2    sit-down with her and have her sign off on any documents that

3    she's not work on any certain products?

4    A.   I mean, I didn't personally.  I don't know if others did.

5    I did not.  But we did have a conversation to make sure that we

6    put her on projects that made sense, given what her background

7    was.

8    Q.   And with that, you felt comfortable that she would be able

9    to do her job and not use or disclose inevitably or in any way

10   Well Talk's confidential information?

11   A.   Yes.

12   Q.   Fair statement?

13   A.   Yeah.

14   Q.   Sir, you talk about this incident on December 4, and it's

15   mentioned in your affidavit.  And in your affidavit you refer

16   to one person coming to you.  Today you've corrected that.  It

17   was three, is that right?

18   A.   That's correct.

19   Q.   Who were those?

20   A.   Marianna Spanos, Stephanie Schreiber and Danny Metzger.

21   Q.   Did they come to you all together?

22   A.   Well, we were at -- we were together and they talked to me

23   about it while we were together.

24   Q.   Now, while we're on this subject of your affidavit, you

25   also testified about the conversation -- testified in your

* S E A L E D * Attorneys' Eyes Only

1    affidavit about the conversation you had with Mr. Smith when

2    you were telling him it's time to leave, his last day.  And

3    your testimony was, "I told Mr. Smith I was uncomfortable with

4    his plans to join ABC, a competitor of Optum, that promises to

5    be a disrupter in the health care industry and that he would

6    have an issue with his noncompete and equity grants under the

7    agreements."  That's your testimony, sir?

8    A.    Correct.

9    Q.    Then you go and say, "Mr. Smith responded that he had

10   spoken with a lawyer and did not think that his noncompete

11   would be an issue."  That was your testimony, too?

12   A.    Yeah.

13   Q.    That was the extent of your testimony on that

14   conversation?

15   A.    That's correct.

16   Q.    And that was at the time you were able to sit down and

17   think about it and work through the language of the affidavit

18   with your lawyer, right?

19   A.    Correct.

20   Q.    Any reason why you didn't elaborate on that like you did

21   here today in court?

22   A.    Those were the main facts of the conversation.

23   Q.    So this was December 4, and two days later, you're all at

24   that offsite meeting in Minnesota?

25   A.    Correct.

* S E A L E D * Attorneys' Eyes Only

1  Q.    Important meeting?

2        THE COURT:  I think you may be confusing some things.

3  His conversation with Mr. Smith about the noncompete wasn't on

4  December 4.

5        MR. SHEEHAN:  No.  The conversation with the three

6  individuals who came to him was on December 4.  I'm sorry if I

7  was confusing.

8        THE WITNESS:  That's correct.

9        MR. SHEEHAN:  Let me rephrase this.  Okay?

10       THE WITNESS:  Yeah.

11 Q.    So December 4, those three individuals who you've

12 identified came to you, and two days later, December 6, you and

13 other senior leaders and others on the team and Mr. Smith met

14 in Minnesota, correct?

15 A.    That's correct, yeah.

16 Q.    Why didn't you then and there, if you had concerns about

17 Mr. Smith seeking out this information, why didn't you then and

18 there, before the meeting got started, pull him aside and talk

19 to him?

20 A.    Because number one, I wanted to talk to Mr. Seddon about

21 it before we had any action.  And number two, you know, I think

22 it's like any feedback I might get on an employee where I'm

23 taking it into consideration as I'm thinking about them and

24 their performance.

25       And as I mentioned, because a performance review was

* S E A L E D * Attorneys' Eyes Only

1    coming up quite shortly, I was trying to make a determination

2    of did it deserve a separate conversation or should we include

3    it as part of the performance review he was going to be getting

4    towards the end of the year.

5    Q.   Is it fair to say then you saw this as a performance

6    issue?

7    A.   I saw it as a concerning performance issue, yes.  More --

8    I would say more than a performance issue because it's dealing

9    with confidential information around a project that was, as I

10   mentioned, amongst the most confidential we had within Optum.

11   So I was concerned about a pattern of behavior to seek

12   information that is confidential that had no reason -- he had

13   no reason to have.

