# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

OPTUM, INC. and
OPTUM SERVICES, INC.,

*Plaintiffs*,

v.

DAVID WILLIAM SMITH,

*Defendant*.

Civil Action No. 19-cv-10101-MLW

**OPTUM, INC. AND OPTUM
SERVICES, INC.'S SUPPLEMENTAL
MEMORANDUM IN SUPPORT OF THEIR
MOTION FOR A TEMPORARY
<u>RESTRAINING ORDER</u>**

Respectfully submitted,

OPTUM, INC. and
OPTUM SERVICES, INC.,

By their attorneys,

*/s/ Russell Beck*
Russell Beck, BBO No. 561031
Stephen D. Riden, BBO No. 644451
Hannah Joseph, BBO No. 688132
Beck Reed Riden LLP
155 Federal Street, Suite 1302
Boston, Massachusetts  02110
617.500.8660 Telephone
617.500.8665 Facsimile
*rbeck@beckreed.com*
*sriden@beckreed.com*
*hjoseph@beckreed.com*

Dated:  February 19, 2019

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document has been filed through the CM/ECF system on February 19, 2019, and will be served electronically to the registered participants as identified on the Notice of Electronic Filing through the Court's transmission facilities, and that non-registered participants have been served this day by mail.

*/s/ Russell Beck*

**INTRODUCTION**

If a corporate executive in a high-level strategic position surreptitiously obtained, printed, and reviewed documents containing his or her employer's most important strategic and product trade secrets on his way out the door to work for a competitor, it would be obvious that his or her work for the new employer should be enjoined. That is *exactly* what happened here. Smith violated both his noncompetition agreement and the laws protecting trade secrets by planning his transition to (and then working for) market disruptor ABC, a competitor of Optum, in a role that inevitably will require him to share Optum's confidential information. Smith requested, printed, and studied Optum's trade secrets *while* interviewing for and accepting a job he called "an opportunity of a lifetime."[1] Smith has failed to offer any reason to believe he not will share Optum's information with ABC. And ABC has offered no reason to doubt that the real reason Smith was hired was his keen insights into Optum's strategy. Even in sealed proceedings, ABC could not disabuse anyone of the obvious reasons for his hiring.[2]

By contrast, Optum has shown that it has critical reasons to enforce noncompete agreements for strategic positions like Smith's. If a team member helps develop a company's strategic plans, then the vital information in those plans necessarily informs that person's thinking about the market. If that employee goes to work for a competitor, then it is *impossible* to wall off the confidential information he or she obtained with the old employer from the new job. And when, as here, that employee goes to unusual lengths to obtain *more* information about confidential strategies while transitioning to a competitor, there is even more reason to fear that such information will find its way to the new employer. There thus is every reason to create a one-year breathing period here that will at once uphold the value of the noncompete without

---

[1] Smith Testimony, TRO Hr'g Tr. Jan 30, 2019 ("Smith Testimony"), pp. 112 & 187.
[2] Stoddard Testimony, TRO Hr'g Tr. Jan 31, 2019 ("Stoddard Testimony"), pp. 98:18-24, 103:4-104:14, & 114-123; Smith Testimony, pp. 135:21-136:2, 139:19-151:11.

impacting Smith's ability to work for a competitor in a year (or a non-competitor now).

Smith insists that Optum has nothing to fear from his new position. But his tale is thin even for a children's bedtime story. ABC hardly knew Smith for a role they had not defined, yet paid him a base salary of $300,000. ABC paid two law firms to represent him, guaranteed his compensation even if he is enjoined from working for ABC (a fact of which Smith claimed to be unaware),[3] and started him the day after Optum filed this lawsuit. For his part, Smith has made myriad meritless attempts to delay this case (*see* Dkt. #s 16, 39 and 43), hoping to ensure that he can continue using Optum's trade secrets while working for ABC before *any* court can stop him.

Enough is enough. Smith's attempts to avoid this Court's authority are over. Smith knows Optum trade secrets, sought and printed Optum's competitively-sensitive information on his way out the door, studied Optum's information for his interview and new job, and now is engaged in competitive activities designed to displace Optum at JPMorgan Chase and the Berkshire Hathaway companies Optum currently services, and then in the market more generally – a plan ABC's COO refused to deny and that the market recognizes *will* happen. A TRO should issue.

## FACTUAL BACKGROUND

Optum delivers integrated solutions to improve the health system and improve overall population health, including for large employers like ABC's founding companies. Optum's core capabilities include data and analytics, pharmacy care services, population health, healthcare delivery, and healthcare operations. Weissel Testimony, TRO Hr'g Tr. Jan. 31, 2019 ("Weissel Testimony"), pp. 42:8-44:12; Wolin Aff. ¶¶ 2, 3. Optum's trade secrets and other confidential business information provide a competitive advantage, which Optum has spent substantial time and resources developing and safeguarding in many ways. Wolin Testimony, TRO Hr'g Tr. Jan

---

[3] Smith Testimony, pp. 129:15-18, 153:14-154:7, 132:14-134:9; Stoddard Testimony, p 108:5-7.

31, 2019 ("Wolin Testimony"), pp. 130:5-133:7; Wolin Aff.. ¶¶ 8-13.

Smith began working for Optum in August 2016 as Vice President of Corporate Strategy, and later was named Vice President of Product Strategy. Wolin Aff. ¶ 14. Smith was exposed to Optum's most important trade secrets and valuable confidential information, and played an integral role in overseeing products and developing enterprise strategies for Optum. Wolin Testimony, 126:10-128:24; Wolin Aff., ¶ 15. Contrary to his suggestions, Smith was not a "junior" employee with mundane responsibilities at Optum. Smith Aff., ¶ 3. He was an executive who was compensated with valuable stock, was a member of Optum's corporate strategy team, and had access to information that would be valuable for a disruptor like ABC entering the health care services market. Wolin Testimony, 126:10-133:7; Wolin Aff., ¶¶ 10-12, 14-20.