14   Q.   When you say a "a pattern of behavior," this was the first

15   and only instance this was ever raised to you, wasn't it, sir?

16   A.   Correct, but I wanted to make sure that --

17   Q.   Okay.  And when you excused Mr. Smith from the office and

18   told him -- you understood on that day he thought he was going

19   to continue to work with the company for the rest of the year,

20   right?

21   A.   I understand that we told him he was on administrative

22   leave at that point.

23   Q.   I'm saying before you came and gave him that information,

24   he was still working at Optum and planning to work for Optum

25   for the rest of the year, right?

* S E A L E D * Attorneys' Eyes Only

1  A.   Well, we had talked.  Initially he had asked me if I could

2  think about what would be an appropriate end date for him and

3  thrown out the option that it would be at the end of the year.

4  Q.   Okay.  Then you came back and said, Well, no, it's going

5  to be today and we're going to put you on administrative leave?

6  A.   That's correct.

7  Q.   Did you then circle back to the office and search the

8  office to see what was there and what wasn't there?

9  A.   I didn't personally do that, but Mike Weissel did that,

10  and then I joined him a few days later and did the same.

11  Q.   And you understood he did that about a week after

12  Mr. Smith's departure?

13  A.   It was probably in that timeframe, yeah.

14       MR. SHEEHAN:  I have no more questions, Your Honor.

15       MR. RIDEN:  I just have two quick lines of questions.

16  REDIRECT EXAMINATION BY MR. RIDEN:

17  Q.   Mr. Wolin, what was the name of that employee from Well

18  Talk?

19  A.   Mimi McCauley is her name.

20  Q.   When she joined Optum, did Optum receive any demand

21  letters from Well Talk regarding her hiring?

22  A.   Not that I'm aware of, and like every employee that we

23  hire, she went through a legal process to assess any noncompete

24  she might have and whether those noncompetes were a concern to

25  the organization as we brought her in.

* S E A L E D * Attorneys' Eyes Only

1   Q.   Standardized process?

2   A.   It is.

3   Q.   Do you know if she had a noncompete?

4   A.   I don't know if she did or not.

5   Q.   Was Optum sued as a consequence of her joining Optum?

6   A.   No, we were not.

7   Q.   Focusing your attention on December 4, when those three

8   people came to bring information to your attention about their

9   concerns about Mr. Smith and his handling of confidential

10  information, did you know at that time that he was

11  contemplating leaving Optum?

12  A.   No, I did not.

13  Q.   If you did know, would you have done anything differently?

14  A.   We would have reacted very differently if we had known

15  that.

16  Q.   What would you have done?

17  A.   We would have immediately had a conversation with him to

18  try to understand why he was seeking this information,

19  immediately tried to understand if he was in the process of

20  leaving the organization and may have at that point in time

21  made the decision to terminate him at that point in time.

22  Q.   Did he have any legitimate business reason for asking

23  these folks for the information he was seeking?

24  A.   No, he did not.

25          MR. RIDEN:   Thank you.

* S E A L E D * Attorneys' Eyes Only

1          MR. SHEEHAN:  I think I get it now.

2     RECROSS-EXAMINATION BY MR. SHEEHAN:

3     Q.   So let me ask you a question.  When you did learn that he

4     was resigning and going to ABC, the joint venture, there's your

5     opportunity.  Did you ask him why were you having conversations

6     with these three on that day, on the day of his resignation?

7     A.   No, I did not.

8     Q.   And then when you came back and circled back to say I know

9     before we talked about you transitioning and staying until the

10    end of the year, but now it's changed, we're putting you on

11    administrative leave, did you ask him then?

12    A.   No, I did not.

13         MR. SHEEHAN:  No more questions, Your Honor.

14         THE COURT:  I've got just a couple.

15         Does Optum provide services or products to JP Morgan

16    Chase and/or Berkshire Hathaway?

17         THE WITNESS:  Yes, we do.

18         THE COURT:  To both?

19         THE WITNESS:  To both, yes.

20         THE COURT:  Are the services to employees of those

21    companies, or is the contractual relationship with the company?

22         THE WITNESS:  I'm not privy to the contract, but just

23    generally the standard would be that the services are -- the

24    contract would be with the company itself.