Smith was rewarded handsomely for his efforts at Optum. His base compensation totaled $200,000 annually; he also received valuable equity awards. Wolin ¶¶ 19, 20; Smith Testimony, p. 129:15-18; 179:13-20 (explaining that his total compensation from Optum exceeded $300,000 annually). In exchange for his equity, Smith executed four agreements containing post-employment restrictions: Restricted Stock Unit Awards in 2017 and 2018 (the "RSU Awards") and Nonqualified Stock Option Awards in 2017 and 2018 (the "NQ Awards," and together with the RSU Awards, the "Agreements"). Wolin ¶¶ 19, 20. Smith agreed in those agreements not to disclose or use Optum's Confidential Information. He also agreed that, for a year after his employment, he would not "[e]ngage in or participate in any activity that competes, directly or indirectly, with any [Optum] activity, product or service that [Smith] engaged in, participated in, or had Confidential Information about during [Smith's] last 36 months of employment with [Optum]." NQ Awards, ¶¶ 4(a) and (c); RSU Awards ¶¶ 8(a) and (c).

ABC is "an independent [limited liability company]" that was announced in January 2018 by Amazon, JPMorgan Chase & Co. ("JPMorgan"), and Berkshire Hathaway. Compl., Exh. 10.

The venture initially will focus on developing solutions for the three partner companies' roughly 1.2 million U.S. employees (many of whom are currently serviced by Optum). Smith Testimony, pp. 147:17-151:15; Stoddard Testimony, pp. 89:11-91:20; Wolin Testimony, pp. 144:15-24; Weissel Testimony, pp. 44:13-45:2. ABC will focus on "technology solutions" to provide "high-quality and transparent health care at a reasonable cost." Compl., ¶ 87. Jamie Dimon (CEO of JPMorgan) explained that "our goal is to create solutions that benefit our U.S. employees, their families and, potentially, all Americans." *Id.*

On June 24, 2018, Smith emailed the CEO of ABC and expressed an interest in a job. Smith Testimony, p. 113:5-15. Smith received no response, so he later applied online for a position there. Smith Testimony, pp. 113:23-114:14. Smith received a response from a recruiter on October 7, 2018. *Id.*, p. 114:15-20.

Smith's first interview was with ABC's COO, Jack Stoddard, in the early afternoon of October 29, 2018. Smith Testimony, pp. 115:22-116:12. That morning, at approximately 9:51 am (Central Time) – and just *one minute before* printing his résumé – Smith printed the highly confidential Optum "Factbook," which contains Optum's in-depth analysis of healthcare trends among consumers, employers, payers, government entities, providers, Pharmacy Benefit Managers, and other life sciences entities, as well as Optum's potential opportunities in, and solutions for, the changing healthcare market. Weissel Testimony, pp. 51:7-52:7; Wolin Aff., ¶¶ 67-68; *see also* Smith Testimony, p. 116:9-24 (confirming the timing and sequence of events).

Smith has failed to offer a credible and legitimate reason for printing the Factbook on October 29. Smith first tried to explain away the obvious implications of printing the Factbook immediately before printing his résumé (only hours before his job interview with ABC) by claiming that it was business as usual for him, because he relied heavily on the Factbook and printed it out multiple times. Smith Testimony, pp. 162:14-167:18, 192:24-193:15. When

confronted with print logs revealing that he had *never* printed that document before 9:51 am on the day in question, Smith asserted for the first time that he may previously have "gotten [the Factbook] from someone else," and that despite his prior testimony he was in fact "not sure whether [he] printed [it] out multiples times." Smith Testimony, pp. 193:16-195:7.

Similarly, Smith gave evasive and inconsistent testimony when trying to explain a legitimate reason for printing the Factbook on that particular day. *Id.*, pp. 162:14-167:18. After testifying that he would have used the Factbook for meetings that day, he admitted that he could not in fact recall any meetings for which he would have printed it that day. *Id.*, pp. 165:1-166:22. Smith also admitted that his interview with Stoddard was "the significant event of the day" for him (Smith Testimony, p. 166:14-22), and that it was his practice to "show[] up for meetings or important events prepared" (*id.*, p. 165:15-25). He also admitted that he probably read the Factbook after printing it – *i.e.*, just before his meeting with Stoddard. *Id.*, p. 165:4-14. The implication is clear that he printed and read the Factbook to prepare for his interview.

Smith testified as a fallback that, since the meeting was merely an introductory one, "[t]he document wouldn't have been relevant for Mr. Stoddard. . . . At no point in our interview did that topic [*i.e.*, the topics in the Factbook] even come up, nor would it have." *Id.*, pp. 166:23-167:18, 117:8-118:20.[4] But the testimony of the person on the other side of the interviewing

---

[4]     Q. Okay. What do you remember talking with him [Stoddard] about?

A. Well, we talked a little bit about the health care venture. We talked a little bit about who was still working at Optum. He had been there a long time ago. We spoke about my experience at Bain and my job at Optum, kind of what my role was. And then we talked a little bit about the three founding companies and what kinds of issues their employees might have, you know. I think we talked a little bit about our families. And that was -- that was about it.

Q. Okay. So what did you tell him about your role at Optum?

A. That I was a -- worked across product and strategy, that my time in -- you know, that I functioned largely as an internal consultant for Optum. I worked with a lot of product leaders and worked on kind of a lot of different strategy projects but didn't really get into detail. We spoke fairly briefly about my -- my experience.

table was quite different. Stoddard confirmed that he and Smith discussed many of the issues

covered in the Factbook during the interview. Stoddard Testimony, p. 99:2-16.[5] Stoddard's

testimony about the content of the interview tracks quite neatly with the topics in the Factbook.

Adding two and two, this much is clear: (1) Smith relied on information from the Factbook in his

discussion with Stoddard; and (2) Smith was aware of his reliance on the Factbook, but declined

to reveal anything in his testimony that he discussed topics connected to the Factbook during his

interview.

Following that initial interview with Stoddard, Smith continued on several occasions to

misappropriate Optum's other trade secrets and confidential information for use at ABC. There is

truly no legitimate explanation for his behavior.  On December 4, 2018, Smith requested some of

Optum's confidential information from junior members on his supervisor's (Steven Wolin) team,

even though he had no legitimate need for that information. Wolin Aff., ¶ 62-63; *see also* Wolin

Testimony, pp. 133-34. Those requests for information made several employees so

uncomfortable that they approached Wolin:

> They told me that they were uncomfortable with [Smith] having gone to some
> junior members on the team looking for them to send him information about the
> corporate strategy work, which is referred to as Optum Enterprise Strategy,
> because it was a project that he wasn't working on and they had no reason to
> believe that the information that he needed, and it was probably the most top

---

*** 

We were having a kind of a broader conversation and that was more of a "getting to know you."