25         THE COURT:  And what services does it provide, does

* S E A L E D * Attorneys' Eyes Only

1    Optum provide, or products, those organizations?

2         THE WITNESS:  Unfortunately, I don't know the list of

3    those services.

4         THE COURT:  Do those questions suggest any further

5    questions to counsel?

6         MR. SHEEHAN:  No, Your Honor.

7         MR. RIDEN:  No, Your Honor.

8         THE COURT:  Okay.  Your testimony is complete.  Do you

9    understand you're subject to what's called a sequestration

10   order?  You can't discuss the case or what you were asked or

11   answered with anybody else who might be a witness unless and

12   until that order is ended.

13        THE WITNESS:  Okay.

14        THE COURT:  You're excused from the courtroom, but

15   don't go away.  You may be needed for a discussion.  Okay?

16        THE WITNESS:  Okay.  Thank you.

17        THE COURT:  Now, there's one more potential witness,

18   correct?

19        MR. SHEEHAN:  Yes, Your Honor.

20        THE COURT:  Who is that?

21        MR. SHEEHAN:  Mr. Andrews, the forensic investigator

22   who was identified.

23        THE COURT:  How long -- what do you want to ask him

24   about?

25        MR. SHEEHAN:  I want to ask him about his

* S E A L E D * Attorneys' Eyes Only

1    investigation that he testified to in support of the motion.

2         THE COURT:  Well, what in his affidavit is in dispute

3    and why would it be material?  Because I think Mr. Smith

4    acknowledged he printed out the Fact Book on October 29.  He

5    printed out the OES deck on maybe December 11.  He said he had

6    a legitimate -- you know, he was working with it.  And, you

7    know, there's some question about whether he ever printed these

8    things out before.

9         MR. SHEEHAN:  That's really the rub, Your Honor.

10   There's zero evidence, and it's an unfair inference, and that's

11   what I want to get to.  Because he didn't go back a year.  He

12   didn't look at anyone else's.  In fact he didn't do anything.

13        He testifies based on what someone else did.  And the

14   person who did the investigation looked at a six-month period

15   and then only gives us a report for this case on the last three

16   months, and it's redacted and it's incomplete.  And even the

17   thing that Your Honor was focused on yesterday about the timing

18   of the printing is misleading because of how the printing works

19   from the person who pushes the button to then the printing

20   being in the queue.  There's just zero inference to be drawn

21   from any of this.

22        THE COURT:  I wonder how much of these facts are in

23   dispute, or is that something to argue about?

24        MR. BECK:  Your Honor, first of all, I can make an

25   offer of proof on what Mr. Andrews would say, if that would be

* S E A L E D * Attorneys' Eyes Only

1 helpful.

2          MR. SHEEHAN:  I'd rather cross-examine him.

3          MR. BECK:  Which is fine.

4          THE COURT:  What's that?

5          MR. BECK:  He's not here to hear it, so it doesn't

6 really matter.

7          THE COURT:  Well, how long do you want to be with

8 Mr. Andrews?

9          MR. SHEEHAN:  I hope to be ten minutes.  It might go

10 twelve.  I don't think this is --

11          THE COURT:  In the interests of completeness -- I

12 mean, as I told you, my time is limited.  And one of the

13 questions I'm going to ask you, we've got to figure out what to

14 do from here.

15          If I hear from Mr. Andrews, I'm going to have heard

16 all the evidence that I would have heard on the motion for

17 temporary restraining order.  And I'm going to ask you, you

18 know, do you want to spend tonight briefing the stay issues and

19 appeal issues?  You're going to have a better chance of

20 answering the question if you let me finish.  I'm not asking

21 you the answer now.  I'll give you a chance to talk to your

22 colleagues or clients.  Do you want me to decide the motion for

23 temporary restraining order?  It wouldn't be today, but it

24 could be tomorrow.  I mean, you don't know how I'm going to

25 decide it.

* S E A L E D * Attorneys' Eyes Only

1           MR. SHEEHAN:  If you told us that first --

2           THE COURT:  You might want a chance to argue it.  But,

3    I mean, as a practical matter, the defendant says he wants to

4    get to arbitration.