Smith Testimony, pp. 117-18.

[5]  The Factbook addresses the following topics: "Consumer Trends," "Employer Trends," "Payer Trends,"
and "Provider Trends." Wolin Aff., Exh. 6. By comparison, Stoddard's testified about what he and Smith discussed
during Smith's October 29, 2018 as follows:
> Q: Going back previously to that interview you had with [Smith] in person, did you
> discuss with him the health care market generally?
> A: Broadly, yes. . . . He was very articulate about understanding that there are hospital systems,
> there are rising costs, there's a migration to value-based payment. He talked about the role of
> payors. He talked about employers. He was very articulate about the different contours of the
> market, but we, again, spoke nothing specifically about Optum.
Stoddard Testimony, p. 99.

secret project that the corporate strategy team has worked on in my tenure there. Wolin Testimony, pp. 133:8-134:7. Wolin raised this with Smith's other supervisor, Nick Seddon, but did not have the chance to raise it with Smith before his abrupt resignation. Wolin Aff., ¶ 65; *see also* Wolin Testimony, pp. 134:5-19. Wolin would have terminated Smith immediately if he had known then that Smith was interviewing with ABC. Wolin Testimony, 143:7-24.

Two days later, on December 6 – on the same day he received a verbal offer from ABC (Smith Testimony, p. 127:11-25) – Smith attended a highly confidential, all-day strategy meeting with Optum's senior leaders (including its CEO). Wolin Aff., ¶¶ 18, 29. Given the high-level position Smith had been offered at ABC and his own level of sophistication, Smith should not have attended that meeting. *Id.*, ¶ 30.

Then, on Monday, December 10 – the same day he accepted ABC's offer and started working with his litigation counsel (Smith Testimony, p. 131:8-132:9; 179:21-25) – Smith printed out a confidential Optum document, the Optum Enterprise Strategy document (the "OES Deck"), concerning Optum's product portfolio performance, new product development, and product assessment plan. Wolin Aff., ¶ 36; s*ee also* Weissel Testimony, pp. 52:8-53:2; Smith Testimony, pp. 134:10-135:17. Smith had no legitimate reason to do so. Wolin Aff., ¶ 36.

Although Smith denies removing from Optum's premises the Factbook or OES Deck that he printed under extremely suspicious circumstances (Smith Affidavit, ¶¶ 21, 25), Optum has not found either document among the items left in Smith's office. Weissel Testimony, p. 53:8-25. And Smith never has denied the obvious implication that, whatever he did with the physical copies of these documents, the confidential information contained in them is now in his head, and may be used in his employment at ABC to Optum's detriment.

On December 11, 2018, Smith signed and returned ABC's employment offer. Wolin

Affidavit, Exh. 11; Smith Testimony, p. 129:19-20. On December 13, 2018, Smith informed his supervisor, Wolin, that he was resigning and that he would be building and leading a "research team" for ABC. Wolin Aff. ¶¶ 22, 23. Smith's representation drastically understated his role, which Smith now describes as "a big job." Smith Testimony, p. 144:18; *see also id*., pp. 139:19-149:5. At the December 13th meeting, Wolin told Smith that he "was uncomfortable with his plans to join ABC, a competitor of Optum, that promises to be a disrupter in the health care industry and that he would have an issue with his noncompete and equity grants under the agreements." Wolin Testimony, 138:24-139:8; *see also* Wolin Aff. ¶ 24.

Smith insists that he is not violating his noncompete clause – but refuses to provide real information about what his job actually entails. When asked what functions he will perform in exchange for his $300,000 salary and whatever other benefits he may receive (beyond having his two sets of lawyers paid for by ABC and being indemnified in the event he is enjoined) (Smith Testimony, pp. 133:11-134:9; Stoddard Testimony, p. 108:5-10), Smith claims he never asked and had no idea what he would be doing before starting work. Smith Testimony, p. 139:2-15.

Smith started working at ABC the day after Optum filed this lawsuit – but even now, he still describes his work in vague terms as "director . . . in the strategy research group . . . thinking about and looking at the three founding companies." Smith Testimony, pp. 135:21-136:2. When pressed for more details, Smith explained in vague, generic terms that he is "working on the analysis side," which means "[y]ou're looking at the problem itself, how big it is, how it's related to other problems, how solving it might create new problems." *Id.*, p. 142:9-23. Summarized, Smith contends that he is being paid "$300,000 to look at [the ABC founding company's] patient pool and analyze that and then maybe at some point look at vendors" together with four other colleagues (including Caitlin Fleming, who was previously one of Smith's direct reports at Optum – she was hired by ABC in January 2019). *Id.*, pp. 144:19-145:1;

151:16-152:5; Wolin Aff. ¶ 44. One thing is clear: Smith has been hired to fill a vital strategic role for ABC. As Stoddard described, Smith "is involved with the process of helping [ABC] to determine what [its] strategy should be . . . ." Stoddard Testimony, p. 91:11-20. Put another way, Smith has been tasked with coming up with a strategy to displace Optum.[6]

Crucially, when his former job required him to be indifferent on the question, Smith himself identified ABC as a competitor of Optum. He generated a list of Optum competitors that included ABC. When confronted with that list, Smith explained away ABC's inclusion by pointing out that ABC was listed as a "disruptor," not a competitor. Smith Testimony, at 107-110 & Exhibit 2. That characterization was contradicted by Weissel, who explained that the list was created for Optum's CEO to identify Optum's competitors. Weissel Testimony, p. 58:4-20. Weissel testified that there is no distinction between calling ABC a "competitor" or a "disrupter" on the list of Optum's competitors. *Id.*, 67:13-17; *see also id.*, 59:1-60:22.