5           MR. SHEEHAN:  Your Honor, before we call the next

6    witness or proceed, if I could just have a couple of minutes

7    with my client and counsel right here.  I may drop my request

8    for --

9           THE COURT:  I want you both to think about the

10   question I ask, because if you both say to me we want to get to

11   arbitration, if I issue a temporary restraining order, it's 14

12   days, and then there can't be more than 28 days unless you

13   agree to it.  But, you know, having heard Mr. Weissel and

14   having heard Mr. Stoddard, I wonder why the mediation wasn't

15   successful.  But right now, Optum knows a lot more about ABC

16   than it did at the time of the mediation, apparently.

17          MR. SHEEHAN:  I think Your Honor's suggestion about

18   how you might put them together today, we would be in favor of

19   that.

20          THE COURT:  But I have a limited amount of time.  I'm

21   going to give you about five minutes.  We're being somewhat

22   practical here.  You understand.

23          MR. SHEEHAN:  I do.  Thank you.

24          MR. BECK:  On that issue of Optum knowing a fair

25   amount more, we still have the issue of a sealed courtroom and

1   counsel who hasn't been able to hear any of those specifics.

2         THE COURT:  If we end up sitting around talking about

3   it, we'll figure out what they can hear.  Court is in recess.

4         (Recess taken, 3:27 p.m - 3:37 p.m.)

5         THE COURT:  Mr. Sheehan, do you want to call another

6   witness?

7         MR. SHEEHAN:  Your Honor, I spoke with my colleagues

8   and with opposing counsel.  I have agreed to withdraw my

9   request for Mr. Andrews so that we could use that time, and

10  counsel agrees with this, for Your Honor to get together with

11  Mr. Weissel and Mr. Stoddard.  I think it's a better use of our

12  time.

13        MR. BECK:  The issue was -- whatever Your Honor has in

14  mind, obviously, but the underlying issue in terms of the

15  evidence is, I think what we have an agreement on is, that the

16  evidence is closed at this point, assuming Your Honor is

17  comfortable with that.  Is that correct?

18        MR. SHEEHAN:  Yes.

19        THE COURT:  Okay.  Fine.  Because I think that makes

20  sense.  And you don't have to -- all right.  I'm going to talk,

21  and it will be not in the public session because it may

22  necessarily implicate discussion of the confidential

23  information for which I closed the courtroom.

24        But as I said, one thing to think about, and I don't

25  think you need to answer it right now, but these two things may

1   be synergistic is, you know, either you're going to spend

2   tonight briefing a fascinating question about the stay, and

3   waiting for me perhaps to write something about it, or you

4   might just say, if it's necessary, Judge, decide the motion for

5   the TRO and order us to arbitration.  Because right now -- I

6   don't know.  Do you know what the answer to that is?

7           MR. SHEEHAN:  No, but the last thing I want to do is

8   put us and my colleagues to that work and Your Honor and

9   everyone in the work of doing that unnecessarily, so I'm not

10  going to -- I'm trying to get so that -- I can't read the cases

11  while in court.  And I need an answer to one of the issues

12  before we make that decision.

13          THE COURT:  Here.  We'll go back and talk.  But bring

14  everything you want.  Mr. Smith needs to be there, corporate

15  counsel needs to be there from Optum.  We'll see where we're

16  going from here, okay?

17          Court is recess.

18          (Recess taken, 3:38 p.m.)

19

20

21

22

23

24

25

*  S  E  A  L  E  D  * Attorneys' Eyes Only

1              CERTIFICATE OF OFFICIAL REPORTER

2

3              I, Kelly Mortellite, Registered Merit Reporter

4    and Certified Realtime Reporter, in and for the United States

5    District Court for the District of Massachusetts, do hereby

6    certify that the foregoing transcript is a true and correct

7    transcript of the stenographically reported proceedings held in

8    the above-entitled matter to the best of my skill and ability.

9                         Dated this  4th day of February, 2019.

10

11                       /s/ Kelly Mortellite

12                       _____

13                       Kelly Mortellite, RMR, CRR

14                       Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25