Although Smith and ABC have downplayed both the nature of Smith's work and ABC's plans, it is clear that Smith, who is one of the first 20 employees at ABC, has been hired to develop and provide products and services that ABC will use to compete directly for two of Optum's customers: JPMorgan and Berkshire Hathaway. Smith Testimony, pp. 147:17-151:15; Stoddard Testimony, pp. 89:11-91:20; Wolin Testimony, pp. 144:15-24; Weissel Testimony, pp. 44:13-45:2. That alone would warrant a TRO under controlling law.

But there is much more here. Even though ABC is motivated in these proceedings to cast

---

[6] Even Smith has implicitly acknowledged that ABC and Optum will inevitably compete. Although Smith continues to maintain that he is not violating his noncompete agreements because he is performing only analysis (so far), he tellingly admits, "I don't touch anything to do with pharmacy because I think there's not a lot of competitors in the pharmacy space and so getting involved there would take me relatively close to Optum even if I was just, you know, looking at it broadly, so I try to stay away from that, and then the rest is, you know, we kind of juggle." Smith Testimony, p. 145:2-14. Similarly, one of Smith's responsibilities at Optum was working on population health (Smith Testimony, pp. 200:19-202:13). Stoddard confirmed ABC is making plans to develop a business strategy in precisely that area: "Q. Do you have any plans to develop a population health management strategy? A. Sure." Stoddard Testimony, 95:19-96:5. Smith's participation in that type of competitive behavior is barred by the Agreements.

itself as a company that does not compete with Optum, Stoddard refused to state that *even for the rest of 2019* alone, ABC would not roll out new competitive products. Thus, Stoddard effectively conceded that ABC could (even in ABC's view) be a competitor of Optum's this year. Stoddard Testimony, p. 96:10-12 ("Q. Can you commit that ABC won't compete with Optum during 2019? A. Commit? You know, I don't want to box the company, but that is not in our plans.")

Instead, Stoddard testified only in broad, vague generalities:

Q. What does ABC do?

A. We are focused on improving the health outcomes and experience for the families and employees of the founding entities.

Q. What does that mean?

A. Well, we're still working that out. . . . We've been asked to solve a very big problem, which is figure out new ways of health care. That combined entity is spending $4 billion of its own money. The employees are spending a lot of money. And what they hear and what we hear is that their experience is not ideal. They have a poor experience. They're not getting the care they need, and the costs continues to raise. That is the problem we've been asked to fix. We've been asked to look at the full spectrum of what are the options, how can we crack the code, who can we have partner with, and how can we derive better outcomes, in the order of better experience, better quality and then lower costs.

Stoddard Testimony, p. 90:11-91:3. The need for a TRO is clear.

## ARGUMENT

I. LEGAL STANDARD

A TRO is warranted if the moving party shows that (1) it has a likelihood of success on the merits of its claims, (2) it will suffer irreparable harm if the injunction is denied, (3) a balancing of the relevant equities favors the issuance of an injunction, and (4) the public interest favors the issuance of an injunction. *Oxford Global Res., Inc. v. Guerriero*, No. 03-12078-DPW, 2003 WL 23112398, *4 (D. Mass. Dec. 30, 2003). "The sine qua non of this four-part inquiry is likelihood of success on the merits[.]" *New Comm. Wireless Servs., Inc. v. SprintCom, Inc.*, 287

F.3d 1, 9 (1st Cir. 2002). The Court need not decide the merits of the underlying claims with certainty. *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996).

Optum has satisfied this standard. At this stage (before any document discovery), Optum has established that Smith misappropriated Optum's trade secrets, used them for his interview with ABC, attempted to misappropriate other confidential information, is engaging in competitive activities, and has testified evasively--all in an effort to hide the results of his conduct. That is well more than enough proof to warrant a TRO under controlling law. *See, e.g., Perficient, Inc. v. Priore*, 2016 WL 1716720, at *8 (D. Mass. Apr. 26, 2016) (enjoining employee from working at competitor in violation of restrictive covenants); *SimpliVity Corp. v. Moran,* 2016 WL 5122671, at *4, *13 (Mass. Super. Aug. 14, 2016) (ordering former employee to cease working for competitor for one year due in part to knowledge of "confidential and commercially sensitive information"). Further, Optum is entitled to injunctive relief pursuant to the Massachusetts Uniform Trade Secrets Act ("MUTSA") and the Federal Defend Trade Secrets Act ("DTSA") because Smith's work for ABC – especially given his pre-departure misconduct – threatens the use or disclosure of Optum's trade secrets.

II.    OPTUM HAS A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS OF ITS CLAIMS

A.     Optum Has A Strong Likelihood of Success on Its Claim for Smith's Breach of His Agreements

Under Delaware law,[7] to succeed on its breach-of-contract claim, Optum must establish "(1) . . . a valid, enforceable contract; (2) [a] breach [of defendant's] obligations under the terms of that contract; and (3) Plaintiff suffered damages." *UtiliSave, LLC v. Miele*, 2015 WL 5458960, at *5 (Del. Ch. Sept. 17, 2015). Optum satisfies these elements.

---

[7] All four Agreements state that Delaware law governs. NQ Awards, ¶ 15; RSU Awards, ¶ 11(h).

1.      _The Noncompete and Nondisclosure Provisions are Narrow, Valid, and Binding_

Delaware courts enforce these covenants when they "(i) adhere to general principles of contract, (ii) are reasonable in scope and duration, (iii) advance the legitimate economic interests of the party enforcing the covenant, and (iv) survive a balance of the equities." *Sensus USA, Inc. v. Franklin*, 2016 WL 1466488, at *7 (D. Del. Apr. 14, 2016) (internal quotations omitted).

The Agreements adhere to general contract principles of mutual assent and consideration. There is no dispute here that Smith received valuable restricted stock units and options to purchase shares of UnitedHealth Group Incorporated Common Stock in exchange for signing the Agreements. *See Newell Rubbermaid Inc. v. Storm*, 2014 WL 1266827, at *6 (Del. Ch. Mar. 27, 2014) (employer and employee entered into enforceable contract when employee "accepted a benefit from her employer, additional [restricted stock units], which she supported with new consideration, such as the post-employment restrictive covenants.").

The noncompete restriction in the Agreements also is reasonable in scope and duration: First, the restriction is limited to the United States; given the worldwide reach of Optum's business, that is reasonable. *See O'Leary v. Telecom Res. Serv., LLC*, 2011 WL 379300, at *5 (Del. Super. Ct. Jan. 14, 2011) (holding that "[a] national scope can be particularly necessary in today's world where so many businesses operate on a national or even global scale."). Second, the term of the restriction is reasonable, as it is limited to a period of one year. *See Am. Homepatient, Inc. v. Collier*, 2006 WL 1134170, at *2 n.5 (Del. Ch. Apr. 19, 2006) ("Non-compete agreements covering limited areas for two or fewer years generally have been held to be reasonable.").

The restrictive covenants also advance Optum's legitimate economic interests. An employer's "legitimate interests include preserving employer goodwill and protecting an employer's confidential information, including . . . pricing, trade secrets and proprietary

information." *Sensus USA, Inc. v. Franklin*, 2016 WL 1466488, at *7 (D. Del. Apr. 14, 2016). Further, restrictive covenants on "key employees" with access to proprietary information serve legitimate interests. *See Delaware Exp. Shuttle, Inc. v. Older*, 2002 WL 31458243, at *15 (Del. Ch. Oct. 23, 2002) (noncompete enforced against employee who had "critical insights into" former employer's "plans for future business expansion" because employer had "a significant and legitimate interest in seeking to limit [defendant's] competition with it."). The nondisclosure provisions of the Agreements are necessary to protect Optum's trade secrets and confidential information. The confidential information Smith learned while working on Optum's behalf is exactly the type of information courts deem entitled to protection. *See Sensus USA, Inc.*, 2016 WL 1466488, at *7; *Delaware Exp. Shuttle, Inc.*, 2002 WL 31458243, at *15.

Smith's noncompete covenant is relatively narrow, as its restriction is limited to competitive activity concerning any "activity, product or service that [Smith] engaged in, participated in, or had Confidential Information about during [Smith's] last 36 months of employment with [Optum]." This is a far cry from the blanket restriction Smith claims Optum is pursuing. He will not be restricted from working in the entire healthcare industry, but just in areas of the healthcare industry in which he would be likely to rely upon Optum's confidential information. Examples of work he can perform in the healthcare field without running afoul of his noncompete restrictions include the following: "a hospital system. . . . the medical device arena, . . . the life sciences industry, pharmaceutical, biotech. . . . He could go work at a health insurer and most parts of the health insurer, maybe not exactly the pure pop[ulation] health side, but he could go work in that." Weissel Testimony, pp. 62:4-63:9.

Smith was a key employee who was given extensive access to Optum's most critical trade secrets and other confidential information. In *Sensus USA, Inc.*, the court ruled that the former employer's noncompete provision served legitimate business interests because, *inter alia*,

13

the defendant was a "key employee," he "had in-depth information regarding the [company's] proprietary technology" and knowledge of company's prices, business strategy, and he worked on some of the company's largest accounts. 2016 WL 1466488, at *7. Optum's information to which Smith was exposed was precisely the type of "in-depth information" that Optum has a legitimate interest in protecting from disclosure to ABC. *See id*.

Separate from his wrongful misappropriation around the end of his employment at Optum, Smith learned about Optum's confidential and highly sensitive competitive information through his participation in (among other things) high-level meetings. Wolin Aff. ¶ 18. Through such meetings – including the meeting he attended on the same day he received an oral offer from ABC and just one day before he received the final written offer – Smith was exposed to the inner workings of Optum's business, products and strategy, marketing plans, and overall goals and plans, which are not generally known in the industry or to the public. *Id*. ¶¶ 29-30. All such confidential and competitively sensitive matters that Smith learned about during his tenure at Optum are entitled to protection under Delaware law. *See Sensus USA, Inc.*, 2016 WL 1466488, at *7; *Delaware Exp. Shuttle, Inc.*, 2002 WL 31458243, at *15. Accordingly, Smith's restrictive covenants are necessary to protect Optum's legitimate business interests in preventing him from using its information to its detriment and for the benefit of ABC. *See id.*

2. *Smith Has Breached His Agreements, Causing Damage to Optum*

Smith breached his obligations under the Agreements when he accepted employment with Optum's competitor, ABC, in a position in which he will be engaging in an "activity that competes, directly or indirectly" with Optum. Smith admits that he will be developing integrated healthcare programs for at least two of Optum's customers (Smith Testimony, pp. 139:19-149:5) -- such programs are plainly a competitive activity (Weissel Testimony, pp. 44:7-45:2). Accordingly, Smith's work for ABC is barred by the Agreements.

While the evidence establishes that ABC poses a competitive threat and was identified by Smith himself as a competitor, the noncompete provisions in the Agreements apply not only to companies that are Optum's established competitors, as the Agreements expressly bar participation "in any *activity* that competes, directly or *indirectly*" with Optum (emphasis added). Actively working -- as Smith is doing -- to develop and/or identify products to displace Optum's products is self-evidently one such activity. Smith Testimony, pp. 141:6-149:21. The threat of future competition by a new employer warrants an injunction order in these circumstances. *See EDIX Media Grp., Inc. v. Mahani*, 2006 WL 3742595, at *9 (Del. Ch. Dec. 12, 2006).[8]

Smith's knowledge of the relevant market is directly informed by his work for Optum.  If he continues to work for ABC, he will inevitably use Optum's trade secrets to expedite ABC's development of competitive capabilities and products. Stoddard was unwilling to testify that it would take more than a year to commercialize competing products -- but even if it would, Smith's assistance *now* in the development of such products is a direct competitive harm to Optum. Indeed, the most obvious explanation for Smith's misappropriation of trade secrets (addressed below) is his own expectation that having access to Optum's confidential inside information would help him perform his job at ABC.

B.     Optum Has A Strong Likelihood of Success on Its Misappropriation Claims

To succeed on its DTSA claim, Optum must establish that: (1) the plaintiff owned a trade secret; (2) the defendant acquired, disclosed, or used that trade secret through improper means; and (3) the defendant's actions harmed the plaintiff. *Phyllis Schlafly Revocable Tr. v. Cori*, No.

---

[8]  In that case, the court reasoned that the departing employee's work for a new employer justified an award of injunctive relief because, although the new employer did not "engage primarily in activities directly in competition with EDIX's business," it "might eventually compete with EDIX" in two specific areas (the provision of paid-for banner advertisements and modeling services). *Id.* As a consequence, the court entered an injunction barring the defendant from, *inter alia*, directly or indirectly providing (a) advertisements for EDIX's advertisers and (b) modeling services.

4:16CV01631 JAR, 2016 WL 6611133, at *2 (E.D. Mo. Nov. 9, 2016). Here, Smith's possession of and inevitable disclosure to ABC of Optum's highly confidential and trade secret information satisfies these elements.[9] Accordingly, Optum is likely to succeed on its claims for misappropriation of trade secrets under the DTSA and MUTSA.

As a threshold matter, Optum possesses trade secrets (as defined by 18 U.S.C.A. § 1839(3) and G.L. c. 93, § 42(4)) that are well known to Smith: As discussed above, Smith had extensive knowledge of Optum's competitively sensitive, confidential information; all aspects of Optum's product strategy plans; and detailed specifics of Optum's corporate strategy. It cannot be credibly disputed that Smith has extensive knowledge of Optum's trade secrets (indeed, he was directly involved in the development and operation of many of Optum's trade secrets) or that – as stated in his Agreements – he acquired knowledge of trade secrets "under circumstances giving rise to a duty to maintain the secrecy" of it (18 U.S.C.A. § 1839(5)) and to "limit its acquisition, disclosure or use" (G.L. c. 93, § 42(2)(B)(II)). Moreover, Optum closely guarded this information from improper disclosure through a variety of means. As described in Optum's affidavits, Optum's trade secret information is kept confidential and has been developed over a long period of time at great expense to Optum. Accordingly, this information constitutes protectable trade secrets.

Smith used improper means to obtain Optum's trade secrets. Under the DTSA and MUTSA, improper means includes "theft, bribery, misrepresentation, breach or inducement of a duty to maintain secrecy, or espionage through electronic or other means." 18 U.S.C.A. §

---

[9] Smith contends that Optum unfairly alleges that Smith has "stolen" Optum's information and has committed "theft." Smith's Opposition to Motion for a Temporary Restraining Order, p. 5, 6, (Dkt. 23); Defendant's Opposition to Plaintiffs' Motion for an Injunction Pending Appeal and/or an Indicative Ruling, p. 8 (Dkt. 63). Optum has not made any such accusation in court; "misappropriation" is a defined term in the DTSA and MUTSA, and does not require Optum to prove outright theft.  In any event, the facts adduced at the hearing speak for themselves in terms of what happened to the key documents Smith printed.

1839(6) (emphasis added); G.L. c. 93, § 42(2) (substantially the same). Under the Agreements, Smith owes a duty to Optum to maintain the secrecy of its trade secret and confidential information. Smith's inevitable use and disclosure of trade secrets is a breach of that duty of secrecy, which constitutes wrongful means under the DTSA and MUTSA. *Id*. Given this improper conduct, Optum is likely to succeed on the merits of its DTSA and MUTSA claims.

Under the DTSA, this Court may enjoin actual or threatened misappropriation of trade secrets. 18 U.S.C. § 1836(b)(3)(A)(i). The MUTSA similarly provides that "threatened misappropriation may be enjoined upon principles of e*quity, including, but not limited to, consideration of prior conduct and the circumstances of potential use*. . . ."[10] (Emphasis added). M.G.L.A. c. 93, § 42A. Thus, Optum need not wait until the actual use or disclosure of a trade secret to seek injunctive relief.

Smith's conduct, combined with his testimony and testimony of ABC officers, establishes a serious risk that Smith will unlawfully share Optum's confidential information. Indeed, his attempts to access confidential information raised red flags among his colleagues and supervisor even before they knew that he was seeking (or had obtained) a job with ABC. Further, Smith's attendance at an all-day strategy meeting, *the very day he was told that he would be receiving his formal written offer from ABC*, is alarming, and it is egregious that he did not

---

[10] The effective date of the MUTSA was October 1, 2018. All of the cases Smith cites in support of his argument that "Optum's Trade Secret Misappropriation Claims Will Fail" (Opposition, Dkt. # 23, pp. 11-13) predate MUTSA. That is significant, as MUTSA now expands the availability of injunctive relief when there is actual or threatened misappropriation (as there is here), as follows:

> (a) Actual or threatened misappropriation may be enjoined upon principles of equity, including but not limited to consideration of prior party conduct and circumstances of potential use, upon a showing that information qualifying as a trade secret has been or is threatened to be misappropriated. . . .

Mass. Gen. Laws Ann. ch. 93, § 42A (West). This language expanded even on the Uniform Trade Secrets Act insofar as it added, "upon principles of equity, including but not limited to consideration of prior party conduct and circumstances of potential use," making clear the ability of the courts to enjoin *threatened* use or disclosure that is *inevitable*.

excuse himself from the confidential discussions during that meeting. Smith's pre-departure conduct ensured that he had an up-to-the-minute roadmap of Optum's products and business strategy. ABC's knowledge of Optum's strategy would allow it to unfairly compete with Optum.

If Smith continues to work for ABC, then the secrecy of Optum's information will be in immediate and constant jeopardy, thereby placing Optum at a significant, unfair competitive disadvantage. Optum legitimately enforces it noncompete agreements in circumstances in which it is difficult for a former employee to avoid sharing those secrets (wittingly or unwittingly) when he works for a competitor. Given Smith's extensive access to Optum's trade secret information, his studying of the information in connection with his departure, his likely retention and mishandling of that information as revealed through forensic analysis and testimony, and his work for ABC in a position in which it will be impossible for him not to draw upon Optum's confidential and trade secret information, Optum has demonstrated a likelihood of success on its claims for trade secrets misappropriation. Accordingly, regardless of Smith's breach of the Agreements, Optum is separately entitled to an order barring Smith from using or disclosing Optum's trade secrets and from working for ABC.

III.   OPTUM WILL SUFFER IRREPARABLE HARM IF SMITH IS NOT ENJOINED IMMEDIATELY

Optum will suffer irreparable harm if a TRO does not issue due to Smith's wrongful conduct in (a) violating his restrictive covenants and (b) currently or imminently exploiting Optum's trade secrets and other confidential information in competition with Optum. Smith contractually committed himself in the Agreements not to work for a competitor or to share Optum's confidential information -- but his employment with ABC does exactly what he promised not to do: places Optum's confidential and trade secret information in grave and immediate risk of disclosure.

As a threshold matter, "When a plaintiff demonstrates likelihood of success on a misappropriation of trade secrets claim, it need not prove irreparable injury because such harm is presumed." *EchoMail, Inc. v. Am. Express Co.*, 378 F.Supp.2d 1, 4 (D. Mass. 2005); *Optos, Inc. v. Topcon Med. Sys.*, Inc., 777 F.Supp.2d 217, 241 (D. Mass. 2011). Regardless, Courts in the District of Massachusetts have recognized that an employer suffers irreparable harm when a former employee will inevitably disclose the employer's trade secrets or confidential information. *See Lombard Med. Techs. Inc. v. Johannessen*, 729 F. Supp. 2d 432, 435 (D. Mass. 2010) (enforcing a noncompetition agreement because, even in the absence of misappropriation of any confidential information, the former employees would "not begin at [the new employer] with 'a tabula rasa with respect to'" their former employer's confidential information); *Corp. Techs., Inc. v. Harnett*, 943 F. Supp. 2d 233, 243 (D. Mass.), aff'd, 731 F.3d 6 (1st Cir. 2013) (finding irreparable harm because the defendant "cannot wipe his mind of the confidential . . . information he learned while employed at [plaintiff] and will inevitably call upon that information" when working for his new employer). The DTSA also provides for protection in the event of "actual *or threatened* misappropriation." 18 U.S.C. § 1836 (b)(3)(A)(ii) (emphasis added); s*ee also Oneida Grp. Inc. v. Steelite Int'l U.S.A. Inc.*, 2017 WL 6459464, at *8 (E.D.N.Y. Dec. 15, 2017) (denying motion to dismiss misappropriation claims under the DTSA where the allegation of a threat of misappropriation was sufficient).

Smith cannot possibly separate the information that he learned at Optum -- even before his misconduct -- from the work he intends to perform for ABC. ABC hired Smith to develop products that will compete with Optum's products; in performing that job, it is inevitable that Smith will rely upon and disclose Optum's trade secret and confidential information. Such disclosure will cause Optum irreparable harm by undermining the substantial time, effort, and expense that Optum has invested in creating and safeguarding its products and its business

strategies. *See Marcam Corp. v. Orchard*, 885 F. Supp. 294, 297 (D. Mass. 1995) ("There is no

way to assess the amount of loss . . . sustain[ed] due to the dissemination of highly confidential

material."); *TouchPoint Solutions, Inc. v. Eastman Kodak Co.*, 345 F. Supp. 2d 23, 28 (D. Mass.

2004) (recognizing the irreparable harm that "once a trade secret is lost, it is gone forever").

Even if ABC does not roll out a competing product for more than a year, Smith was hired to

assist ABC in developing such a product -- and the inside information he acquired at Optum will

surely speed competing products to market.  That is a competitive harm to Optum *now*, not only

when the competing product emerges.

Smith's pre-departure misconduct (and continued denial of wrongdoing) underscores the

certainty (and certainly the likelihood) that he will continue to use Optum's trade secrets for his

own benefit and for ABC's competitive advantage absent immediate injunctive relief pending

arbitration. The resulting risk to Optum is compounded by ABC's unwillingness to disclose facts

surrounding current and planned business activities and its haphazard approach to ensuring

Smith's compliance with his legal obligations to Optum. ABC refuses to disclose details about

what Smith will be doing at ABC or even what its own plans for the next year are. But we know

that Smith "is involved with the process of helping [ABC] to determine what [its] strategy should

be," Stoddard Testimony, p. 91, which is precisely what he did for Optum.

Even while ABC refuses to be forthcoming about Smith's job or its own plans, ABC

expects Optum to take ABC at its word that it will not allow Smith to use Optum's confidential

information at ABC. See Affidavit of John Stoddard ("Stoddard Aff.," Dkt. # 23-2), ¶¶ 20, 22-

25. To that end, ABC has cherry-picked areas of healthcare to exclude from Smith's scope of

work (to date), including pharmacy, health care benefits administration, and specialty networks.

See Stoddard Testimony, pp. 101-102; see also Stoddard Aff., ¶¶ 20-22. But ABC's self-imposed

precautions reflect *its own* view of what constitutes Optum's confidential information (not

Optum's actual knowledge of that information); and ABC's approach relies on Smith to self-police, even in the face of his suspicious behavior at the end of his tenure at Optum. See Stoddard Testimony, p. 102 ("We are not putting [Smith] on anything that we know of in the public domain that relates to anything with Optum, and we have asked him to identify anything that we're not aware of that might overlap with what he has done with Optum and share that with [Optum's in-house counsel]."); see also Stoddard Aff., ¶¶ 20-25. This is not nearly enough.

As this Court observed, every day that Smith works at ABC is another opportunity for him to use Optum's trade secrets and other confidential information. And the longer Smith works at ABC, the more entrenched he becomes in the company and the greater the risk his employment poses to Optum. Among other things, ABC fosters a "collaborative" working environment and has not implemented any technical mechanisms for preventing Smith from placing Optum's confidential information on ABC's systems, or accessing areas of ABC's systems where his knowledge of Optum's confidential information would be useful.[11] Stoddard Testimony, pp. 105:16-106:10. At this point, it is inevitable that Smith will – intentionally or unintentionally – use or disclose Optum's trade secrets in the course of his collaborative work at ABC, where there are no absolute firewalls in place.[12]

---

[11] Stoddard describes a so-called "protocol" that is intended to keep Smith from working on projects at ABC that "reflects back on the work he did at Optum." Stoddard Testimony, pp. 100:19-102:12. However, Smith and Stoddard were unable to provide any substantive details about how the protocol is supposed to operate and how, if at all, it is enforced. Optum disagrees that ABC is the best authority to protect Optum's trade secrets, and, so long as Smith is working in this small (20 employee) collaborative environment, no protocol – whether voluntary or court-ordered – will provide failsafe security of Optum's trade secrets and other confidential information. In this regard, Stoddard's inability to provide a workable description for the "population health management" that Smith worked on while he was at Optum, and the "pieces of what [Smith is] doing" in population health management at ABC (Stoddard Testimony, pp. 102:16-104:25; Smith 201:22-202:21) illustrates that it would be impractical to enter a TRO that would merely prohibit Smith from working on specific matters while at ABC, as opposed to an order barring him from working there altogether for the near term.

[12] Even if Smith's conduct had been above board and he had been forthcoming and honest in his affidavit and testimony, the risks he poses are still too great to allow him to remain at ABC. This Court's decision in *Aspect Software, Inc. v. Barnett*, is particularly instructive, and the reasoning applies equally here:

IV.   THE BALANCE OF THE EQUITIES SUPPORTS THE ISSUANCE OF A TEMPORARY RESTRAINING ORDER

The Court must balance any "potential harm caused to [Plaintiff] by a denial of its motion . . . against any reciprocal harm caused to [Defendant] by the imposition of an injunction." *TouchPoint Solutions, Inc. v. Eastman Kodak Co.*, 345 F. Supp. 2d 23, 32 (D. Mass. 2004). Optum's likelihood of success on the merits and irreparable harm tips the balance of equities in its favor. On one hand, if a TRO is granted, Smith would simply be required to honor his Agreements. *Singh v. Batta Envtl. Assocs., Inc.*, 2003 WL 21309115, at *9 (Del. Ch. May 21, 2003) (ruling that noncompete is not oppressive because its enforcement did not leave well-educated defendant without financial support, and it was not unreasonable to require defendant to "choose between (i) reducing the scope of his . . . business to comply with the noncompetition provision, or (ii) working in a different field in which he is adequately trained . . . , or (iii) simply waiting until the noncompetition period expires."). Further, ABC is paying for Smith's attorneys' fees and it will continue to pay Smith's salary notwithstanding any order requiring Smith to sit on the sidelines for a period of time. Smith Testimony, pp. 133:11-134:9; Stoddard Testimony, p. 108:5-10.

On the other hand, Optum is seeking to protect itself from an unfair competitive threat and threat of imminent use and disclosure of some of its most valuable confidential

---

[W]hat [Smith] knows about [Optum] is bound to influence what he does for [ABC], and to the extent it does, [Optum] will be disadvantaged. Other courts in this district, faced with similar circumstances, have concluded that even sincere, scrupulous efforts by an employee and his or her new employer to protect a prior employer's trade secrets are insufficient to remove the threat of irreparable harm via disclosure of trade secrets. . . . Accordingly, . . . [Optum] has carried its burden of establishing a significant risk of irreparable harm absent preliminary injunctive relief.

*Aspect Software, Inc. v. Barnett*, 787 F. Supp. 2d 118, 130 (D. Mass. 2011) (quoting *Marcam Corp*, 885 F. Supp. at 297).

information.[13] *See TP Group–CI, Inc. v. Vetecnik,* 2016 WL 5864030, at *2 (D. Del. Oct. 6, 2016) ("Defendant's extensive knowledge of Plaintiff's confidential information would make 'his competition with plaintiff's business . . . particularly effective and unfair,' tipping the balance of equities in favor of enforcement."), quoting *McCann Surveyors, Inc. v. Evans*, 611 A.2d 1, 4 (Del. Ch. 1987). Because all equity concerns point in the direction of granting an injunction, this Court should grant this Motion.[14]

## V.   THE PUBLIC INTEREST WILL NOT BE ADVERSELY AFFECTED BY ENFORCEMENT OF THE AGREEMENTS

While this Court is required to consider the impact on the public interest, there is no detrimental impact – and indeed there are positive public implications – for holding Smith to his Agreements and for prohibiting him from using misappropriated confidential information. Both because of the public interest in upholding contracts and the public interest in preventing individuals from misappropriating trade secrets, enforcement of the Agreements is consistent with the public interest (including as demonstrated by the recent enactment of both the DTSA and MUTSA). Smith, for his part, has advised this Court that he thinks "[t]his is a case where the

---

[13] Smith claims that this action was filed for improper purposes, variously alleging that Optum is motivated by the "illicit purpose" of showing other Optum employees a "scalp on a stake" to say "you try it, too, and this is what will happen to you," and that this lawsuit was filed to "intimidate a company in its nascent stages." TRO Hr'g Tr. Jan 30, 2019, p. 80:4-20. Smith's rhetoric is wholly without merit and is directly contradicted by Weissel, who testified that this action is not "any type of personal vendetta," attempt to smear Smith, or an effort to intimidate Optum's employees. Weissel Testimony, p. 49:10-17. Indeed, Optum is judicious about when it enforces its noncompete agreements. *Id.*, p. 46:24-47:25; 63:10-22.  In this case, Optum legitimately decided to enforce its agreement.

[14] Optum anticipates that Smith will advise this court that on February 14, 2019, he offered to stipulate to emergency arbitration proceedings and that he will argue that he, therefore, has addressed Optum's concerns about the ongoing threat of irreparable harm caused by the passage of time since this case was commenced. Smith's offer to stipulate to emergency arbitration is a red herring, not to mention contrary to his argument that the parties should stick to their arbitration agreement. That agreement expressly incorporates AAA Employment Arbitration Rules. But it does *not* incorporate the AAA's rules governing emergency arbitration. Instead, it expressly designates courts of law as the forum for resolving exigent matters on an injunctive basis. Optum has several reasons for excluding the emergency arbitration rules from its policy, including that there is no opportunity for the parties to weigh in on the selection of an emergency arbitrator and the practical challenge of finding an arbitrator on short notice who is not conflicted.

public interest is a nonfactor." Smith's Reply in Support of his Motion to Stay Proceedings, Dkt. # 46, p. 5.

## **CONCLUSION**

This is an open and shut case for a TRO. Smith violated his noncompete, and with each passing day is misappropriating Optum's most important trade secrets. Smith's tortured litigation strategy has made it painfully clear that his only real goal here is to make it as difficult as possible for *anyone* to unwind the clock on the damage he already has inflicted on Optum. Smith is out of those options. The Court should minimize the harm and enter a TRO immediately.